# 18-16700

IN THE

## United States Court of Appeals

FOR THE NINTH CIRCUIT



REYNALDO GONZALEZ; THE ESTATE OF NOHEMI GONZALEZ;
BEATRIZ GONZALEZ, Individually and as Administrator
of the Estate of Nohemi Gonzalez; JOSE HERNANDEZ;
REY GONZALEZ; PAUL GONZALEZ,

*Plaintiffs-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellee.*

───────────

*Appeal From the United States District Court for
the Northern District of California, Oakland
Case No. 4:16-cv-03282-DMR, Magistrate Judge Donna M. Ryu*

## JOINT BRIEF FOR PLAINTIFFS-APPELLANTS

Keith L. Altman
Daniel W. Weininger
EXCOLO LAW
*Attorneys for Plaintiff-Appellant
Reynaldo Gonzalez*
26700 Lahser Road, Suite 401
Southfield, Michigan 48033
516-456-5885

Robert J. Tolchin
Meir Katz
THE BERKMAN LAW OFFICE, LLC
*Attorneys for Plaintiffs-Appellants
The Estate of Nohemi Gonzalez,
Beatriz Gonzalez, Individually and
as Administrator of the Estate of
Nohemi Gonzalez, Jose Hernandez,
Rey Gonzalez and Paul Gonzalez*
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627

# **Table of Contents**

TABLE OF AUTHORITIES ...................................................................*iii*

INTRODUCTION ............................................................................... 1

PERTINENT AUTHORITY ................................................................ 2

JURISDICTIONAL STATEMENT ...................................................... 2

ISSUES PRESENTED......................................................................... 3

STATEMENT OF THE CASE.............................................................. 3

    A.   The Murder of Nohemi Gonzalez ................................................ 3

    B.   ISIS' Operations on November 13, 2015 .................................... 4

    C.   ISIS' Dependence on YouTube.................................................... 6

    D.   Google's Actual Knowledge of its Support of ISIS..................... 8

    E.   Material Support: Communications ........................................... 11

    F.   Material Support: Networking ................................................... 14

    G.   Material Support: Financial Contribution ................................. 16

    H.   Material Support: Content Creation .......................................... 17

    I.   The Anti-Terrorism Act............................................................. 19

    J.   The Communications Decency Act............................................ 20

    K.   Procedural History.................................................................... 26

SUMMARY OF ARGUMENT ........................................................... 27

STANDARD OF REVIEW ................................................................ 30

ARGUMENT

    I.   Section 230 Does not Apply Extraterritorially........................... 31

    II.   Rule 12(b)(6) Dismissal for an Affirmative Defense is Inappropriate Since the Complaint Does Not Make the Defense Inevitable ................................................................................. 39

    III.   Plaintiffs ATA Claims are Properly Stated ............................... 41

A.   The Claims for Secondary Liability are Plainly Proper ................. 41

    1.   Aiding and Abetting ................................................ 43

    2.   Conspiracy ............................................................ 47

B.   The Claims for Primary Liability are Likewise Proper ................... 49

IV.   Section 230(c)(1), Even if Applicable, Provides No Defense ................. 54

A.   Section 230(c)(1) Does Not Shield Google for Content it Created ............................................................................ 55

B.   Section 230(c)(1) Does Not Shield Google for Content it Developed ........................................................................ 58

C.   Plaintiffs' Claims do Not Seek to Hold Google Liable as a Publisher ........................................................................ 61

V.   Even if the ATA and §230(c)(1) are in Tension, the ATA Must Control ................................................................................ 63

A.   Section 230(c)(1) Can Never Apply Against the ATA, Which Civilly Enforces Criminal Counter-Terrorism Provisions ...................................................................... 63

B.   Section 230(c)(1) Can Never Apply Against JASTA ..................... 64

C.   Expansive Common Law Interpretations of §230(c)(1) Must Yield to the Clear Text of the ATA ................................. 66

D.   Principles of Statutory Interpretation Favor the ATA, the More Specific, Later-Enacted Statute ............................... 66

E.   Alternatively, the Later-Enacted ATA Should Be Deemed to Have Implicitly Repealed §230 to the Extent of the Conflict.......... 68

VI.   The District Court's Dramatic Expansion of §230 Yields Absurd Results, Divorces §230 From its Objectives, and Neuters the ATA ........ 69

CONCLUSION .................................................................. 70

STATEMENT OF RELATED CASES ............................................. 71

CERTIFICATE OF COMPLIANCE

ADDENDUM

## <u>Table of Authorities</u>

### <u>Cases</u>

*Ashcroft v. ACLU*,
    535 U.S. 564 (2002) ....................................................................... 23

*Barnes v. Yahoo!*,
    570 F.3d 1096 (9th Cir. 2009) .......................................... 24, 35, 61-62, 66-67

*Bennett v. Mueller*,
    322 F.3d 573 (9th Cir. 2003) .......................................................... 39

*Boim v. Holy Land Found.*,
    549 F.3d 685 (7th Cir. 2008) (*en banc*)................................................. 1, 47, 51

*Boim v. Quranic Literacy Inst. & Holy Land Found.*,
    291 F.3d 1000 (7th Cir. 2002) ....................................................... 51

*Cal. Pub. Employees v. WorldCom*,
    368 F.3d 86 (2d Cir. 2004) ............................................................ 68

*Cohen v. Facebook*,
    252 F.Supp.3d 140 (E.D.N.Y. 2017)................................................. 37

*DeHoog v. Anheuser-Busch*,
    899 F.3d 758 (9th Cir. 2018) .......................................................... 30

*Doe v. GTE Corp.*,
    347 F.3d 655 (7th Cir. 2003) ..................................................... 25, 39

*Doe v. Internet Brands*,
    824 F.3d 846 (9th Cir. 2016) ...................................................... 25, 55, 61

*Doe I v. Nestle USA*,
    766 F.3d 1013 (9th Cir. 2014) ..................................................... 32-33

*Fair Hous. Council v. Roommates.com*,
    521 F.3d 1157 (9th Cir. 2008) (*en banc*).......... 22-23, 26, 34-35, 54-56, 58-60

*FDA v. Brown & Williamson*,
  529 U.S. 120 (2000) ..................................................................66-68

*Fields v. Twitter*,
  881 F.3d 739 (9th Cir. 2018)...................................................20, 30, 42, 51-54

*FTC v. LeadClick Media*,
  838 F.3d 158 (2d Cir. 2016) ..........................................................59

*Gomez v. Toledo*,
  446 U.S. 635 (1980) .......................................................................39

*Gonzalez v. Google*,
  335 F.Supp.3d 1156 (N.D. Cal. 2018)..........................................26

*Gonzalez v. Google*,
  282 F.Supp.3d 1150 (N.D. Cal. 2017)..........................................26

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983).................................................42-48

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ...................................................... 1, 47, 49, 65

*Huon v. Denton*,
  841 F.3d 733 (7th Cir. 2016)...................................................58-59

*Jones v. Bock*,
  549 U.S. 199 (2007) .......................................................................39

*J.S. v. Village Voice*,
  359 P.3d 714 (Wash. 2015) (*en banc*)....................................58, 62

*Kiobel v. Royal Dutch Petroleum*,
  569 U.S. 108 (2013) .................................................................32-33, 39

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014)................................................39-40

*Licci v. Lebanese Canadian Bank*,
  834 F.3d 201 (2d Cir. 2016) ..........................................................32

*Linde v. Arab Bank,*
  882 F.3d 314 (2d Cir. 2018) ........................................................ 1, 42, 44, 51

*Linde v. Arab Bank,*
  706 F.3d 92 (2d Cir. 2013) ............................................................... 63

*Mahoney v. Sessions,*
  871 F.3d 873 (9th Cir. 2017) ............................................................ 30

*Matter of Warrant to Search a Certain E-Mail Account,*
  829 F.3d 197 (2d Cir. 2016) ............................................................ 34

*Morrison v. Nat'l Australia Bank,*
  561 U.S. 247 (2010) .................................................................31-32, 34, 39

*New Lamp Chimney v. Ansonia Brass & Copper,*
  91 U.S. 656 (1875) ...................................................................66-67

*Owens v. BNP Paribas,*
  897 F.3d 266 (D.C. Cir. 2018).......................................................... 53

*In re Partida,*
  862 F.3d 909 (9th Cir. 2017) ........................................................... 67

*Perez-Guzman v. Lynch,*
  835 F.3d 1066 (9th Cir. 2016) .......................................................... 67

*Reno v. ACLU,*
  521 U.S. 844 (1997) ..................................................................... 23

*Ricci v. DeStefano,*
  557 U.S. 557 (2009) ..................................................................... 66

*Ricci v. Teamsters Union,*
  781 F.3d 25 (2d Cir. 2015) (*per curiam*)...........................................25, 39-40

*RJR Nabisco v. European Community,*
  136 S.Ct. 2090 (2016) ................................................................32-33, 39

*Rothstein v. UBS,*
  708 F.3d 82 (2d Cir. 2013) ............................................................. 53

*State of Ga. v. Penn. R.*,
  324 U.S. 439 (1945) ....................................................................... 68

*Stratton Oakmont v. Prodigy Services*,
  1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........................... 22

*Tellabs, Inc. v. Makor Issues & Rights*,
  551 U.S. 308 (2007) ....................................................................... 30

*U.S. v. Fausto*,
  484 U.S. 439 (1988) ....................................................................... 66

*WesternGeco v. ION Geophysical*,
  138 S.Ct. 2129 (2018) ................................................. 33-34, 37, 39

*Zeran v. AOL*,
  129 F.3d 327 (4th Cir. 1997) ......................................................... 25

*Zeran v. AOL*,
  958 F.Supp. 1124 (E.D. Va. 1997) ................................................ 25

## **Statutes, Regulations, and Rules**

18 U.S.C.:
  §373 ................................................................................................ 63
  §956 ................................................................................................ 63
  §2331 ............................................................... 19, 32, 41, 60, 67
  §2332 ......................................................................... 49, 60, 63
  §2333 ...................................................................................*passim*
  §2333, note (JASTA §2)...................... 20, 42, 46, 64, 68, Addendum a10-a11
  §2339A .................................................. 1, 8-9, 26, 49-50, 60, 63
  §2339B........................................ 1, 8-9, 26, 49-50, 60, 63-65, 68
  §2339B, note.................................................................64-65
  §2339C............................................................................ 26

20 U.S.C. 4303 ................................................................................ 64

28 U.S.C.:

 §636 ............................................................................................ 64

 §1291 ........................................................................................... 2

 §1331 ........................................................................................... 2

 §3008 ........................................................................................... 64

42 U.S.C.:

 §1988 ........................................................................................... 64

 §7522 ........................................................................................... 36

47 U.S.C. 230 ........................................................................... *passim*

50 U.S.C. 1705 ................................................................................ 26

Anti-Terrorism Act ("ATA"),

 18 U.S.C. 2331, *et seq.* ........................................................ *passim*

Anti-Terrorism Clarification Act of 2018,

 Pub. L. 115-253, 132 Stat. 3183 ............................................. 46, 68

Child Online Protection Act,

 Pub. L. 105-277, 112 Stat. 2681-736 ........................................... 23

Communications Decency Act of 1996 ("CDA"),

 Title V, Subtitle A, of the Telecommunications Act of 1996. Pub. L. 104-104, 110 Stat. 133 ...................................... *passim*, Addendum a2-a8

Justice Against Sponsors of Terrorist Act ("JASTA"),

 Pub. L. 114-222, 130 Stat. 852 ............................................... *passim*

Pub. L. 104-132, Title III, 110 Stat. 1247 ....................................... 68

31 C.F.R.:

 595.201 ......................................................................................... 26

 595.204 ......................................................................................... 26

Fed. R. Civ. P.:

    Rule 8 ............................................................................... 39

    Rule 12 ............................................................. 3, 26-27, 30, 39-41

Fed. R. App. P. 4 ................................................................... 2

**Federal Authority**

H.R.Rep. 104-458 (1996) (Conf. Rep.) ...................................... 22, 34-35

S.Rep. 102-342 (1992) ........................................................ 19, 63

S.Rep. 104-23 (1995) .......................................................... 22, 34

Statement of Alan Kreczko on S. 2465,
    Before the Subcommittee on Courts and Administrative Practice (July 25,
    1990), https://www.state.gov/documents/organization/28458.pdf ......... 19, 63

**Other Authority**

Email from Ralph S. Seep, Law Revision Counsel, to Meir Katz
    (Nov. 6, 2014) .............................................................. 65

*Google parent Alphabet rakes in profit, and YouTube is one of its rising stars*,
    L.A. TIMES, Oct. 27, 2016, https://www.latimes.com/business/
    technology/la-fi-tn-google-youtube-20161027-story.html ........................ 16

Norman Singer & Shambie Singer,
    1A Sutherland Statutes & Statutory Construction § 20:3 (7th ed. 2008) ..... 65

Wikipedia,
    Islamic State of Iraq and the Levant, https://en.wikipedia.org/wiki/
    Islamic_State_of_Iraq_and_the_Levant ("Wikipedia, ISIS") ................... 4, 7
    November 2015 Paris Attacks, https://en.wikipedia.org/wiki/November_
    2015_Paris_attacks ......................................................... 5

YouTube Help, *About targeting for video campaigns*, https://support.google.
    com/youtube/answer/2454017?hl=en (2019) ................................ 17

## BRIEF FOR PLAINTIFFS-APPELLANTS

## INTRODUCTION

For the past many years, YouTube has knowingly hosted ISIS terrorism videos, which feature gruesome murders of helpless ISIS prisoners. Google (through YouTube) has thereby provided ISIS valuable services without which ISIS never could have gained substantial funding or following. Providing that support is a federal crime. 18 U.S.C. §§2339A, 2339B; *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31, 33 (2010).

When terrorism supported by a U.S. defendant causes the murder of a U.S. citizen, her survivors have a private right of action against the providers of that support. 18 U.S.C. 2333; *Linde v. Arab Bank*, 882 F.3d 314 (2d Cir. 2018); *Boim v. Holy Land Found.*, 549 F.3d 685 (7th Cir. 2008) (*en banc*). Plaintiffs lost their only daughter and sister, a U.S. citizen, to ISIS terrorism perpetrated by terrorists who were facilitated by YouTube. They are entitled to damages.

Google seeks to shirk responsibility, hiding behind 47 U.S.C. 230(c)(1), a provision of the Communications Decency Act ("CDA"), enacted to protect Internet providers from liability for removing material objectionable for minors. That provision deems third-party content appearing on a website not attributable to the website. But plaintiffs do not attribute *anything* that ISIS posted on YouTube to

Google. Instead, they assert Google's liability for providing a communications platform to a designated terrorist organization. Section 230 is perfectly irrelevant.

## PERTINENT AUTHORITY

The Addendum contains the entire CDA (as enacted), pertinent portions of the Anti-Terrorism Act, 47 U.S.C. 2331, *et seq.* ("ATA"), the Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 ("JASTA"), and 47 U.S.C. 230, and a table of statutes from U.S.C. Titles 18 and 47 that reflect an intent to limit liability.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. 1331 (federal question) and, alternatively, 18 U.S.C. 2333(a). That court (Ryu, *M.J.*) entered final judgment for the defendant. (1[*]). Because this appeal follows the final judgment of the district court, this Court has jurisdiction under 28 U.S.C. 1291.

Final judgment was entered August 31, 2018. (1) The notice of appeal was timely filed September 9, 2018 (58-61). FRAP 4(a)(1)(A).

---

[*] Unless otherwise noted, parenthetical page citations reference plaintiffs' Record Excerpts. "DE" references district court docket entries.

## ISSUES PRESENTED

1.    Does the ATA subject Google to liability for supporting terrorism?

2.    Does 47 U.S.C. 230(c)(1) apply in cases lacking domestic conduct?

3.    Did the district court properly dismiss the complaint under Rule 12(b)(6) based on §230(c)(1), an affirmative defense, even though the complaint did not facially establish elements of that defense?

4.    Does §230(c)(1) "immunize" Google from liability for its own tortious conduct, like facilitating terrorist networking and influencing terrorist conduct?

5.    Does §230(c)(1) "immunize" Google for material support of terrorism simply because its acts of material support involved publication (broadly defined)?

6.    Assuming §230 otherwise applies, must it yield to the ATA's prohibition against material support of terrorism?

## STATEMENT OF THE CASE

### A.   The Murder of Nohemi Gonzalez

Nohemi Gonzalez, a U.S. citizen (88), was a first-generation Mexican-American, born in California. (172). "[H]appy" and "hard-working," she was within a year of becoming the first in her family to graduate college. *Id.* The first semester of her senior year, she studied abroad in Paris. It was her first time living in Europe. (171-72).

-3-

On Friday, November 13, 2015, Nohemi and her friends dined at La Belle Équipe, a lively Paris bistro on Rue de Charonne. At 9:36 p.m., three ISIS[1] terrorists fired bullets into the crowd of diners. Nohemi, just 26 and in the prime of her life, was one of 130 innocent civilians murdered that night. (162, 171-72).

Nohemi's senseless murder devastated the plaintiffs, Nohemi's father, mother, step-father, and brothers. (88-89, 173).

### B.    ISIS' Operations on November 13, 2015

Nohemi's murder was part of a broader ISIS campaign, aided significantly by YouTube. (86-88, 136). The evening of her murder, three ISIS cells conducted coordinated mass-casualty attacks on crowds gathered at popular sites in Paris, aiming to kill as many innocent people as possible. The first cell carried out three suicide bombings outside the crowded National Stadium. Minutes later, the second fired automatic rifles from a car, killing scores of people (including Nohemi) before detonating a suicide bomb inside Le Comptoir Voltaire café. The third attacked the

---

[1] This foreign terrorist organization has been known by many names, including Islamic State of Iraq and Syria ("ISIS"), *Daesh*, *al-Qaeda* in Iraq, and the "Zarqawi Network." (107-11); Wikipedia, Islamic State of Iraq and the Levant, https://en.wikipedia.org/wiki/Islamic_State_of_Iraq_and_the_Levant ("Wikipedia, ISIS").

crowded Bataclan Theatre, taking up strategic positions within the hall, took hostages, and shot many concert-goers. The attacks paralyzed Paris (159-62).[2]

ISIS had targeted France for terrorism over a year before Nohemi's murder. (87, 136, 150-57). In September 2014, ISIS used YouTube to disseminate a video of its spokesman urging ISIS supporters worldwide to take vengeance against the United States and European states, specifically mentioning France. (151-52).[3] The next month, ISIS used YouTube to disseminate a video featuring a French-speaking terrorist threatening France with terrorism and imploring Muslims in France to "attack any civilian." (153-54). The video warned Frenchmen that they are not "safe anywhere in France." *Id.*

In January 2015, terrorists attacked innocent civilians in the office of the *Charlie Hebdo* satire magazine. (155-56). Shortly afterward, an ISIS terrorist shot dead a French police officer and five civilians, holding many more hostage. (156). ISIS prominently praised these attacks and the attackers. *Id.* The next month, ISIS used YouTube to disseminate a video of a French ISIS leader praising both attacks and calling for more attacks in France—"[k]ill them with knives[!]"—and threatening more terrorism. (156).

---

[2] For more on these attacks, see Wikipedia, November 2015 Paris Attacks, https://en.wikipedia.org/wiki/November_2015_Paris_attacks.

[3] ISIS's interest in France stemmed in part from France's participation in the multilateral military campaign against ISIS. (87, 161-62).

That summer, after arresting and interrogating an ISIS terrorist, French police learned that Abdelhamid Abaaoud, ISIS' principal commander in Europe who would eventually murder Nohemi Gonzalez (172), had been training recruits to use hand grenades and assault rifles, instructing them to target crowds. (157). He promised recruits that by killing innocent people, they could transform France's foreign policy. *Id.* By September 2015, ISIS had already begun moving its operatives into place for the November 13 attack. (157-62).

The day after the Paris attacks, ISIS used YouTube to claim responsibility. (162-63). It kept using YouTube over the following months, repeatedly releasing videos in French—some featuring gruesome executions—praising the November 13 attacks and threatening new attacks, instilling fear in the French people (136, 163-71), just as it had done before the attacks (136; *see also* 87, 151-54).

## C. ISIS' Dependence on YouTube

ISIS uses violence to influence policy. Its use of violence is calculated to impact people who were *not* present at the attack and did *not* personally witness the violence. Its objective is to instill terror in the general public and, thereby, influence government and other decision-makers. (117-18, 136; *see also* 119-35). ISIS trades primarily in psychological warfare, not physical violence. Violence and death are merely tools its uses to conduct its psychological warfare. *Id.*

ISIS has been continuously designated by the federal government as an illegal terrorist organization since October 2004 (86) and is similarly designated by the U.N. and many other authorities.[4] Legal barriers that accompany these designations require ISIS leaders and operatives to operate clandestinely. Their ability to meet and coordinate their efforts, interact with the public, and execute psychological warfare are thus severely limited. ISIS depends on the ability to maintain robust communication both within its internal network and with the world outside while remaining hidden "underground." (117-20, 129, 134-35, 185) ("The impact and effectiveness of ISIS terrorism...are dependent upon ISIS's ability to communicate its messages and reach its intended audiences, without intermediaries and without interference.").

YouTube makes that possible. "YouTube...has become an essential...part of ISIS's program of terrorism." (118; *see also* 86-87). Through YouTube, ISIS leaders, operatives, and recruits can communicate and coordinate their terrorist activities from essentially anywhere. ISIS uses YouTube to execute "essential communication components" of its terror attacks and

> for recruiting, planning, inciting, ...to issue terroristic threats, attract attention to its terror attacks and atrocities, instill and intensify fear from terror attacks, intimidate and coerce civilian populations, take credit for terror attacks, communicate its desired messages about the terror attacks, reach its desired audiences, demand and attempt to obtain

---

[4] Wikipedia, ISIS, *supra*.

results from the terror attacks, and influence and affect government policies and conduct.

(118).

YouTube proved essential in enabling ISIS to "grow, develop, and project itself as the most feared terrorist organization in the world." (86-87, 117, 135-36). The U.K. Parliament's Home Affairs Committee found in 2016: "The use of the internet to promote radicalisation and terrorism is one of the greatest threats that countries...face." (186). It charged social media companies, like Google, with "*consciously* failing to combat the use of their sites to promote terrorism and killings" noting that "Networks like...YouTube are the vehicle of choice in spreading propaganda and they have become *the* recruiting platforms for terrorism." *Id.* (emphasis added). As one Mid-East authority reported in August 2015, before Nohemi's murder, "YouTube serves as the main media platform" of ISIS. (177).

### D. Google's Actual Knowledge of its Support of ISIS

Google owns and operates YouTube. (89). It is categorically prohibited from giving ISIS, a designated foreign terrorist organization, any "material support or resources," even in a commercial setting. 18 U.S.C. 2339B. "Material support or resources" is defined to include "any property, tangible or intangible, or service,

including...expert advice or assistance,[5] ...communications equipment, [and] facilities...." 18 U.S.C. §§2339A(b)(1), 2339B(g)(4). Only "medicine [and] religious materials" are excluded from this broad prohibition. *Id*.

Google does not object to this material support prohibition. In fact, its own policies bar designated terrorists and terrorist organizations from using Google's services, including YouTube. (119). But it is public knowledge that Google, through YouTube, enables ISIS to communicate publicly. YouTube disseminates countless grotesque videos, made by ISIS and bearing ISIS's logos and name, depicting the ruthless murder of innocent people by masked monsters. (*See* 63-64). And ISIS and its affiliates maintain many YouTube "channels" and accounts conspicuously bearing ISIS' name and insignia. (120).

Google is plainly aware of ISIS' presence on YouTube. (87-88). Google has received actual complaints from users about ISIS content and affirmatively decided many times *not* to remove it. (174). Google has even affirmatively *approved* certain ISIS videos. (179). Google's reason: The ISIS content does not violate YouTube's internal policies. Of course, Google must abide not just its own policies but also those of Congress, embodied in statutes like §2339B. That statute prohibits Google

---

[5] "Expert advice or assistance" is defined as any "advice or assistance derived from scientific, technical or other specialized knowledge." §2339A(b)(3).

from providing ISIS with material support. Google has repeatedly ignored that prohibition.

Google's tolerance of terror videos has also received public criticism. For instance, Senator Joseph Lieberman, writing as Chairman of the Senate's Homeland Security committee specifically asked Google to remove terror videos from YouTube, noting that the videos "document horrific attacks on American[s]," "provide weapons training," speeches, and "material intended to radicalize potential recruits." (63, 175). When Google refused to remove videos that lacked "violent or hate speech content," Lieberman informed Google that posting videos by designated foreign terrorist organizations "should not be tolerated" "[n]o matter what their content." (175) (emphasis in original). More recently, a Google executive testified before a U.K. parliamentary committee about terrorist content on YouTube. (66-83, 176). That committee subsequently released a formal report charging Google with "conscious[]" acquiescence in the use of YouTube to spread terrorist propaganda. (186). And Google has received significant media attention over terror content on YouTube. In March 2015 alone, just months before Nohemi was murdered, at least five media outlets reported on YouTube's terrorism videos. (179-80).

Google could easily prevent ISIS from using YouTube. Google can electronically identify ISIS's names, symbols, and emblems and either delete or flag for human screening any account, channel, or post with ISIS hallmarks. (185).

Google often chooses not to. Indeed, even when Google has removed accounts, it does little or nothing to prevent terrorists from quickly regenerating those accounts. (185-86). Google's lip service about keeping terrorists off its platform does not match Google's actions and does not describe its true policy. Rather, Google's actual policy allows terrorists to use and benefit from its services. (173-78).

### E.    Material Support: Communications

Through YouTube, Google provides ISIS with an extraordinarily effective vehicle to distribute its speeches and publicize its violent acts. (120). ISIS demonstrated it understood this as early as 2004. It kidnapped American businessman Nicholas Berg and severed his head with a knife on camera. It publicized the execution video by uploading it to a website where it was downloaded "thousands of times"; it "still circulates on the [I]nternet today." (105). *Atlantic* described ISIS' use of the Internet to publicize the Berg execution as "the most successful online terrorist PR campaign ever." (105). ISIS, *Atlantic* explains, "had anticipated the importance of the Internet—an increasingly important weapon in the global terrorist arsenal." (106).

ISIS showed its commitment to a permanent Internet presence in 2006 when it created an affiliate to publish professional video materials on YouTube and elsewhere online. This affiliate, a "milestone on the path of Jihad," was created to "use media as a weapon." (120). In 2013-14, ISIS created three similar affiliates to

further weaponize media. One creates audio content, such as Islamic songs and chants that are often featured in ISIS videos. ISIS terrorists use these songs and chants to excite themselves and strengthen their resolve before executing a terror attack. (121-23). They are so popular that *New Republic* deemed one 2014's Most Influential Song of the Year. (123).

ISIS' media affiliates are incredibly successful at getting attention. One example: A graphic hour-long ISIS video published in 2014 was viewed on YouTube nearly 60,000 times in its first 24 hours online. (125). Their work is extremely disturbing. The complaint highlights many ISIS execution videos available on YouTube. Many feature beheadings, usually performed with small knives. (129-33). One shows an ISIS captive being burned alive in a cage. (133). Another shows caged captives being lowered into the water and drowned. *Id.* And another shows captives being killed by explosive devices strapped to their bodies. *Id.*

YouTube enables ISIS not just to instill fear among its intended victims, but also to raise its standing among like-minded people. YouTube has proven to be a highly effective recruitment tool for ISIS. "Tens of thousands of people from around the world have viewed ISIS's propaganda on YouTube and have been persuaded to travel to Syria and Iraq to join ISIS and engage in its jihad." (126). Many of ISIS' YouTube videos are intended for recruitment. As *Huffington Post* notes, many

videos "are filmed in HD, contain sophisticated graphics and logos, and include English subtitles," suggesting a concerted effort to reach "second generation immigrants, especially the young." (127). Its videos are highly effective indoctrination tools. (127-29). Thanks largely to its aggressive use of YouTube, ISIS recruited more than 30,000 new terrorists since 2014, 250 of them American. (128).

The 12 terrorists responsible for executing the November 13 Paris attacks were recent ISIS recruits. (136-37). The ISIS recruitment networks responsible for recruiting new European ISIS terrorists before November 2015 were known to "use[] and rel[y] on social media to build and maintain connections with ISIS recruits" and made significant use of YouTube in particular "as a primary tool for indoctrination and recruitment to ISIS." (137-40). These recruitment networks posted "sermons, speeches, news events, and other materials" on YouTube specifically to "lure, recruit, and indoctrinate young Muslims to travel to Syria and Iraq to join ISIS." (140-47).

One of these recruitment networks recruited Abdelhamid Abaaoud, who became the operational leader of the November 13 attack. (136, 148, 162). Abaaoud was the driver and one of the gunmen who attacked patrons at La Belle Équipe,

murdering many including Nohemi Gonzalez. (159-60, 172). He used YouTube actively both before joining ISIS in 2013 and afterwards. (148-49).[6]

Thus, one of the three people who shot Nohemi is *known* to have been influenced and indoctrinated by ISIS videos on YouTube.

Abaaoud survived November 13 and was featured in a subsequent ISIS-YouTube video praising the attack in French. (162, 166-67).

### F.   Material Support: Networking

Google does not passively wait for users to find content that interests them. It actively recommends content to users based on its knowledge about the user. (179). People whom Google knows to have interest in ISIS are recommended ISIS videos. (182-85). Thus, Google hands users with a fledgling interest in terrorism and little or no contact with ISIS terrorists a seemingly endless flow of information from ISIS, all while the user remains passive. Indeed, a user watching one ISIS video need not do anything to receive a second one—Google selects and plays the next ISIS video automatically, with no further user input, right after the first video ends. (182-85). Google thus assists ISIS to spread its reach and its message by bringing ISIS content directly to anyone who expresses interest in seeing it. ISIS would have no access to

---

[6] In 2014, Abaaoud posted a YouTube recruitment video featuring himself speaking in French, seeking to encourage others to join him and ISIS. (150).

nearly all of these people but for Google's assistance. (182). Google brings people together who have nothing in common aside from their interest in ISIS. (184).

Google helps ISIS develop its network in other ways. When a user posts new videos to YouTube, everyone who has elected to subscribe to that user's "channel" automatically and instantaneously receives access to that new content. (184). Users who receive that content may then "like" or "share" it, causing Google to make the video available to everyone in the *recipient's* network. *Id.* Google thus facilitates instantaneous communication by ISIS to anyone desiring to receive that communication and even to people who are ambivalent but are friendly with those who do. The final recipient, while remaining passive, gets immediate real-time access to new content, ISIS gets a massive worldwide audience with people it does not know, and Google profits for doing all the work facilitating this unprecedented instantaneous transfer of terrorist content around the globe. *Id.*

According to terrorism expert Gabriel Weinmann, YouTube's "usefulness in facilitating social networking among jihadists" is more significant to ISIS than the videos themselves. (185). Through YouTube, ISIS can "send private messages to other users" and identify other jihadists, creating "a vibrant jihadist virtual community." (185).

### G. Material Support: Financial Contribution

YouTube's business is advertising (178)—it makes its money by selling ads and selectively displaying them to users. One analyst figured in 2016 that YouTube netted $10 billion the prior year, with its profits growing 40% per year.[7] It has an audience of over 1 billion people.[8]

YouTube expands its revenue stream by enlisting its users. It gives users the option of actively participating in YouTube's advertising campaign "AdSense," in exchange for a share of the revenue. (178). YouTube's rules require that Google review and approve each video before that video may be accepted into AdSense. (178-79). When a YouTube user views an approved AdSense video, Google displays that video together with advertisements. Its proprietary algorithms consider what Google knows about the video, the user watching the video, and its advertisements to display the advertisement most likely to get the viewer's attention. (179).

Google has reviewed and accepted certain ISIS videos into the AdSense program. (179). It thus agreed to—and ultimately did!—share advertising revenue with ISIS and its terrorists in consideration for its use of ISIS' videos in the AdSense program. *Id.*

---

[7] *Google parent Alphabet rakes in profit, and YouTube is one of its rising stars*, L.A. TIMES, Oct. 27, 2016, https://www.latimes.com/business/technology/la-fi-tn-google-youtube-20161027-story.html.

[8] *Id.*

Besides AdSense, Google also generates revenue by giving its advertisers the option (for a fee) to target ads to specific users based on their demographics and interests. (181); YouTube Help, *About targeting for video campaigns*, https://support.google.com/youtube/answer/2454017?hl=en (2019). Google shares its revenue from targeted advertising with users who post videos subject to targeted advertising. (181). Google has placed targeted ads together with videos created and posted by ISIS on known ISIS YouTube accounts. Thus, Google again shared advertising revenue with ISIS. *Id.*

Through AdSense and its targeted advertising programs, Google has created a financial incentive for terrorists to post terrorist videos on YouTube. (179). The more interesting and attention-getting videos ISIS posts on YouTube, the more its videos are subject to Google advertising and thus revenue. YouTube is thus a fundraiser for ISIS. (134).

YouTube does more than just raise funds for ISIS. Through its profit-sharing scheme, it *encourages* ISIS to post extreme material on YouTube. Both Google and ISIS benefit monetarily from the web traffic that ISIS' extreme material generates. (179-81).

## H.   Material Support: Content Creation

Google does not merely host ISIS content and play it for anyone interested in it. It also pairs that ISIS content with selected advertising and other videos. Google

aims to give users the most engaging experience possible, considering everything Google knows about that user. Google's proprietary algorithms match the video the user selects with other videos and advertising that, Google expects, will interest the user. (182-83). It exercises unilateral control over that process. *Id.* The page Google displays is thus not just the user-selected video, but a mosaic containing that video, advertising, and other recommended videos. *Id.* For example:



(181). ISIS created the content in its videos. It did not associate the various materials appearing on this and any other YouTube page displaying ISIS content. Google did. (183).

## I.   The Anti-Terrorism Act

Congress enacted the ATA in 1992 as a legal complement to existing criminal penalties for terrorism (*see* Pub. L. 99-399, Title XII, 100 Stat. 896 (creating in 1986 what is today Chapter 113B of Title 18)), specifically intending that the civil provisions would not only provide a mechanism for compensating victims of terror, but also serve as an important way to deprive terrorists of financial resources to carry out attacks.[9]

The ATA created civil remedies for individuals injured "by reason of an act of international terrorism," defining "international terrorism" to include "acts dangerous to human life that are a violation of the criminal laws of the United States." 18 U.S.C. §§2331(1), 2333(a). It thus made all the criminal prohibitions against terrorism predicate acts to support claims for civil liability, granting victims

---

[9] State Department Deputy Legal Advisor, Alan Kreczko, testified that the proposed bill "will add to the arsenal of legal tools that can be used against those who commit acts of terrorism against United States citizens abroad." He added:

> We view this bill as a welcome addition to the growing web of law we are weaving against terrorists.... The existence of such a cause of action...may deter terrorist groups from maintaining assets in the United States, from benefiting from investments in the U.S. and from soliciting funds within the U.S.

Statement of Alan Kreczko on S. 2465, Before the Subcommittee on Courts and Administrative Practice (July 25, 1990), https://www.state.gov/documents/ organization/28458.pdf. Similarly, a Senate Committee Report explained that the ATA's provision of treble damages "would interrupt, or at least imperil, the flow of money" to terrorist organizations." S.Rep. 102-342 at 22 (1992).

treble damages and attorney's fees. 18 U.S.C. 2333(a). This Court has held that the phrase "by reason of" demands demonstration of proximate causation (but not but-for causation) as a condition precedent to civil recovery. *Fields v. Twitter*, 881 F.3d 739 (9th Cir. 2018).

In September 2016, Congress enacted JASTA, amending the ATA. JASTA makes liable under the ATA "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with [a] person who committed...an act of international terrorism." 18 U.S.C. 2333(d)(2). Congress found: "International terrorism is a serious and deadly problem that threatens the vital interests of the United States." JASTA §2(a)(1), *codified at* 18 U.S.C. 2333, note. Congress' stated purpose in passing JASTA was to provide civil litigants "the ***broadest possible basis***, consistent with the Constitution of the United States, to seek relief against persons...that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities...." JASTA §2(b), *codified at* 18 U.S.C. 2333, note. (emphasis added).

### J. The Communications Decency Act

Congress enacted the CDA as Title V, Subtitle A, of the Telecommunications Act of 1996. Pub. L. 104-104, 110 Stat. 133. (Addendum a2-a8). As originally enacted, the CDA prohibits certain obscene or harassing communications, §502; modifies the penalty for obscene programing on cable television, §503; requires

cable providers to scramble certain cable channels and video programing, §§504-05; authorizes cable operators to refuse certain programing that "contains obscenity, indecency, or nudity," §506; clarifies existing statutory law on the communication of obscene materials by computer, §507; criminally prohibits the coercion and enticement of minors to engage in prostitution or "any sexual act," §508; and includes a provision titled "Online Family Empowerment," which does nothing other than create 47 U.S.C. 230, CDA §509. (Addendum a2-a8). Congress revealed its intent for §230 by placing it within the CDA and titling its enacting provision "Online Family Empowerment"—Congress plainly intended §230 to protect the public generally and children specifically from indecent material. *See* §509; (Addendum a6-a8). Subsection §230(c), which Congress titled "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material" is part of that scheme.

The Senate committee report confirms this. The CDA is intended to

modernize[] the protections in the 1934 Act against obscene, lewd, indecent, and harassing use of a telephone. These protections are brought into the digital age. The provisions increase the penalties for obscene, harassing, and wrongful utilization of telecommunications facilities; protect privacy; protect families from uninvited cable programming which is unsuitable for children; and give cable operators authority to refuse to transmit programs...which contain obscenity, indecency, or nudity. The measure specifically excludes from liability telecommunications and information service providers and system operators who are not themselves knowing participants in the making

or otherwise responsible for the content of the prohibited communications.... *The provisions seek to encourage telecommunications and information service providers to deploy new technologies and policies which would allow users to control access to prohibited communications.* The incorporation of such technology where reasonable and appropriate would be a defense against liability....

S.Rep. 104-23 at 9, 59 (1995) (emphasis added).

The Conference Report likewise describes §230(c) as doing nothing but "protect[ing] from civil liability those providers and users of interactive computer services for actions to *restrict* or to *enable restriction* of access to objectionable online material." H.R.Rep. 104-458 at 194 (1996) (Conf. Rep.) (emphasis added). It explains that the objective of §230(c) is "to overrule *Stratton-Oakmont* [sic] *v. Prodigy*," a New York state court case involving Prodigy's removing some (but not all) defamatory messages on its site. Analogizing to a newspaper publisher, the court reasoned that Prodigy was responsible for the defamatory messages that remained. *Stratton Oakmont v. Prodigy Services*, 1995 WL 323710, *3-*4 (N.Y. Sup. Ct. May 24, 1995). The Conference Report explains that "such decisions create serious obstacles to the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services." H.R.Rep. 104-458 at 194. Clearly, Congress "sought to [protect] the *removal* of user-generated content, not the *creation* of content...." *Fair Hous.*

*Council v. Roommates.com*, 521 F.3d 1157, 1163-64 & n.12 (9th Cir. 2008) (*en banc*) (emphasis in original).

After portions of the CDA were invalidated by *Reno v. ACLU*, 521 U.S. 844 (1997), Congress amended the CDA with the Child Online Protection Act, Title XIV of an omnibus appropriations act. *Ashcroft v. ACLU*, 535 U.S. 564, 569 (2002); Pub. L. 105-277, 112 Stat. 2681-736.[10] Congress made these findings:

> (1) while custody, care, and nurture of the child resides first with the parent, the widespread availability of the Internet presents opportunities for minors to access materials through the [Internet] in a manner that can frustrate parental supervision or control;
>
> (2) the protection of the physical and psychological wellbeing of minors by shielding them from materials that are harmful to them is a compelling governmental interest;
>
> (3) to date, while the industry has developed innovative ways to help parents and educators restrict material that is harmful to minors through parental control protections and self-regulation, such efforts have not provided a national solution to the problem....

*Id.* Again, Congress made clear its intent for CDA was to protect children from indecent material.

Section 230(b) states the relevant federal policy is to ensure "the continued development of the Internet" and the "competitive free market" in which it operates

---

[10] Nothing invalidated by *Reno* or upheld by *Ashcroft* is directly relevant to this litigation.

without significant government regulation while simultaneously "remov[ing] disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." §230(b)(1), (b)(2), (b)(4). The references to developing the Internet, the free market, and government regulation appear *nowhere* else in the CDA. (Addendum a2-a8).

The CDA implements this federal policy, in part, by declaring that "interactive computer services,"[11] such as Google, may not "be treated as the publisher or speaker of any information provided by another information content provider." §230(c)(1). "Publisher" and "speaker" are undefined. The statute does not affect "any...Federal criminal statute," §230(e)(1), but does preempt all inconsistent state and local law. §230(e)(3). It thus creates an affirmative defense for Internet companies like Google from claims that would treat those companies as the publisher or speaker of third-party content. *See* §230(c)(1) & (f)(3).

Section 230 nowhere uses the word "'immunity' or any synonym." *Barnes v. Yahoo!*, 570 F.3d 1096, 1100 (9th Cir. 2009). Indeed, the operative subsection "precludes liability only by means of a definition." *Id.*; §230(c)(1) (defining certain computer services as other than a "publisher" or "speaker"). Plaintiffs are aware of no reference to "immunity" in the legislative history. Many courts nonetheless

---

[11] "Interactive computer service" is defined by §230(f)(2).

describe §230(c) as creating "immunity." That word was first used about §230 by *Zeran v. AOL*, 958 F.Supp. 1124 (E.D. Va. 1997), which used the term without explanation (*e.g.*, *id.* at 1134). The Fourth Circuit followed the district court's lead precisely, making "immunity" part of §230 doctrine. *Zeran v. AOL*, 129 F.3d 327, 328 (4th Cir. 1997). The use of that term is unfortunate because it is confusing. Section 230(c)(1) simply creates an affirmative defense, no different from any other affirmative defense. *Ricci v. Teamsters Union*, 781 F.3d 25, 28 (2d Cir. 2015) (*per curiam*); *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003); *see also Zeran*, 129 F.3d at 329-30 (calling §230(c)(1) an "affirmative defense").

To prevail on this affirmative defense, a defendant must show 1) it provides an "interactive computer service" and 2) a claim[12] based on information provided exclusively by "another information content provider" that 3) would treat the defendant as the publisher or speaker of that information. *Doe v. Internet Brands*, 824 F.3d 846, 850 (9th Cir. 2016). An "information content provider" is "any person or entity that is responsible, *in whole or in part*, for the *creation or development* of information provided through the Internet or any other interactive computer service." §230(f)(3) (emphasis added). Thus, §230 withdraws its defense from any

---

[12] *Doe* speaks specifically of a "state law cause of action," *Doe* 824 F.3d at 850, but the elements are no different for a federal cause of action. *See* §230(c)(1).

defendant that either created or developed (both terms undefined) any part of the offending content. *Id.*; *Roommates.com*, 521 F.3d at 1163.

### K.   Procedural History

Plaintiffs sued under the ATA for Google's knowing provision of high-tech communication, networking, and financial services to ISIS and for its failure to deny those services to ISIS upon learning of its presence on YouTube.

The district court's first substantive opinion dismissed the complaint with leave to amend. (31-57); *Gonzalez v. Google*, 282 F.Supp.3d 1150 (N.D. Cal. 2017). Plaintiffs timely filed an amended complaint (84-194), asserting claims against Google for 1) aiding and abetting and conspiracy under 18 U.S.C. 2333(d), and 2) for direct liability under §2333(a) for Google's violations of a) 18 U.S.C. §§2339A (material support of terrorists), b) 2339B (material support of terrorist organizations), c) 2339C (concealing the provision of material support), and d) 50 U.S.C. 1705; 31 C.F.R. §§594.201, 594.204 (prohibiting the handling of terrorists' property). (187-92). Google again moved to dismiss under Rule 12(b)(6), arguing that 47 U.S.C. 230(c)(1) immunizes Google. (DE 116). The district court granted that motion in August 2018, incorporating its earlier opinion for particular points. (2-30); *Gonzalez v. Google*, 335 F.Supp.3d 1156 (N.D. Cal. 2018).

The district court held in particular that 1) JASTA does not "repeal section 230(c)(1)" (13, 38-42); 2) §230 applies even as for conduct occurring entirely

overseas (13-14, 42-45); 3) §230 applies even to statutes, like that ATA, that civilly enforce criminal counter-terrorism provisions (14-16, 45-46); and 4) §230 partially "immunizes" Google because a) many of plaintiffs' claims arising from Google's material support of terrorism somehow "seek to treat Google as a publisher or speaker" of ISIS content (17-19, 22-25, 46-51); and b) those same claims do not involve material created or developed by Google (19-22, 51-56). The district court dismissed the remaining claims for failure to meet "the proximate causation standard announced in *Fields*" (26), asserting that the complaint "does not allege any facts plausibly connecting...YouTube with the attack itself." (29).

The district court entered judgment and plaintiffs timely appealed. (1, 58-61).

## SUMMARY OF ARGUMENT

The district court erroneously relied on the CDA. The CDA, just as every other federal statute, is presumed to operate only domestically. The ATA, which creates a cause of action for *international* terrorism, was intended to operate extraterritorially. Nothing in the CDA suggests intent for extraterritorial application. And nothing of any significance to this case occurred in the United States. Thus, the CDA plays no role. Moreover, because the district court was deciding a Rule 12(b)(6) motion, it needed to accept the complaint's well-pleaded allegations as true, giving plaintiffs the benefit of every inference, and determine whether the complaint states a viable cause of action. Whether the defendant has a defense was irrelevant,

unless the complaint itself makes application of that defense inevitable. The district court looked beyond the complaint, applying an affirmative defense not made inevitable by it.

Defendant's motion to dismiss should have been denied; plaintiffs' claims are all properly stated and supported by well-pleaded allegations. Plaintiffs alleged that ISIS committed an act of "international terrorism" causing Nohemi Gonzalez' murder. Google knowingly and intentionally aided ISIS for many years and throughout the period preceding Nohemi's murder, despite knowing that ISIS is a designated foreign terrorist organization that regularly illegally kills people, and for its own pecuniary benefit. That suffices to support plaintiffs' secondary liability claims under 18 U.S.C. 2333(d). Plaintiffs' claims for primary liability under §2333(a) require plaintiffs to allege only that Google knowingly materially supported ISIS and its terrorists and that its material support proximately caused plaintiffs' injuries. Plaintiffs' many material support allegations are unquestionably sufficient. And they have adequately alleged "some direct relationship" between Google's material support and Nohemi's murder—for example, that the ISIS commander who directed the terror attack and who personally shot Nohemi was radicalized and recruited to ISIS by YouTube videos.

While not relevant, the CDA provides no affirmative defense to these claims. Section 230(c)(1) creates an affirmative defense only for third-party content that was

-28-

neither created in part nor developed in part by the defendant. The ISIS videos posted on YouTube were created in part by Google in that Google arranged them with other material to interest Google's users and draw as much attention to the ISIS videos as possible. It developed the videos in part by encouraging ISIS to post them for its own pecuniary benefit and by using those videos to facilitate connections between ISIS and people everywhere who otherwise would have no contact with ISIS, illegally enabling ISIS to reach and influence far more people. Additionally, §230(c)(1)'s defense applies only against claims that assert a "duty" deriving "from the defendant's status or conduct" as a publisher or speaker of third-party content. Plaintiffs' claims arise from Google's duty not to support terrorists and do not depend on Google's status as a publisher.

Moreover, even if §230(c)(1) otherwise excused Google's conduct, it would not apply here. *First*, the ATA's civil provisions are intended to aid the enforcement of federal counterterrorism laws. Because §230, on its own terms, does not impair "enforcement of...any...Federal criminal statute," §230(e)(1), it does not impair the ATA. *Second*, Congress intended JASTA to supersede any inconsistent statute. JASTA created the ATA's secondary liability provision, §2333(d), long after the CDA was enacted. If the CDA is inconsistent with JASTA, JASTA must control. *Third*, any tension between §230(c)(1) and the ATA derives from common law— judicial construction and interpretation of §230—not the statutory language. That

common law must yield in the face of later contrary statutory enactments. *Fourth*, with no alternative, more general statutes and those enacted earlier (like the CDA) must be interpreted narrowly to permit broader application of more specific later-enacted statutes (like the ATA). *Fifth*, applying §230(c)(1) here would transform §230 into a statute seemingly designed to facilitate the spread of terrorism. An interpretation so obviously the *opposite* of what Congress intended should be shunned.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's grant of a motion to dismiss under Rule 12(b)(6), accepting all factual allegations in the complaint as true and construing them in the light most favorable to the [plaintiffs]," *Fields*, 881 F.3d at 743, drawing "all inferences" in their favor. *Mahoney v. Sessions*, 871 F.3d 873, 877 (9th Cir. 2017).

Courts deciding a Rule 12(b)(6) motion "must consider the complaint in its entirety" along with "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007).[13]

---

[13] The district court erroneously refused to take judicial notice of certain publicly-available government documents, reproduced in the Record Excerpts (62-83), because "Plaintiffs did not authenticate" them. (10). *First*, these documents are quoted prominently in the complaint and are thus incorporated therein. (175-76); *DeHoog v. Anheuser-Busch*, 899 F.3d 758, 762 (9th Cir. 2018). *Second*, there is no

## **ARGUMENT**

### **I.    Section 230 Does not Apply Extraterritorially**

"[L]egislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States" because Congress "is primarily concerned with domestic conditions." *Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 255 (2010). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.*

Lamenting that many courts had long "disregard[ed] the presumption against extraterritoriality," *Morrison* hoped to finally demonstrate that the Court takes the doctrine seriously. *Id.* at 255, 261. Recognizing that the presumption against extraterritoriality is not usually self-executing because "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States," *Morrison* noted that the presumption "would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved." *Id.* at 266 (emphasis in original). Instead, *Morrison* emphasized, only certain especially significant contacts count in the extraterritoriality analysis. *Id.*

The district court failed to heed *Morrison*. It erroneously relied on §230(c)(1) to dismiss this case although all acts occurred overseas and §230 permits no

---

need to "authenticate" publicly available government documents on a pre-discovery motion to dismiss. Plaintiffs ask this Court to take judicial notice of these documents.

conclusion that Congress intended §230 to apply extraterritorially. (13-14). Indeed, this is the "rare" easy case that *Morrison* spoke of; it lacks *all* contact with United States territory. It is being litigated here because the ATA, which explicitly applies extraterritorially, grants the family members of U.S. national victims of international terrorism access to U.S. courts, 18 U.S.C. 2333(a), allowing litigation over acts that "occur primarily outside the territorial jurisdiction of the United States." 18 U.S.C. 2331(1).

The district court's first error was doctrinal. It cited *Morrison* for the assertion that "[c]ourts must use a 'two-step framework for analyzing extraterritoriality issues.'" (43) But the Supreme Court never demanded a two-step process. Instead, it stated that in two difficult cases (*Morrison* and *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108 (2013)), the Court had in fact used "a two-step framework for analyzing extraterritoriality issues." *RJR Nabisco v. European Community*, 136 S.Ct. 2090, 2101 (2016). Close cases notwithstanding, it remains true that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.* at 2100. Thus, when "all the relevant conduct...took place outside the United States," the Court's work is done. There is no need to proceed to *Morrison's* two-step analysis. *Id.* at 2100-01 (quoting *Kiobel*); *see also Licci v. Lebanese Canadian Bank*, 834 F.3d 201, 214-15 (2d Cir. 2016); *cf. Doe I v. Nestle USA*, 766 F.3d 1013, 1028

(9th Cir. 2014) (reading *Kiobel* to abandon the two-step test for a class of cases, revealing that it is not essential to the extraterritoriality analysis).

Nohemi Gonzalez was killed overseas by terrorists who planned their actions, communicated, were funded, and operated overseas. The material support the terrorists received from Google derived from Google employees or agents in Ireland, not the U.S. (178). There are no domestic contacts and thus no need for further inquiry; §230 provides no defense to claims arising entirely overseas. That should end the matter.

The district court mistakenly approached the question differently. It presumed a requirement to conduct a two-step inquiry and jumped into the second step without having identified a single important domestic contact. (43). It applied the second step incorrectly as well, as plaintiffs explain shortly.

The purpose of the second step—to be used only in far closer cases—is to "determine whether the case involves a domestic application of the statute" by "looking to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad[.]" *RJR Nabisco*, 136 S.Ct. at 2101. A statute's "focus" is "the object of its solicitude, which can include the *conduct* it seeks to regulate, as well as the *parties* and *interests* it seeks to protect or vindicate." *WesternGeco v. ION Geophysical*, 138 S.Ct. 2129, 2137 (2018) (cleaned

up) (emphasis added). A statute's focus may not be derived "in a vacuum." *Id.* Significantly, courts must identify the focus of the *entire* enactment, not a single provision. *Morrison*, 561 U.S. at 266-68 (referencing "the focus of the Exchange Act" as a whole); *Matter of Warrant to Search a Certain E-Mail Account*, 829 F.3d 197, 217-20 (2d Cir. 2016), *vacated on other grounds*, 138 S.Ct. 1186 (2018). When determining the statutory focus of the entire enactment, "it is helpful to resort to the familiar tools of statutory interpretation, considering the text and plain meaning of the statute, as well as its framework, procedural aspects, and legislative history." *Id.* at 217 (internal citation omitted).

The entirety of the CDA (Addendum a2-a8) and its legislative history (*supra*) make clear that the focus of the CDA (not merely §230) is regulation of indecent and objectionable material on the Internet. Its principal purpose was to facilitate development of blocking and filtering technology. S.Rep. 104-23 at 59; H.R.Rep. 104-458 at 194; *see also Roommates.com*, 521 F.3d at 1163-64 & n.12. Section 230, enacted under the title "Online Family Empowerment" (Addendum a6), implements that objective by removing the threat of liability for editing third-party content, a significant obstacle to voluntary editing.

Moreover, even if §230's focus is considered independent of the rest of the CDA, as the district court erroneously did (14), its focus is likewise not limiting liability. The statute does not mention "immunity" nor any synonym and addresses

liability in just one subsection of the statute not relevant here. §230(c)(2); *see Barnes*, 570 F.3d at 1100. The operative provision appears under the title "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material"; §230 should be interpreted consistent with that caption. *Roommates.com*, 521 F.3d at 1164. Its purpose, as a part of the CDA, is to prevent objectionable material from being attributed to the website where it appears, making it safer for Internet companies to self-regulate content. H.R.Rep. 104-458 at 194 (Conf. Rep.); *Roommates.com*, 521 F.3d at 1163-64 & n.12.

If Congress intended §230(c)(1) to limit liability, it would have said so. Plaintiffs surveyed the civil statutes in Titles 18 and 47 (where the ATA and §230 are codified, respectively) and identified 65 instances, reproduced in the Addendum, where Congress *expressly* limited civil liability. (Addendum a17-a28). One such example is §230(c)(2): Congress declared certain Internet providers "shall [not] be held liable on account of" either of two specified actions. §230(c)(2). As that provision and the rest of the Addendum make clear, Congress uses explicit language to create liability exceptions. Section 230(c)(1) lacks this language. Liability limitation, standing alone, is thus not intended by §230(c)(1) and is certainly not its *focus*.

To determine the focus of that singular provision, one must consider its unusual language. The construct "no...shall be treated as" appears just 68 times in

-35-

the United States Code (38 of those instances are in the Tax Code). Of those, just *one* expresses an intent to limit liability: 42 U.S.C. 7522(a) provides that certain actions "shall not be treated as *a prohibited act* under [another provision]." §7522(a) (emphasis added). An important distinction exists between §7522(a) and §230: The former states that the subject act is not to be treated as a "prohibited act," while §230 states that certain Internet providers are not to be treated "as [a] publisher or speaker," with neither term defined. Clearly, §230(c)(1) is intended simply to bar application of certain rules applicable to publishers and speakers, not to specifically limit liability. Any liability limitations effected are incidental to the statute's actual objective: enabling Internet providers to *remove* objectionable content by ensuring that any material left behind is not attributable to them.

The only contacts germane to the extraterritoriality analysis are contacts relevant to the CDA's focus, <u>the relevant objectionable material appearing on the Internet</u>. Here, all such contacts are in France, possibly Belgium, and, if Google manually reviewed the postings, possibly Ireland, where that review would have occurred (178). These are the locations where the offensive content was posted to YouTube, the intended recipients were located, YouTube's services forged relationships and enabled communication among terrorists, any complaints about the posts were likely made to Google, and Google possibly reviewed the offensive content. *Nothing occurred in the United States.*

Even so, the district court held that "the focus of section 230(c)(1) is on limiting civil liability." (13). Its *only* authority for that conclusion is a district court decision now on appeal, *Cohen v. Facebook*, 252 F.Supp.3d 140 (E.D.N.Y. 2017) (2d Cir. No. 18-397). (13, 43-44). It does not bear its own weight:

1.    A statute's "focus" is not determined "in a vacuum." *WesternGeco*, 138 S.Ct. at 2137. The 26 words of §230(c)(1) limit liability (to facilitate removal of offensive content). They are part of the 4,478 words of the Communications *Decency* Act, designed to protect children from objectionable material. The focus of 4,478 words cannot be determined by looking only at 26.

2.    A statute's focus is "the *conduct* it seeks to regulate, as well as the *parties* and *interests* it seeks to protect or vindicate." *Id.* (emphasis added). Limiting liability is neither conduct, nor party, nor interest that Congress desires to protect or vindicate. It cannot fairly be described as the "focus" of a statute.

3.    The relief provided by a statute "is not necessarily its focus." *Id.* at 2138. Relief is simply "the means by which the statute achieves its end." *Id.* Section 230(c)(1) indeed limits liability. But that is just how the statute "remove[s] disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material" with minimal government interference. §230(b).

-37-

By calling §230's limitation on liability the CDA's "focus," the district court conflated focus and effect.

4.    Declaring that the *focus* of the CDA is "limiting civil liability" oversimplifies matters. If Google used its website to steal users' bank information, its liability certainly would not be limited by the CDA, which has nothing to do with bank fraud. The "focus" of the CDA must relate in some way to how, where, and why the statute operates, not merely what it does, stated broadly.

5.    If Congress had desired §230(c)(1) simply to limit liability of Internet companies, it would have said so, as it did in the adjacent (but irrelevant) §230(c)(2) and elsewhere. (*See* Addendum a17-a28).

6.    By the district court's rationale, every statute that in some way constrains a cause of action to particular facts (such as creating an element of a claim), shortens a statute of limitations, or limits jurisdiction, would likewise have the focus of limiting liability. A statutory focus cannot be simply to limit (or expand) liability. Indeed, even a tort reform statute—reflecting a policy of limiting liability— would not have the "focus" of liability limitation. The focus of such a statute would be regulating compensation to victims of tortious injury. The extraterritoriality analysis would look not to the location of the court but to the location of the tortious conduct or the plaintiff's injuries.

Erroneously concluding that the CDA's focus is limiting liability, the district court held that the relevant contact is the place where Google's liability is to be limited, its own courtroom. (13). Its holding erroneously renders the CDA, and every other liability-limiting statute, exempt from the presumption against extraterritoriality. But the Supreme Court has issued four opinions since 2010 (*Kiobel*, *Morrison*, *RJR Nabisco*, and *WesternGeco*) aimed at getting lower courts to take the presumption against extraterritoriality seriously.

## II.  Rule 12(b)(6) Dismissal for an Affirmative Defense is Inappropriate Since the Complaint Does Not Make the Defense Inevitable

Section 230(c)(1) provides an affirmative defense no different from any other affirmative defense. *GTE Corp.*, 347 F.3d at 657; *Ricci*, 781 F.3d at 28; *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); (*see* 198-200). Thus, a defendant must raise it in an answer, Rules 8(c) & 12(b), and must plead the elements of the defense. *Jones v. Bock*, 549 U.S. 199, 211-12 (2007); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant."); *Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003).

Google has not filed an answer. It asserted §230 "immunity" in its motion to dismiss. But "[a]ffirmative defenses do not justify dismissal under Rule 12(b)(6); litigants need not try to plead around defenses." *GTE Corp.*, 347 F.3d at 657. Plaintiffs did not have to try to plead around §230. Courts may dismiss an action

under Rule 12(b) based on an affirmative defense not listed in Rule 12(b) *only* when "the statute's barrier to suit is evident from the face of the complaint." *Ricci*, 781 F.3d at 28; *Klayman*, 753 F.3d at 1357. Google nowhere argued its entitlement to dismissal is facially evident from the complaint. The district court thus twice erred, *first* shifting Google's burden to prove *its* affirmative defense onto plaintiffs, and *second* finding that affirmative defense applicable despite the complaint not making its application inevitable.

*Ricci* and *Klayman*, both affirming Rule 12 dismissals under §230, provide the district court no support. *Ricci* was an action for defamation. *Ricci*, 781 F.3d at 27. The complaint stated claims against a computer service, treating it as a publisher or speaker of information written by others. *Id.* The *Ricci* plaintiffs thus pleaded the elements of §230(c) on the face of the complaint. *Id.* at 28. *Klayman* involves claims for assault and negligence for the defendant's failure to delete threatening or dangerous social media posts. *Klayman*, 753 F.3d at 1356-57. The *Klayman* plaintiff asserted that the defendant had assaulted him. *Id. Klayman* held the complaint facially pleaded a §230 defense by attributing the content of a third-party to the defendant, treating it as the "publisher" of that content. *Id.* at 1357-59.

Plaintiffs' complaint here certainly does not facially plead a §230 defense. It plausibly alleges, as plaintiffs explain *infra*, that Google is both a creator and developer (at least "in part" (§230(f)(3))) of the offending content. Similarly, the

complaint pleads that speaking and publication have *nothing* to do with their ATA claims and that the acts complained of are not the acts of a traditional publisher (*see infra*).

Google believes it can nonetheless prove entitlement to the §230 defense. It may try, but only after the parties have had discovery and the case progresses to summary judgment or trial. The district court's resolution of the §230 affirmative defense at this stage improperly addressed the defense before the claim.

## III.   Plaintiffs' ATA Claims are Properly Stated

Plaintiffs' ATA claims come in two forms. Some are for direct liability under 18 U.S.C. 2333(a). Those claims assert that Google directly violated the prohibition against "international terrorism" in 18 U.S.C. 2331(1), actionable under §2333(a). Plaintiffs separately assert that Google is secondarily liable under §2333(d) for ISIS' "international terrorism." Both sets of claims survive Rule 12(b)(6).

### A.   The Claims for Secondary Liability are Plainly Proper

Google asserted no deficiency in plaintiffs' secondary liability claims. (DE 116). The district court did not find any. It dismissed those claims solely based on "section 230 immunity." (26). This Court should affirmatively hold that there are no deficiencies with those claims.

The ATA authorizes substantive causes of action for aiding and abetting and conspiracy liability. §2333(d). Plaintiffs pleading secondary liability need *not* allege

that the secondary actor (here, Google) proximately caused the injury.[14] Rather, they must allege only that "the...*terrorists* who committed the...attacks at issue caused plaintiffs' injuries." *Linde*, 882 F.3d at 331 (emphasis added). Plaintiffs easily meet that standard. (159-62). Indeed, ISIS publicly admitted its responsibility for the November 13 terror attacks on Paris. (163-64).

Congress directed courts to follow *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), in assessing secondary liability under the ATA. *Linde*, 882 F.3d at 329; JASTA §2(a)(5), *codified at* §2333, note. Given its significance to secondary liability claims under the ATA, we start with a brief review of *Halberstam*:

Linda Hamilton was the "passive but compliant partner" to a burglar named Welch. 705 F.2d at 474. Hamilton did not participate in the burglaries—she might not have even known that burglaries were happening—but she knew "that something illegal was afoot," and she helped convert stolen property and accounted for the resulting cash. *Id*. at 486-87. After Welch killed one of his victims during a burglary, the victim's family and estate successfully sued Hamilton on theories of aiding and abetting and conspiracy.

---

[14] *Fields* (discussed below) does not even mention JASTA or §2333(d), which does not repeat the phrase in §2333(a) that occupied *Fields'* attention: "by reason of." *See* 881 F.3d at 743-48; §2333(d). That language requires only that the *primary* actor (here, ISIS) proximately caused the plaintiffs' damages through "international terrorism" (here, the Paris attacks). *Fields*, 881 F.3d at 744-48; §2333(a).

After surveying case law governing aiding and abetting and civil conspiracy, the D.C. Circuit affirmed Hamilton's liability. *Halberstam*, 705 F.2d at 479-86. *Halberstam* found Hamilton liable even though nothing suggested that her back-office activities caused the murder or that she was even aware of the burglaries (let alone the murder). As for aiding and abetting, *Halberstam* held it sufficed "that she knew [Welch] was involved in some type of personal property crime at night," "because violence and killing is a foreseeable risk in any of these enterprises." *Id.* at 488. As for conspiracy, *Halberstam* held "a conspirator can be liable even if he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy." *Id.* at 487.

With these holdings in mind, we consider the elements of aiding and abetting and conspiracy.

### 1.   *Aiding and Abetting*

To plead aiding and abetting, the complaint's allegations must support the plausible inference that "(1) the party the defendant aid[ed]...perform[ed] a wrongful act that cause[d] an injury; (2) the defendant [was] generally aware of his role" in the "overall illegal or tortious activity"; and "(3) the defendant...knowingly and substantially assist[ed] the principal violation." *Id.* at 487-88. "[Any] person who assists in a tortious act may be liable for other reasonably foreseeable acts done in

connection with it," even if the secondary actor lacked knowledge of the other connected acts. *Id.* at 484. Thus, noted *Halberstam*, a thirteen-year-old boy could properly be held secondarily liable for a church fire arising during a break-in by boys seeking soft drinks, despite that he had nothing to do with the fire. *Id.* at 482-84 (citing *Am. Fam. Mut. v. Grim*, 440 P.2d 621 (Kan. 1968)).

The first element is not disputed: ISIS wrongfully killed Nohemi Gonzalez. (159-60). The second element requires allegations suggesting only that Google was "generally aware" of its role in some tortious activity, not that it knew of any specific activity or even the nature or extent of the damages. *Halberstam*, after all, found Hamilton "generally aware" of her role in Welch's criminal activities despite not being specifically aware of any of them. *See id.* at 488. Plaintiffs have adequately pleaded facts sufficient to support the plausible inference that Google was generally aware of its role in facilitating ISIS' terrorism, despite having no prior knowledge of any of its attacks. (*See*, *e.g.*, 120, 134, 174-76, 179-80, 185-86); *see also Linde*, 882 F.3d at 329-30.

The third element, knowing substantial assistance, is necessarily less straight-forward because it involves balancing various factors, each with "many variables," in a "calculus" that courts must use to determine whether the assistance provided was adequately substantial. *Halberstam*, 705 F.2d at 483, 488. *Halberstam* articulates six factors—no one of which is dispositive and the weight of each in the

calculus is undefined. *Id.* at 478, 483-84, 488 & n.13. Notably, the contributing activity need not be "nefarious," it merely needs to be substantial. *Id.* at 482.

The first factor, the "nature of the act encouraged" is most significant here. *Halberstam* explains that the type and extent of support necessary will vary depending on what the primary tortfeasor did. *Id.* at 484 & n.13. Less support might be sufficient if it causes the victims to suffer severe injuries (like death). Similarly, less support is sufficient as for "particularly bad or opprobrious acts." *Id.* In other words, "a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." *Id.* The act here, terrorism causing mass death, is "particularly bad."

The second factor, "the amount [and kind] of assistance," looks not to the dollar value of the support rendered but to the support's significance in "prompting the tort." Support "integral" to the wrongful act is more likely to be found adequately "substantial." *Id.* at 484, 488. ISIS' operations and attacks at issue were theoretically possible without Google, but they would have been far less likely. ISIS' development from a backwater organization operating in the shadow of *al-Qaeda* to "one of the largest and most widely-recognized and feared terrorist organizations in the world" is due largely to YouTube. (*See* 86, 102-13, 117-36), Further, at least one of the three people who murdered Nohemi was radicalized on YouTube. (148-50, 159-60, 172).

-45-

Google was admittedly not present at Nohemi's murder, just as Hamilton was not present at Welch's murder. But, like Hamilton, "[Google]'s role in [the business] was substantial." *Halberstam*, 705 F.2d at 488. Thus, Google's absence from the murder does not cut against its liability.

The fourth factor, Google's relation to ISIS and its terrorists, likewise supports Google's liability. Google profited from its arrangement with ISIS. (178-81). The more people who view ISIS' videos, the more Google profits. Thus, Google benefits from and has an incentive to facilitate interest in ISIS videos, such as by encouraging or facilitating ISIS' posting of controversial and extreme material.

The fifth (Google's "state of mind") and sixth ("duration of assistance") factors likewise balance in favor of liability. Google knew or was indifferent to the fact it was engaged in the material support of ISIS for years and even ratified ISIS postings, allowing ISIS to participate in special revenue-sharing programs with Google. (178-81).

Finally, given the strong federal policy against terrorism and it supporters, continually re-affirmed by Congress (Congress again *unanimously* amended the ATA in October 2018, strengthening it further[15]), extending to terror victims "the broadest possible basis" for civil recovery even against indirect supporters of terrorism (JASTA §2(b), 18 U.S.C. 2333, note), this Court should recognize that the

---

[15] Anti-Terrorism Clarification Act of 2018, Pub. L. 115-253, 132 Stat. 3183.

scales that weigh "substantial assistance" must be properly calibrated to fairly address terrorism in the digital age. *Halberstam* made clear that law governing secondary liability is still being developed and must not be viewed as "immutable" but will "be adapted as new cases test [its] usefulness in evaluating vicarious liability." *Halberstam*, 705 F.2d at 489. *Halberstam* thus had no problem modifying the definition of "substantial assistance" (adding a sixth factor to the Restatement's list of five). *Id.* at 478, 484. This Court should follow suit. Old modes adequate when actors interacted face-to-face are no longer adequate, at least in terrorism cases. One who knowingly gives significant support to a designated foreign terrorist organization should be liable as an abettor of terrorism *per se*. *See Boim*, 549 F.3d at 698; *Holder*, 561 U.S. at 29-32; (117). "[V]iolence and killing," after all, "is a foreseeable risk" of any significant support of terrorism. *See Halberstam*, 705 F.2d at 488.

### 2. *Conspiracy*

Civil conspiracy demands no showing of substantial assistance. *Id.* at 478. Its elements are "[1] an agreement to do an unlawful act or a lawful act in an unlawful manner; [2] an overt act in furtherance of the agreement by someone participating in it; and [3] injury caused by the act." *Id.* at 487. *All* members of a conspiracy "are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy." A conspirator who knew nothing of a particular injurious act and enjoyed no direct

benefit from that act is still liable, "so long as the purpose of the tortious action was to advance the overall object of the conspiracy." *Id.* at 481.

The second and third elements of conspiracy are not disputed. The "overt act" required in the second element is the ISIS terror attack here at issue. *See id.* at 477, 487. And Nohemi's death at ISIS' hands is not in question.

As to the first element: "[A] tacit, as opposed to explicit, understanding [between the parties] is sufficient to show agreement" for civil conspiracy. *Id.* at 477, 487. The evidentiary threshold is rather low. Even at trial, plaintiffs will need to produce only "indirect" or "circumstantial" evidence from which the jury will be able to "infer" the existence of a tacit agreement between ISIS and Google. *Id.* at 480, 486. Thus, at the pleading stage, they need only plausibly allege circumstances suggesting Google and ISIS tacitly worked in tandem to achieve ISIS' "international terrorism," as defined by §2331(1).

Plaintiffs allege ISIS and Google "tacit[ly]" (*id.*) reached an agreement, reflected by Google's knowing and repetitive tolerance of ISIS' presence on YouTube (*see*, *e.g.*, 87-88, 120, 134, 174-76, 179-80, 185-86), to facilitate ISIS' terrorist operations. (189) ("Google...conspired with ISIS, its members[,] and affiliates...."). ISIS certainly benefits, as detailed extensively above. Google likewise benefits because ISIS' extreme rhetoric brings people, and thus advertising revenue, to Google. That Google benefits from the arrangement is evident from its actions:

Google knowingly permitted, and sometimes affirmatively authorized, ISIS terrorists to operate on YouTube, sometimes after shutting down an ISIS account only to allow it to reactivate after a short period. (*E.g.*, 174, 179, 185-86). The acts contemplated by this agreement are unlawful in that they violate 18 U.S.C. §§2332, 2339A, and 2339B. (187). Plaintiffs have met their pleading burden.

## B.    The Claims for Primary Liability are Likewise Proper

All one must do to violate 18 U.S.C. 2339B is "knowingly provide[] material support or resources to a foreign terrorist organization," knowing that the organization is a foreign terrorist organization, but not necessarily desiring to further its terror activities. §2339B; *Holder*, 561 U.S. at 30-31, 33. "Material support" is defined so broadly as to include nearly anything, "tangible or intangible," except for "medicine [and] religious materials." 18 U.S.C. §§2339A(b)(1), 2339B(g)(4). "Material support" includes even the provision of "technical or specialized knowledge." §2339A(b)(3).

The complaint alleges (providing specific examples) that Google provided valuable services to ISIS that undoubtedly meet the broad statutory definition of "material support." (120, 126-29, 173-86). It also alleges facts from which it may reasonably be inferred that Google knew of or was willfully blind to ISIS' designation as a foreign terrorist organization and that Google knew ISIS had

engaged and engages in terrorist activity as defined by §2339B. (102-13). Plaintiffs thus adequately allege Google's violation of §2339B.

Section 2339A differs from §2339B mainly in that the former applies to the material support of individual terrorists, rather than an organization, and requires that the material supporter "know[] or intend[]" that the material support (defined just as in §2339B) be "used in preparation for, or in carrying out" acts of terrorism. §2339A. Plaintiffs meet this standard as well. The complaint alleges many facts from which it may reasonably be inferred that Google knew that ISIS terrorists were using YouTube to facilitate terrorism. (134, 174, 178-81). The complaint alleges, for example, that ISIS' leaders, including the federally designated terrorists among them, maintain YouTube accounts in their own names, openly displaying ISIS emblems and symbols. (*E.g.*, 151, 174). Google permitted—and even ratified (178-81)—ISIS' presence on YouTube, even though terminating it would have been very "easy." (63, 185-86). Google provided ISIS and its operatives material support in many forms over many years, as detailed above, knowing that ISIS has but one business: terrorism. Thus, it can be reasonably inferred that Google intended that its material support of ISIS be used in the conduct of ISIS' one business.

By properly articulating liability under §§2339A, 2339B, a plaintiff states valid claims against the material supporter under §2333(a), provided that he alleges "acts dangerous to human life" that "appear to be intended" to coerce or influence

government or the civilian population. §2331(1); *see Boim v. Quranic Literacy Inst. & Holy Land Found.*, 291 F.3d 1000, 1015 (7th Cir. 2002) ("If…[defendants] violated…2339A or section 2339B, that…would…be sufficient to meet the definition of 'international terrorism' under…2333 and 2331."); *Linde*, 882 F.3d at 325-26. Plaintiffs meet that standard. *Boim*, 549 F.3d at 690 ("Giving [resources] to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life.'").[16]

Primary liability under §2333(a) (but not secondary liability under §2333(d)) requires that the defendant proximately cause the plaintiffs' injuries. *Fields*, 881 F.3d at 744. Under *Fields*, proximate causation requires a showing of "at least *some* direct relationship between a defendant's acts and a plaintiff's injuries." *Id.* at 748 (emphasis added). Thus, it is insufficient to plead that the defendant "facilitated the [terrorist] organization's growth and ability to plan and execute terrorist acts" as that allegation does not tie the defendant to the plaintiff's injuries. *Id.* at 749-50. But *Fields* does not delineate what allegations are necessary to meet its standard.

---

[16] *Linde*, decided following a trial, is not to the contrary. It held that, at trial, a jury must find that financing the terrorist organization in question was, in fact, "dangerous to human life." 882 F.3d at 327-28. This appeal arises from a Rule 12(b)(6) motion. Plaintiffs' burden is only to create, through their allegations, the plausible inference that Google's support of ISIS was dangerous to human life. They have certainly done so.

The district court claimed to apply *Fields*, dismissing much of the complaint for failure to plead proximate causation. (28). But it offers little analysis:

> Here, the court concludes that the TAC does not meet the *Fields* standard of proximate cause. Specifically, the TAC does not allege a direct relationship between the "material support" that Google allegedly provided to ISIS and the Paris attack.... [T]he TAC does not allege any facts plausibly connecting the general availability of YouTube with the attack itself.

(28). This case and *Fields* are quite different. Plaintiffs allege that ISIS' use of YouTube is significant not just because it facilitates ISIS' planning and execution of terror attacks. YouTube, plaintiffs allege, is also the very vehicle by which ISIS achieves its primary objective: to terrorize and awe the general population. Indeed, the complaint details how YouTube enabled ISIS to become "the most feared terrorist organization in the world." (86, 117, 135-36). It is the very reason ISIS could operate in France, rather than as a small group in Iraq. (*See* 103-113, 117-36, 151-57). The complaint also alleges that ISIS' commanders and spokesmen used YouTube before the Paris attack to encourage its operatives to attack civilians in France. (151-54, 156). It is highly plausible that at least some of those YouTube postings inspired the attack that killed Nohemi. Finally, the complaint details how YouTube's support of ISIS exacerbated plaintiffs' injuries by featuring videos of ISIS terrorists bragging about and praising their heartless murder of Nohemi. (*See*

162-71). These allegations are sufficient to satisfy *Fields'* requirement of "some"[17] or "any"[18] direct connection between the material support and the plaintiffs' injuries. *Cf. Owens v. BNP Paribas*, 897 F.3d 266, 273 n.8 (D.C. Cir. 2018) (stating that there is little or no daylight between *Fields*, on the one hand, and *Rothstein v. UBS*, 708 F.3d 82 (2d Cir. 2013), and *Owens* on the other). The district court paid these allegations no attention.

The connection between Google's support of ISIS and the plaintiffs' injuries runs far deeper. The complaint alleges that the lead commander of the Paris attacks, who was also one of the three people who shot Nohemi, was radicalized by ISIS videos on YouTube. (148-50, 159-60, 172). But for those YouTube videos, Nohemi's killer likely never would have joined ISIS. Additionally, the complaint creates the plausible inference that many other ISIS terrorists, including others involved in the Paris attacks, were radicalized by YouTube. (136-51).

The district court considered the latter allegations, rejecting them by improperly granting *Google* the benefit of every inference. (28-29). Its principal conclusion was that the complaint does not specifically allege that the "Zerkani Network," one of the three recruiting networks responsible for recruiting ISIS'

---

[17] *Fields*, 881 F.3d at 744-49 (using the phrase "some direct relation[ship]" 15 times).

[18] *Id.* at 749-50.

terrorists during the relevant period, used YouTube. (28-29). That is false. The complaint states the Zerkani Network "used and relied on social media to build and maintain connections with ISIS recruits." (140). Moreover, given all else the complaint states on the topic, one should (indeed, at this stage, *must*) infer that all of ISIS' recruiters during the relevant period used YouTube extensively. The district court's contrary inference was erroneous. And no matter what the Zerkani Network was doing, the complaint alleges that Abaaoud was radicalized on YouTube and, upon joining ISIS, used YouTube extensively to radicalize others and communicate with ISIS terrorists and others. (148-50). Plaintiffs' allegations certainly create "some direct relationship" between the material supporter and the plaintiffs' injuries, satisfying *Fields*. (*Contra* 29). It "strains both credulity and English," *Roommates.com*, 521 F.3d at 1166, to conclude that allegations linking Google's support directly to the terrorist who killed Nohemi does not create some—"any"— direct relationship between the two.

## IV.    Section 230(c)(1), Even if Applicable, Provides No Defense

The "Internet has outgrown its swaddling clothes and no longer needs to be...gently coddled." *Roommates.com*, 521 F.3d at 1175 n.39. It "has become...the preeminent...means through which commerce [and much else] is conducted.... [I]ts vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress...." *Id.* at 1164 n.15. With §230,

Congress created a narrow defense necessary to facilitate the removal of offensive content and the development of blocking and filtering technology, nothing more.

This Court need not even reach §230 for reasons explained above. If it does, it will have three independent reasons for finding that §230 provides Google no defense. Section 230's reach should not be expanded, wrongly transforming it into "an all[-]purpose get-out-of-jail-free card" for social media companies. *Internet Brands*, 824 F.3d at 853.

### A. Section 230(c)(1) Does Not Shield Google for Content it Created

Only a defendant that "passively displays content…created entirely by third parties" is immune under §230(c). *Roommates.com*, 521 F.3d at 1162. Any content the defendant itself "creat[es] or develop[s]," whether "in whole or in part," receives no protection under §230(c)(1) "even if the [content] originated with a [third party]." §230(f)(3); *Roommates.com*, 521 F.3d at 1162-63, 1165. Thus "a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content." *Id.*

The primary concern of *Roommates.com* was defining "development," noting that its meaning must differ from "creation," lest those statutory terms be rendered redundant. *Id.* at 1168. It had no trouble defining "creation." *Id.* We turn to the development prong below but pause to note an important point lost on the district court: *Roommates.com's* definition of "development" has *nothing* to do with the

definition of "creation." The district court conflated the two, using *Roommates.com's* definition of "development" to explain why Google did not "creat[e]" any content. (20-22, 52-54). It erred.

Google did not initially create any ISIS videos or any other ISIS content. But it did pair ISIS content with selected advertising and other videos. (182-83). It did so to engage its users, ensuring that they remain on YouTube for as long as possible, maximizing its advertising revenue and that of ISIS. (52, 182-83). What Google creates is not the content on its website, but the mosaic in which it is presented.

A mosaic is the creation of the artist who assembled it, despite that the artist created neither the stones, nor the color they display, nor the grout adhering them. Rather, he takes objects fully formed before coming into his possession and simply arranges them. One who does it well can amaze,



tell a story,



or transform the mundane.



Google creates mosaics in the course of its business. The more effective its mosaics are in gaining the attention of its users, the more money it makes. Creating potent mosaics is thus a significant part of its business.

Google's support of ISIS turns on YouTube's ability to reach and engage people. The more YouTube manages to bring attention to ISIS, the more people hear its message of terror and the more revenue it receives from Google. Because that support derives largely from Google's effectiveness in choosing and arraigning

content—in creating mosaics—Google may be held liable for that material support notwithstanding §230.

### B. Section 230(c)(1) Does Not Shield Google for Content it Developed

A defendant that assists or "participate[s]," even "in part," in the "development" of "what made the [offending] content unlawful" is not protected by §230(c). §230(f)(3); *Roommates.com*, 521 F.3d at 1162-63. This Court defines "development" as "materially contributing to [the] alleged unlawfulness" of the third-party content in question. *Id.* at 1167-68. Thus, §230(c)(1)'s protections disappear for any website that "contributes materially to the alleged illegality" of the third-party content. *Id.*

Not much is needed to meet that standard: When an Internet provider aggressively uses illegal information as part of its business or "encourage[s] [the posting of] illegal content," it stops being a passive re-publisher and becomes an active participant in the development of that information. *Id.* at 1172, 1175; *J.S. v. Village Voice*, 359 P.3d 714, 717-18 (Wash. 2015) (*en banc*) (holding a website designed to facilitate routine violations of statute unprotected by the CDA). Even merely "encourag[ing]" third parties to post unlawfully defeats §230 immunity. *Roommates.com*, 521 F.3d at 1171; *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016) (encouraging the "most defamation-prone commenters" to write comments

forfeits CDA immunity). Similarly, an Internet provider that unlawfully selectively directs certain content to certain selected users or unlawfully "steer[s] users" to particular information or people forfeits §230(c)(1)'s protections. *Roommates.com*, 521 F.3d at 1167.

Moreover, a defendant may be liable for seemingly re-publishing content of another party, notwithstanding §230, if its presentation or organization of that material is designed or intended to influence the intended recipient's response to that information. *Roommates.com*, 521 F.3d at 1165, 1171. Indeed, action that merely "increase[es] the likelihood that" the intended audience of the information might react in a desired (unlawful) manner renders the defendant an "information content provider," and thus not immune under §230. *FTC v. LeadClick Media*, 838 F.3d 158, 176 (2d Cir. 2016).

Google invites and promotes third-party content. It makes its money by getting its users hooked. It gets its users hooked by, among other things, making outrageous and extreme material that matches their interests easily available to them. When its users are interested in terrorism, Google makes its money by supplying them with extreme material about terrorism. All the better when that material is made by terrorists in the course of their business.

Google uses ISIS' content to bring ISIS to the doorsteps (or living rooms) of people all over the world who have a latent or undeveloped interest in terrorism.

Access to these people is tremendously valuable to ISIS. Google also facilitates ISIS' communication with its own members and recruits, helps with logistics and planning by bringing ISIS information that otherwise would have been difficult to uncover, handles ISIS' public relations by distributing its messages much farther and with far more speed than other media possibly could, and helps ISIS fundraise by bringing ISIS into communication with potential donors that it could not have known about otherwise. And it enables ISIS to communicate directly with its enemies to intimidate them. All that would have been (nearly) impossible without Google's help.[19]

Likewise, Google selectively favors or suppresses ISIS content depending on whether Google believes a given user will be galvanized by it. In the process, Google controls what its users see and how they think to maximize their usage of YouTube.

ISIS authors the content. Google makes it effective.

That is not merely bad, it is criminal. *E.g.* 18 U.S.C. §§2332, 2339A, 2339B. (187). It is grounds for liability under the ATA. 18 U.S.C. §§2331, 2333.

---

[19] None of the forms of material support articulated here are a traditional publishing function like "an editor's minor changes to the spelling, grammar[,] and length of third-party content." *See Roommates.com*, 521 F.3d at 1170.

### C. Plaintiffs' Claims do Not Seek to Hold Google Liable as a Publisher

Section 230 provides a defense only as to claims that "inherently require[] the court to treat the defendant as a 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1102; *see also Internet Brands*, 824 F.3d at 850. The essential question that "courts must ask" is "whether the *duty* that the plaintiff alleges the defendant violated *derives from the defendant's status or conduct* as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1102 (emphasis added). Torts that do not "derive liability from behavior that is identical to publishing or speaking" are not excused by §230(c)(1). *Id.* at 1107 (refusing to apply §230(c)(1) even though defendant was allegedly liable for failing to delete third-party content); *Internet Brands*, 824 F.3d at 853 (refusing to apply §230(c)(1) even though defendant's "[p]ublishing activity is a but-for cause" of plaintiff's injuries).[20]

None of plaintiffs' claims asserts a duty that "inherently requires" a court to treat Google as a publisher or speaker. Nor does the ATA "derive liability" from anything like publishing or speaking. Rather, the ATA imposes on Google "a legal

---

[20] The district court held that *any* claim that requires "recourse" to third-party content falls within the CDA. (17-18, 23-25, 47). This Court's precedent says otherwise.

duty distinct from the [specific] conduct at hand, be it the conduct of a publisher, of a doctor, or of an overzealous uncle." *Barnes*, 570 F.3d at 1107.

Plaintiffs do not attribute the content of any ISIS video or other material to Google. Rather, plaintiffs assert a duty to not support terrorists. That duty does not vary based on content and does not specifically restrict speech. Terrorism can be supported in many different ways. That Google opted to support ISIS through conduct that *might* involve "publication" changes nothing. *See*, *e.g.*, *Village Voice*, 359 P.3d at 722-23 (Wiggins, *J.*, concurring).[21] To illustrate by analogy: The ATA prohibits Walmart from supplying fertilizer, knives, or even food to ISIS. That prohibition does not turn on anything ISIS said or on any background legal duty Walmart might have as a publisher. So too, the ATA prohibits Google from

---

[21] Plaintiffs question whether "publication" is even at issue. If an artist uses a publisher to help sell a painting, the publisher merely supplies the artist with a forum, enabling potential buyers to find the artist, perhaps via the Yellow Pages or a website. YouTube is quite different. When an artist uses YouTube for publicity, posting a video depicting his new painting, YouTube analyzes that video and uses its proprietary algorithms to feed that video to other YouTube users who are interested in similar topics. Within minutes, an art collector who often posts videos about his collection on YouTube might learn of the artist's new video without doing *anything* to search for it. Google determined that the painter and the collector have mutual interests and facilitated or suggested the union of the two. It thus played an active role in facilitating a possible sale. *That is matchmaking or brokerage, not publication*. (*See* 184-85).

supplying ISIS a platform and communications services regardless of the content of ISIS' speech or any background legal duty Google might have as a publisher.

## V. Even if the ATA and §230(c)(1) are in Tension, the ATA Must Control

Because the CDA does not even apply here, and because the CDA does not immunize Google in any event, the CDA presents no conflict with the ATA. But even if it did, that conflict would be resolved in favor of the ATA.

### A. Section 230(c)(1) Can Never Apply Against the ATA, Which Civilly Enforces Criminal Counter-Terrorism Provisions

The CDA explicitly disclaims any impact on "enforcement of...any...Federal criminal statute." §230(e)(1). Congress intended the ATA, which creates a civil remedy for violations of criminal law (18 U.S.C. 2331(1); *see* 18 U.S.C. §§373, 956, 2332, 2339A, 2339B), as an important way to deprive terrorists of financial resources and as part of "the growing web of law we are weaving against terrorists." Statement of Alan Kreczko on S. 2465, *supra*. It was designed and intended to help "enforce[]" federal criminal anti-terrorism statutes. *See Linde v. Arab Bank*, 706 F.3d 92, 112 (2d Cir. 2013) ("[T]he interests of the United States weigh heavily in this [ATA] case, even though it is a private lawsuit brought by individual victims of terrorism."); S.Rep. 102-342 at 22. Thus, on its own terms, the CDA cannot impair enforcement of the ATA. §230(e)(1).

## B.    Section 230(c)(1) Can Never Apply Against JASTA

When Congress amended the ATA through JASTA, it articulated its purpose for doing so. In the process, it announced JASTA's intended scope:

> The purpose of this Act... is to provide civil litigants with the broadest possible basis, *consistent with the Constitution of the United States*, to seek relief against [terrorists and their supporters].

JASTA §2(b), *codified at* 18 U.S.C. 2333, note (emphasis added). The italicized text is anomalous in federal law. As far as plaintiffs are aware, JASTA is the *only* instance of Congress limiting the scope of a civil statute only by the "Constitution" and not also federal "laws" or "treaties."[22] *See*, *e.g.*, 20 U.S.C. 4303(b) ("The Board of Trustees is authorized to...make such rules...not inconsistent with the Constitution *and laws* of the United States...." (emphasis added)); 28 U.S.C. 636(b)(3) ("A magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution *and laws* of the United States." (emphasis added)); 28 U.S.C. 3008 (similar); 42 U.S.C. 1988 ("[T]he common law, ...so far as the same is not inconsistent with the Constitution *and laws* of the United States, shall be extended to and govern...." (emphasis added)).

---

[22] We are aware of just *two* instances in the criminal context. One is at 18 U.S.C. 2339B(i) and the other is codified as a note to §2339B. Both are counter-terrorism statutes closely related to §2333.

-64-

By limiting JASTA only by the Constitution, and not also by federal statute, Congress showed its intent that JASTA should supersede all contrary federal statutes. It had no need to list each preempted statute separately. (*Contra* 40).

The district court erred in refusing to give proper weight to Congress' deliberate decision to prioritize JASTA over all contrary statutes. It labeled JASTA §2(b) a mere "prefatory clause," like a "whereas" clause. (42). It is not. It appears after JASTA's enacting clause ("Be it enacted...") and is thus binding statutory text, no different from any other part of JASTA. *See* Norman Singer & Shambie Singer, 1A Sutherland Statutes & Statutory Construction § 20:3 (7th ed. 2008). While §2(b) does not create any independent substantive rights, it defines JASTA's scope and is controlling. The mere fact that it is "uncodified" (42) reveals nothing other than an "editorial decision" by the Office of Law Revision Counsel to classify §2(b) as a note to an existing provision, rather than as a "free-standing provision," and "has no effect on its validity or application."[23] The district court had no authority to ignore it. *See Holder*, 561 U.S. at 29, 32 (using enacted congressional findings codified as a note to §2339B to inform the interpretation and application of §2339B).

---

[23] Email from Ralph S. Seep, Law Revision Counsel, to Meir Katz (Nov. 6, 2014) (discussing 28 U.S.C. 1610, note) (on file with counsel).

C.  Expansive Common Law Interpretations of §230(c)(1) Must
    Yield to the Clear Text of the ATA

Any "conflict" that might exist between §230 and the ATA is due not to the

text of §230 but to common law expansions of §230. Section 230(c)(1) itself grants

no immunity. All it does is define terms. *See Barnes*, 570 F.3d at 1000. Any

immunity emanating from that statute was created not by Congress but through the

common law as the courts interpreted and applied §230(c)(1).

Resolving this conflict is simple. Common law (even if rooted in statutory

text) is abrogated upon later statutory amendments that alter undermine the common

law. *U.S. v. Fausto*, 484 U.S. 439, 453 (1988). "The classic judicial task of

reconciling many laws enacted over time, and getting them to make sense in

combination, necessarily assumes that the implications of a statute may be altered

by the implications of a later statute." *FDA v. Brown & Williamson*, 529 U.S. 120,

143 (2000) (quotation marks omitted). Thus, if the ATA is inconsistent with

common law surrounding §230(c), that common law is abrogated to the extent that

it conflicts with the ATA.

D.  Principles of Statutory Interpretation Favor the ATA, the More
    Specific, Later-Enacted Statute

Assuming the statutory conflict is real, the preferred method of resolving it is

to read one of the statutes as narrowly as necessary to reconcile them, giving effect

to both provisions. *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009); *New Lamp*

-66-

*Chimney v. Ansonia Brass & Copper*, 91 U.S. 656, 662-63 (1875); *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1074-75 (9th Cir. 2016). When determining which statute to construe narrowly, courts have traditionally favored specific statutes over more generalized ones, *id.* at 1075, and later enacted statutes over earlier ones, especially when a question of federal policy is at issue. *Brown & Williamson*, 529 U.S. at 143; *In re Partida*, 862 F.3d 909, 912 (9th Cir. 2017).

Both factors point to the ATA. *First*, the ATA is exceptionally clear and specific. It provides that victims of terrorism may sue any perpetrator or aider and abettor of "international terrorism," a term defined broadly to reference dangerous criminal acts intended to intimidate or coerce. 18 U.S.C. §§2331(1), 2333. It imposes liability on the facts alleged here and can be read no other way. It contains no exception for Internet-based claims. In contrast, §230 is a rule of general applicability that says nothing of immunity and operates only by defining terms, *Barnes*, 570 F.3d at 1100, requiring only that Google not be "treated as the publisher or speaker" of the offending posts by third-party terrorists. §230(c)(1). No matter what §230(c) might mean when read while not in conflict with the ATA, once in conflict with the ATA, it *must* be construed narrowly to reconcile it with the more-specific ATA. *Perez-Guzman*, 835 F.3d at 1075.

*Second*, the same Congress that enacted §230 in February 1996[24] enacted 18 U.S.C. §2339B a few weeks later, in April 1996.[25] In 2016, Congress amended the ATA with JASTA, providing civil litigants "the broadest possible basis...to seek relief against" material supporters of terrorism. 18 U.S.C. 2333, note. It did so again just a few months ago with the ATA Clarification Act of 2018, *supra*. Both amendments reveal Congress' desire for extraordinarily broad protections for terror victims.

"[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended." *Brown & Williamson*, 529 U.S. at 143. The ATA (as amended by JASTA) is the later-enacted statute. The policies it embodies must govern.

### E. Alternatively, the Later-Enacted ATA Should Be Deemed to Have Implicitly Repealed §230 to the Extent of the Conflict

Where it is impossible to construe two statutes to avoid irreconcilable conflict, the later-enacted statute is deemed to repeal the earlier-enacted statute "pro tanto[,] to the extent of the [conflict]." *State of Ga. v. Penn. R.*, 324 U.S. 439, 456-57 (1945); *Cal. Pub. Employees v. WorldCom*, 368 F.3d 86, 104 (2d Cir. 2004).

---

[24] CDA, Pub. L. 104-104, 110 Stat. 133, 137.

[25] Pub. L. 104-132, 110 Stat. 1247, 1250.

Section 230(c) was enacted in February 1996 and has not been subsequently amended. The ATA, on the other hand, was amended in 2016 to permit liability for aiding and abetting, an amendment particularly likely to create conflict with §230. 18 U.S.C. §2333(d)(2). If there is an irreconcilable conflict between the ATA and §230, that conflict must be resolved in favor of the later-enacted ATA.

## VI.   The District Court's Dramatic Expansion of §230 Yields Absurd Results, Divorces §230 From its Objectives, and Neuters the ATA

The district court held that §230 immunizes Google from liability for any claim related to third-party content. If so, any U.S.-based Internet service should be free to *deliberately and openly assist ISIS* coordinate its terrorism by prioritizing posts by ISIS commanders, so long as it does not substantively alter the posts. Nothing in the CDA suggests such a rule. And nothing could be further from the intent of Congress as expressed in the ATA and JASTA.

Further, §230(c)(1) provides: "No *provider or user* of an interactive computer service shall be treated as the publisher or speaker of any information provided by [third parties]." *Id.* (emphasis added). That language requires that "provider[s]" and "user[s]" of Internet services be treated with parity. Thus, if Google is immune, so too any user who repeats information received from another information content provider. Thus, using the district court's approach, immunity would extend *even to an ISIS operative* who publishes on YouTube a statement of an ISIS commander (a

different "information content provider") calling for specific terror attacks. It is inconceivable that the Congress that passed the ATA and JASTA intended both to be so significantly subrogated to §230.

That is especially true considering that Congress enacted §230 to protect children from objectionable material. The decision below morphs §230 into a statute that appears to have been specifically designed to facilitate the spread of terrorism on the Internet. That conflicts precisely with Congress' intent.

## <u>CONCLUSION</u>

For all these reasons, the opinion of the court below should be reversed and this case remanded with instructions that this case proceed to discovery.

## <u>STATEMENT OF RELATED CASES</u>

Plaintiffs are aware of no related cases, as defined by Circuit Rule 28-2.6.

Dated: Baltimore, Maryland
     February 4, 2019

          Respectfully submitted,

          THE BERKMAN LAW OFFICE, LLC
           *Attorneys for The Estate of Nohemi Gonzalez, Beatriz Gonzalez, Individually and as Administrator of the Estate of Nohemi Gonzalez, Jose Hernandez, Rey Gonzalez and Paul Gonzalez*

          by:   /s/ Meir Katz
              Meir Katz
          Robert J. Tolchin, Esq.
          Meir Katz, Esq.
          111 Livingston Street, Suite 1928
          Brooklyn, New York 11201
          (718) 855-3627
          RTolchin@berkmanlaw.com
          MKatz@berkmanlaw.com

          EXCOLO LAW
           *Attorneys for Reynaldo Gonzalez*

          by:   /s/ Keith L. Altman
              Keith L. Altman
          Keith L. Altman, Esq.
          Daniel W. Weininger, Esq.
          26700 Lahser Road, Suite 401
          Southfield, Michigan 48033
          (516) 456-5885
          kaltman@excololaw.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 18-16700

I am the attorney or self-represented party.

**This brief contains** | 15,400 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⦿ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ⦿ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated           .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Meir Katz     **Date** | 02/04/2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**          *Rev. 12/01/2018*

ADDENDUM

## **Table of Contents**

Communications Decency Act of 1996, Pub. L. 104-104, tit. V, sub tit. A,
110 Stat. 133, 133-39 (as enacted)................................................................. a2

18 U.S.C. 2331(1) .................................................................................................. a9

18 U.S.C. 2333(a), (d)........................................................................................... a9

Justice Against Sponsors of Terrorist Act ("JASTA"), Pub. L. 114-222,
130 Stat. 852, §2, *codified at* 18 U.S.C. 2333, note ...................................... a10

18 U.S.C. 2339A ................................................................................................. a11

18 U.S.C. 2339B(a)(1), (d) ................................................................................. a12

47 U.S.C. 230...................................................................................................... a13

Table of Civil Statutes in Titles 18 and 47 of the United States Code
Reflecting Intent to Limit Liability................................................................. a17

PUBLIC LAW 104–104—FEB. 8, 1996          110 STAT. 133

# TITLE V—OBSCENITY AND VIOLENCE

## Subtitle A—Obscene, Harassing, and Wrongful Utilization of Telecommunications Facilities

SEC. 501. SHORT TITLE.

This title may be cited as the "Communications Decency Act of 1996".

SEC. 502. OBSCENE OR HARASSING USE OF TELECOMMUNICATIONS FACILITIES UNDER THE COMMUNICATIONS ACT OF 1934.

Section 223 (47 U.S.C. 223) is amended—

(1) by striking subsection (a) and inserting in lieu thereof:

"(a) Whoever—

"(1) in interstate or foreign communications—

"(A) by means of a telecommunications device knowingly—

"(i) makes, creates, or solicits, and

"(ii) initiates the transmission of,

any comment, request, suggestion, proposal, image, or other communication which is obscene, lewd, lascivious, filthy, or indecent, with intent to annoy, abuse, threaten, or harass another person;

"(B) by means of a telecommunications device knowingly—

"(i) makes, creates, or solicits, and

"(ii) initiates the transmission of,

any comment, request, suggestion, proposal, image, or other communication which is obscene or indecent, knowing that the recipient of the communication is under 18 years of age, regardless of whether the maker of such communication placed the call or initiated the communication;

"(C) makes a telephone call or utilizes a telecommunications device, whether or not conversation or communication ensues, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications;

"(D) makes or causes the telephone of another repeatedly or continuously to ring, with intent to harass any person at the called number; or

"(E) makes repeated telephone calls or repeatedly initiates communication with a telecommunications device, during which conversation or communication ensues, solely to harass any person at the called number or who receives the communication; or

"(2) knowingly permits any telecommunications facility under his control to be used for any activity prohibited by paragraph (1) with the intent that it be used for such activity, shall be fined under title 18, United States Code, or imprisoned not more than two years, or both."; and

(2) by adding at the end the following new subsections:

"(d) Whoever—

"(1) in interstate or foreign communications knowingly—

Communications Decency Act of 1996.
Law enforcement and crime. Penalties.

47 USC 609 note.

-a2-

"(A) uses an interactive computer service to send to a specific person or persons under 18 years of age, or

"(B) uses any interactive computer service to display in a manner available to a person under 18 years of age, any comment, request, suggestion, proposal, image, or other communication that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs, regardless of whether the user of such service placed the call or initiated the communication; or

"(2) knowingly permits any telecommunications facility under such person's control to be used for an activity prohibited by paragraph (1) with the intent that it be used for such activity,

shall be fined under title 18, United States Code, or imprisoned not more than two years, or both.

"(e) In addition to any other defenses available by law:

"(1) No person shall be held to have violated subsection (a) or (d) solely for providing access or connection to or from a facility, system, or network not under that person's control, including transmission, downloading, intermediate storage, access software, or other related capabilities that are incidental to providing such access or connection that does not include the creation of the content of the communication.

"(2) The defenses provided by paragraph (1) of this subsection shall not be applicable to a person who is a conspirator with an entity actively involved in the creation or knowing distribution of communications that violate this section, or who knowingly advertises the availability of such communications.

"(3) The defenses provided in paragraph (1) of this subsection shall not be applicable to a person who provides access or connection to a facility, system, or network engaged in the violation of this section that is owned or controlled by such person.

"(4) No employer shall be held liable under this section for the actions of an employee or agent unless the employee's or agent's conduct is within the scope of his or her employment or agency and the employer (A) having knowledge of such conduct, authorizes or ratifies such conduct, or (B) recklessly disregards such conduct.

"(5) It is a defense to a prosecution under subsection (a)(1)(B) or (d), or under subsection (a)(2) with respect to the use of a facility for an activity under subsection (a)(1)(B) that a person—

"(A) has taken, in good faith, reasonable, effective, and appropriate actions under the circumstances to restrict or prevent access by minors to a communication specified in such subsections, which may involve any appropriate measures to restrict minors from such communications, including any method which is feasible under available technology; or

"(B) has restricted access to such communication by requiring use of a verified credit card, debit account, adult access code, or adult personal identification number.

"(6) The Commission may describe measures which are reasonable, effective, and appropriate to restrict access to prohibited communications under subsection (d). Nothing in

PUBLIC LAW 104–104—FEB. 8, 1996          110 STAT. 135

this section authorizes the Commission to enforce, or is intended to provide the Commission with the authority to approve, sanction, or permit, the use of such measures. The Commission shall have no enforcement authority over the failure to utilize such measures. The Commission shall not endorse specific products relating to such measures. The use of such measures shall be admitted as evidence of good faith efforts for purposes of paragraph (5) in any action arising under subsection (d). Nothing in this section shall be construed to treat interactive computer services as common carriers or telecommunications carriers.

"(f)(1) No cause of action may be brought in any court or administrative agency against any person on account of any activity that is not in violation of any law punishable by criminal or civil penalty, and that the person has taken in good faith to implement a defense authorized under this section or otherwise to restrict or prevent the transmission of, or access to, a communication specified in this section.

"(2) No State or local government may impose any liability for commercial activities or actions by commercial entities, nonprofit libraries, or institutions of higher education in connection with an activity or action described in subsection (a)(2) or (d) that is inconsistent with the treatment of those activities or actions under this section: *Provided, however*, That nothing herein shall preclude any State or local government from enacting and enforcing complementary oversight, liability, and regulatory systems, procedures, and requirements, so long as such systems, procedures, and requirements govern only intrastate services and do not result in the imposition of inconsistent rights, duties or obligations on the provision of interstate services. Nothing in this subsection shall preclude any State or local government from governing conduct not covered by this section.

"(g) Nothing in subsection (a), (d), (e), or (f) or in the defenses to prosecution under subsection (a) or (d) shall be construed to affect or limit the application or enforcement of any other Federal law.

"(h) For purposes of this section—

"(1) The use of the term 'telecommunications device' in this section—

"(A) shall not impose new obligations on broadcasting station licensees and cable operators covered by obscenity and indecency provisions elsewhere in this Act; and

"(B) does not include an interactive computer service.

"(2) The term 'interactive computer service' has the meaning provided in section 230(e)(2).

"(3) The term 'access software' means software (including client or server software) or enabling tools that do not create or provide the content of the communication but that allow a user to do any one or more of the following:

"(A) filter, screen, allow, or disallow content;

"(B) pick, choose, analyze, or digest content; or

"(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

"(4) The term 'institution of higher education' has the meaning provided in section 1201 of the Higher Education Act of 1965 (20 U.S.C. 1141).

110 STAT. 136          PUBLIC LAW 104–104—FEB. 8, 1996

"(5) The term 'library' means a library eligible for participation in State-based plans for funds under title III of the Library Services and Construction Act (20 U.S.C. 355e et seq.).".

**SEC. 503. OBSCENE PROGRAMMING ON CABLE TELEVISION.**

Section 639 (47 U.S.C. 559) is amended by striking "not more than $10,000" and inserting "under title 18, United States Code,".

**SEC. 504. SCRAMBLING OF CABLE CHANNELS FOR NONSUBSCRIBERS.**

Part IV of title VI (47 U.S.C. 551 et seq.) is amended by adding at the end the following:

47 USC 560.

**"SEC. 640. SCRAMBLING OF CABLE CHANNELS FOR NONSUBSCRIBERS.**

"(a) SUBSCRIBER REQUEST.—Upon request by a cable service subscriber, a cable operator shall, without charge, fully scramble or otherwise fully block the audio and video programming of each channel carrying such programming so that one not a subscriber does not receive it.

"(b) DEFINITION.—As used in this section, the term 'scramble' means to rearrange the content of the signal of the programming so that the programming cannot be viewed or heard in an understandable manner.".

**SEC. 505. SCRAMBLING OF SEXUALLY EXPLICIT ADULT VIDEO SERVICE PROGRAMMING.**

(a) REQUIREMENT.—Part IV of title VI (47 U.S.C. 551 et seq.), as amended by this Act, is further amended by adding at the end the following:

47 USC 561.

**"SEC. 641. SCRAMBLING OF SEXUALLY EXPLICIT ADULT VIDEO SERVICE PROGRAMMING.**

"(a) REQUIREMENT.—In providing sexually explicit adult programming or other programming that is indecent on any channel of its service primarily dedicated to sexually-oriented programming, a multichannel video programming distributor shall fully scramble or otherwise fully block the video and audio portion of such channel so that one not a subscriber to such channel or programming does not receive it.

Children and youth.

"(b) IMPLEMENTATION.—Until a multichannel video programming distributor complies with the requirement set forth in subsection (a), the distributor shall limit the access of children to the programming referred to in that subsection by not providing such programming during the hours of the day (as determined by the Commission) when a significant number of children are likely to view it.

"(c) DEFINITION.—As used in this section, the term 'scramble' means to rearrange the content of the signal of the programming so that the programming cannot be viewed or heard in an understandable manner.".

47 USC 561 note.

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect 30 days after the date of enactment of this Act.

**SEC. 506. CABLE OPERATOR REFUSAL TO CARRY CERTAIN PROGRAMS.**

(a) PUBLIC, EDUCATIONAL, AND GOVERNMENTAL CHANNELS.— Section 611(e) (47 U.S.C. 531(e)) is amended by inserting before the period the following: ", except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity".

PUBLIC LAW 104–104—FEB. 8, 1996        110 STAT. 137

(b) Cable Channels for Commercial Use.—Section 612(c)(2) (47 U.S.C. 532(c)(2)) is amended by striking "an operator" and inserting "a cable operator may refuse to transmit any leased access program or portion of a leased access program which contains obscenity, indecency, or nudity and".

**SEC. 507. CLARIFICATION OF CURRENT LAWS REGARDING COMMU-NICATION OF OBSCENE MATERIALS THROUGH THE USE OF COMPUTERS.**

(a) Importation or Transportation.—Section 1462 of title 18, United States Code, is amended—

(1) in the first undesignated paragraph, by inserting "or interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934)" after "carrier"; and

(2) in the second undesignated paragraph—

(A) by inserting "or receives," after "takes";

(B) by inserting "or interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934)" after "common carrier"; and

(C) by inserting "or importation" after "carriage".

(b) Transportation for Purposes of Sale or Distribu-tion.—The first undesignated paragraph of section 1465 of title 18, United States Code, is amended—

(1) by striking "transports in" and inserting "transports or travels in, or uses a facility or means of,";

(2) by inserting "or an interactive computer service (as defined in section 230(e)(2) of the Communications Act of 1934) in or affecting such commerce" after "foreign commerce" the first place it appears;

(3) by striking ", or knowingly travels in" and all that follows through "obscene material in interstate or foreign com-merce," and inserting "of".

(c) Interpretation.—The amendments made by this section are clarifying and shall not be interpreted to limit or repeal any prohibition contained in sections 1462 and 1465 of title 18, United States Code, before such amendment, under the rule established in United States v. Alpers, 338 U.S. 680 (1950).

18 USC 1462 note.

**SEC. 508. COERCION AND ENTICEMENT OF MINORS.**

Section 2422 of title 18, United States Code, is amended—

(1) by inserting "(a)" before "Whoever knowingly"; and

(2) by adding at the end the following:

"(b) Whoever, using any facility or means of interstate or foreign commerce, including the mail, or within the special maritime and territorial jurisdiction of the United States, knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years to engage in prostitution or any sexual act for which any person may be criminally prosecuted, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both.".

**SEC. 509. ONLINE FAMILY EMPOWERMENT.**

Title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end the following new section:

**"SEC. 230. PROTECTION FOR PRIVATE BLOCKING AND SCREENING OF OFFENSIVE MATERIAL.**

47 USC 230.

"(a) Findings.—The Congress finds the following:

"(1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

"(2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

"(3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

"(4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

"(5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

"(b) POLICY.—It is the policy of the United States—

"(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

"(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

"(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

"(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

"(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

"(c) PROTECTION FOR 'GOOD SAMARITAN' BLOCKING AND SCREENING OF OFFENSIVE MATERIAL.—

"(1) TREATMENT OF PUBLISHER OR SPEAKER.—No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

"(2) CIVIL LIABILITY.—No provider or user of an interactive computer service shall be held liable on account of—

"(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

"(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

"(d) EFFECT ON OTHER LAWS.—

"(1) NO EFFECT ON CRIMINAL LAW.—Nothing in this section shall be construed to impair the enforcement of section 223 of this Act, chapter 71 (relating to obscenity) or 110 (relating

PUBLIC LAW 104–104—FEB. 8, 1996          110 STAT. 139

to sexual exploitation of children) of title 18, United States Code, or any other Federal criminal statute.

"(2) NO EFFECT ON INTELLECTUAL PROPERTY LAW.—Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

"(3) STATE LAW.—Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

"(4) NO EFFECT ON COMMUNICATIONS PRIVACY LAW.—Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

"(e) DEFINITIONS.—As used in this section:

"(1) INTERNET.—The term 'Internet' means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

"(2) INTERACTIVE COMPUTER SERVICE.—The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

"(3) INFORMATION CONTENT PROVIDER.—The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

"(4) ACCESS SOFTWARE PROVIDER.—The term 'access software provider' means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

"(A) filter, screen, allow, or disallow content;

"(B) pick, choose, analyze, or digest content; or

"(C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.".

# Subtitle B—Violence

**SEC. 551. PARENTAL CHOICE IN TELEVISION PROGRAMMING.**

(a) FINDINGS.—The Congress makes the following findings:     47 USC 303 note.

(1) Television influences children's perception of the values and behavior that are common and acceptable in society.

(2) Television station operators, cable television system operators, and video programmers should follow practices in connection with video programming that take into consideration that television broadcast and cable programming has established a uniquely pervasive presence in the lives of American children.

(3) The average American child is exposed to 25 hours of television each week and some children are exposed to as much as 11 hours of television a day.

## 18 U.S.C. 2331 – Definitions

As used in this chapter—

**(1)** the term "international terrorism" means activities that—

    **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

    **(B)** appear to be intended—

      **(i)** to intimidate or coerce a civilian population;
      **(ii)** to influence the policy of a government by intimidation or coercion; or
      **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

    **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

## 18 U.S.C. 2333 – Civil Remedies

**(a)** **Action and Jurisdiction**— Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees. * * *

**(d) Liability**—

    **(1)** **Definition**— In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

    **(2)** **Liability**— In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

## Justice Against Sponsors of Terrorist Act ("JASTA"), Pub. L. 114-222, 130 Stat. 852, § 2, *codified at* 18 U.S.C. 2333, note

(a) **Findings**—Congress finds the following:

    (1) International terrorism is a serious and deadly problem that threatens the vital interests of the United States.

    (2) International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.

    (3) Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.

    (4) It is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code.

    (5) The decision of the United States Court of Appeals for the District of Columbia in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.

    (6) Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

    (7) The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided

material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

**(b)** **Purpose**— The purpose of this Act [enacting section 1605B of Title 28, Judiciary and Judicial Procedure, amending this section and section 1605 of Title 28, and enacting provisions set out as notes under this section, section 1 of this title, and section 1605B of Title 28] is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

## 18 U.S.C. 2339A – Providing Material Support to Terrorists

**(a)** **Offense**— Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

**(b)** **Definitions**— As used in this section—

**(1)** the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

**(2)** the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

**(3)** the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

## 18 U.S.C. 2339B – Providing Material Support or Resources to Designated Foreign Terrorist Organizations

**(a) Prohibited Activities—**

**(1) Unlawful conduct**— Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989). * * *

**(d) Extraterritorial Jurisdiction—**

**(1) In general**— There is jurisdiction over an offense under subsection (a) if—

**(A)** an offender is a national of the United States...or an alien lawfully admitted for permanent residence in the United States...;

**(B)** an offender is a stateless person whose habitual residence is in the United States;

**(C)** after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

**(D)** the offense occurs in whole or in part within the United States;

**(E)** the offense occurs in or affects interstate or foreign commerce; or

**(F)** an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

-a12-

**(2) Extraterritorial jurisdiction**— There is extraterritorial Federal jurisdiction over an offense under this section.

## 47 U.S.C. 230 – Protection for Private Blocking and Screening of Offensive Material

**(a) Findings**— The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**— It is the policy of the United States—

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**— No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**— No provider or user of an interactive computer service shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[26]

**(d) Obligations of interactive computer service**— A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

---

[26] So in original. Probably should be "subparagraph (A)."

**(e)** **Effect on other laws**

    **(1)** **No effect on criminal law**— Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

    **(2)** **No effect on intellectual property law**— Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

    **(3)** **State law**— Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

    **(4)** **No effect on communications privacy law**— Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(f)** **Definitions**— As used in this section:

    **(1) Internet**— The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

    **(2) Interactive computer service**— The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

    **(3) Information content provider**— The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.

**(4)** **Access software provider**— The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

  **(A)** filter, screen, allow, or disallow content;

  **(B)** pick, choose, analyze, or digest content; or

  **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

**Table of Civil Statutes in Titles 18 and 47 of the United States Code Reflecting Intent to Limit Liability[*]**

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 1 | 18 U.S.C. 203(a) & 203(b) | Whoever, *otherwise than as provided by law for the proper discharge of official duties*, directly or indirectly [does prohibited conduct] shall be subject to...penalties.... (18 U.S.C. 216(b) describes applicable civil liability.) |
| 2 | 18 U.S.C. 203(d) & 203(e) | *Nothing in this section prevents* [an employee] ... from acting, with or without compensation, as agent or attorney.... (18 U.S.C. 216(b) describes applicable civil liability.) |
| 3 | 18 U.S.C. 203(f) | *Nothing in this section prevents* an individual from giving testimony under oath or from making statements required to be made under penalty of perjury. (18 U.S.C. 216(b) describes applicable civil liability.) |
| 4 | 18 U.S.C. 205(a) | Whoever, being an officer or employee of the United States in the executive, legislative, or judicial branch of the Government or in any agency of the United States, *other than in the proper discharge of his official duties* [does prohibited conduct] shall be subject to...penalties.... (18 U.S.C. 216(b) describes applicable civil liability.) |

---

[*] Plaintiffs identified the statutes populating this table by initially searching for the terms "immune," "immunity," "exempt," "liable," "liability," and "cause of action." They reviewed all statutes reflecting one of those terms to determine whether the statute is civil or criminal and whether it reflects an intent to limit liability.

Plaintiffs' counsel thanks law students Yael Klausner and Amit Liran for their extremely helpful research assistance. Without their help, compiling this Table would have been impossible.

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 5 | 18 U.S.C. 205(b) | Whoever, being an officer or employee of the District of Columbia or an officer or employee of the Office of the United States Attorney for the District of Columbia, *otherwise than in the proper discharge of official duties* [does prohibited conduct] shall be subject to...penalties.... (18 U.S.C. 216(b) describes applicable civil liability.) |
| 6 | 18 U.S.C. 205(d), 205(e), & 205(f) | *Nothing in subsection (a) or (b) prevents* [a governmental agent] ... from acting ... as agent or attorney.... (18 U.S.C. 216(b) describes applicable civil liability.) |
| 7 | 18 U.S.C. 205(g) | *Nothing in this section prevents* an officer or employee from giving testimony under oath or from making statements required to be made under penalty for perjury or contempt. (18 U.S.C. 216(b) describes applicable civil liability.) |
| 8 | 18 U.S.C. 205(i) | *Nothing in this section prevents* an employee from acting pursuant to [specified statutes]. (18 U.S.C. 216(b) describes applicable civil liability.) |
| 9 | 18 U.S.C. 207(j)(1) | *The restrictions contained in this section shall not apply* to acts done in carrying out official duties on behalf of the United States or the District of Columbia or as an elected official of a State or local government. (18 U.S.C. 216(b) describes applicable civil liability.) |
| 10 | 18 U.S.C. 207(j)(2) | *The restrictions contained in subsections (c), (d), and (e) shall not apply* to acts done in carrying out official duties as [a governmental] employee.... (18 U.S.C. 216(b) describes applicable civil liability.) |

| # | Citation | Pertinent Excerpt |
|---|---|---|
| 11 | 18 U.S.C. 207(j)(3) | *The restrictions contained in this section shall not apply* to an appearance or communication on behalf of, or advice or aid to, an international organization in which the United States participates, if the Secretary of State certifies in advance that such activity is in the interests of the United States.<br>(18 U.S.C. 216(b) describes applicable civil liability.) |
| 12 | 18 U.S.C. 207(j)(4) | *The restrictions contained in subsections (c), (d), and (e) shall not prevent* an individual from making or providing a statement, which is based on the individual's own special knowledge in the particular area that is the subject of the statement, if no compensation is thereby received.<br>(18 U.S.C. 216(b) describes applicable civil liability.) |
| 13 | 18 U.S.C. 207(j)(5) | *The restrictions contained in subsections (a), (c), and (d) shall not apply* with respect to the making of communications solely for the purpose of furnishing scientific or technological information....<br>(18 U.S.C. 216(b) describes applicable civil liability.) |
| 14 | 18 U.S.C. 207(j)(6) | *Nothing in this section shall prevent* an individual from giving testimony under oath, or from making statements required to be made under penalty of perjury.<br>(18 U.S.C. 216(b) describes applicable civil liability.) |
| 15 | 18 U.S.C. 207(j)(7) | Except as provided in subparagraph (B), *the restrictions contained in subsections (c), (d), and (e) shall not apply* to a communication or appearance made solely on behalf of a candidate in his or her capacity as a candidate....<br>(18 U.S.C. 216(b) describes applicable civil liability.) |
| 16 | 18 U.S.C. 208(b) | *Subsection (a) shall not apply* [in specified instances].<br>(18 U.S.C. 216(b) describes applicable civil liability.) |

| # | Citation | Pertinent Excerpt |
|---|---|---|
| 17 | 18 U.S.C. 209(c) | *This section does not apply* to a special Government employee or to an officer or employee of the Government serving without compensation.... <br><br> (18 U.S.C. 216(b) describes applicable civil liability.) |
| 18 | 18 U.S.C. 209(d), 209(e), 209(f), 209(g)(1), & 209(h) | *This section does not prohibit....* <br><br> (18 U.S.C. 216(b) describes applicable civil liability.) |
| 19 | 18 U.S.C. 229(b) | Subsection (a) *does not apply* to the retention, ownership, possession, transfer, or receipt of a chemical weapon by a department, agency, or other entity of the United States, *or by a person described in paragraph (2)*, pending destruction of the weapon. <br><br> (18 U.S.C. 229A describes applicable civil liability.) |
| 20 | 18 U.S.C. 248(a) | Whoever [does specified activities] shall be subject to...the civil remedies provided in subsection (c), *except that a parent or legal guardian of a minor shall not be subject to any ... civil remedies* under this section for such activities insofar as they are directed exclusively at that minor. |
| 21 | 18 U.S.C. 922(s)(7) | A chief law enforcement officer or other person responsible for providing criminal history background information pursuant to this subsection *shall not be liable in an action at law for damages* for [preventing or failing to prevent the] sale or transfer [of] a handgun. |
| 22 | 18 U.S.C. 922(z)(2) | *Paragraph (1)* [prohibiting certain transfers of handguns] *shall not apply to* [specified transfers]. <br><br> (18 U.S.C. 924(p)(1)(A)(ii) describes applicable civil liability.) |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 23 | 18 U.S.C. 922(z)(3)(A) | *Notwithstanding any other provision of law*, a person who has lawful possession and control of a handgun, and who uses a secure gun storage or safety device with the handgun, *shall be entitled to immunity from a qualified civil liability action.* |
| 24 | 18 U.S.C. 981(e)(7) | The United States *shall not be liable* in any action arising out of the seizure, detention, and transfer of seized property to State or local officials. The United States *shall not be liable* in any action arising out of a transfer under paragraph (3), (4), or (5) of this subsection. |
| 25 | 18 U.S.C. 983(d)(1) | An innocent owner's interest in property *shall not be forfeited under any civil forfeiture statute.* |
| 26 | 18 U.S.C. 1033(e)(2) | A person described in paragraph (1)(A) *may engage in the business of insurance or participate in such business if* such person has the written consent of any insurance regulatory official authorized to regulate the insurer, which consent specifically refers to this subsection. (18 U.S.C. 1034(a) describes applicable civil liability.) |
| 27 | 18 U.S.C. 1169 | Any person making a report described in subsection (a) which is based upon their reasonable belief and which is made in good faith *shall be immune from civil or criminal liability* for making that report. |
| 28 | 18 U.S.C. 1531(a) | *This subsection does not apply* to a partial-birth abortion that is necessary to save the life of a mother.... (18 U.S.C. 1531(c) describes applicable civil liability.) |
| 29 | 18 U.S.C. 1833(b)(1) | An individual *shall not be held criminally or civilly liable* under any Federal or State trade secret law for the disclosure of a trade secret that.... |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 30 | 18 U.S.C. 1833(b)(2) | An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law *may disclose* the trade secret to the attorney of the individual and use the trade secret information in the court proceeding.... |
| 31 | 18 U.S.C. 1962(a) | A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, *shall not be unlawful* under this subsection if.... <br> (18 U.S.C. 1964(c) describes applicable civil liability.) |
| 32 | 18 U.S.C. 2252(c), 2252A(c), & 2252A(d) | *It shall be an affirmative defense* to a charge of violating [a specified provision] that.... <br> (18 U.S.C. 2252A(f) & 2255(a) describe applicable civil liability.) |
| 33 | 18 U.S.C. 2258B(a) | Except as provided in subsection (b), *a civil claim* or criminal charge against an electronic communication service provider, a remote computing service provider, or domain name registrar ... *may not be brought in any Federal or State court.* |
| 34 | 18 U.S.C. 2258D(a) | Except as provided in subsections (b) and (c), *a civil claim* or criminal charge against the National Center for Missing and Exploited Children...*may not be brought in any Federal or State court.* |
| 35 | 18 U.S.C. 2319B(d) | With reasonable cause, the owner or lessee of a motion picture exhibition facility...may detain...any person suspected of a violation of this section...and *shall not be held liable in any civil or criminal action* arising out of a detention.... |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 36 | 18 U.S.C. 2336(a) | *No action shall be maintained* under section 2333 of this title for injury or loss by reason of an act of war.<br>(18 U.S.C. 2333(a) & (d) describe applicable civil liability.) |
| 37 | 18 U.S.C. 2337 | *No action shall be maintained* under section 2333 of this title against the United States [or an agent or officer of the United States] or a foreign state [or an agent or officer of any foreign state].<br>(18 U.S.C. 2333(a) & (d) describe applicable civil liability.) |
| 38 | 18 U.S.C. 2421A(e) | *It shall be an affirmative defense* to a charge of violating subsection (a), or subsection (b)(1) where the defendant proves, by a preponderance of the evidence, that the promotion or facilitation of prostitution is legal in the jurisdiction where the promotion or facilitation was targeted.<br>(18 U.S.C. 2421A(c) describes applicable civil liability.) |
| 39 | 18 U.S.C. 2511(2)(a)(ii)(B) & 2703(e) | *No cause of action shall lie in any court* against any provider of wire or electronic communication service, ... for providing information, facilities, or assistance in accordance with the terms of a court order, ... statutory authorization, or certification under this chapter. |
| 40 | 18 U.S.C. 2520(d) | A good faith reliance on [specified justifications] *is a complete defense against any civil or criminal action brought under this chapter or any other law.* |
| 41 | 18 U.S.C. 2701(c) & 2707(e) | *Subsection (a) of this section does not apply* with respect to conduct authorized [by specified people or statutes].<br>(18 U.S.C. 2707(a)-(c) & (e) describe applicable civil liability.) |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 42 | 18 U.S.C. 2710(c)(4) | *No liability shall result* from lawful disclosure permitted by this section. |
| 43 | 18 U.S.C. 2721(b) | Personal information referred to in subsection (a) ... *may be disclosed* as follows: .... (18 U.S.C. 2724 describes applicable civil liability.) |
| 44 | 18 U.S.C. 3486(d) | *Notwithstanding any Federal, State, or local law*, any person, ... receiving a subpoena under this section, who complies in good faith with the subpoena and thus produces the materials sought, *shall not be liable in any court of any State or the United States* to any customer or other person for such production or for nondisclosure of that production to the customer. |
| 45 | 18 U.S.C. 3509(h)(3) | A guardian ad litem shall be presumed to be acting in good faith and *shall be immune from civil and criminal liability* for complying with the guardian's lawful duties described in paragraph (2). |
| 46 | 18 U.S.C. 4042(c)(5) | The United States and its agencies, officers, and employees *shall be immune from liability* based on good faith conduct in carrying out this subsection and subsection (b). |
| 47 | 47 U.S.C. 152 | *The provisions of this chapter ... shall not apply* to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone. (47 U.S.C. 206 describes applicable civil liability.) |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 48 | 47 U.S.C. 208(a) | If such common carrier within the time specified shall make reparation for the injury alleged to have been caused, *the common carrier shall be relieved of liability to the complainant* only for the particular violation of law thus complained of. |
| 49 | 47 U.S.C. 210(a) & (b) | *Nothing in this chapter or in any other provision of law shall be construed to prohibit* common carriers from [doing specified acts]. |
| 50 | 47 U.S.C. 222(d) | *Nothing in this section prohibits* a telecommunications carrier from using, disclosing, or permitting access to customer proprietary network information obtained from its customers, either directly or indirectly through its agents [for specified reasons].<br>(47 U.S.C. 206 describes applicable civil liability.) |
| 51 | 47 U.S.C. 223(c)(2) | Except as provided in paragraph (3), *no cause of action may be brought in any court or administrative agency* against any common carrier, or any of its affiliates, including their officers, directors, employees, agents, or authorized representatives on account of [specified acts]. |
| 52 | 47 U.S.C. 223(e)(1) | In addition to any other defenses available by law:<br>*No person shall be held to have violated subsection (a) or (d) solely for* [specified acts]....<br>(47 U.S.C. 206 describes applicable civil liability.) |
| 53 | 47 U.S.C. 223(e)(4) | In addition to any other defenses available by law:<br>*No employer shall be held liable under this section* for the actions of an employee or agent unless the employee's or agent's conduct is within the scope of his or her employment or agency and the employer (A) having knowledge of such conduct, authorizes or ratifies such conduct, or (B) recklessly disregards such conduct. |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 54 | 47 U.S.C. 223(f)(1) & 231(c)(2) | *No cause of action may be brought in any court or administrative agency* against any person on account of any activity that is not in violation of any law punishable by criminal or civil penalty, and that the person has taken in good faith to implement a defense authorized under this []section or otherwise to restrict or prevent the transmission of, or access to, a communication specified in this section. |
| 55 | 47 U.S.C. 223(f)(2) | *No State or local government may impose any liability for commercial activities or actions* by commercial entities, nonprofit libraries, or institutions of higher education in connection with an activity or action described in subsection (a)(2) or (d) that is inconsistent with the treatment of those activities or actions under this section.... (47 U.S.C. 206 describes applicable civil liability.) |
| 56 | 47 U.S.C. 227(b)(1)(C)(ii) | *... except that this clause shall not apply* in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005.... (47 U.S.C. 206 describes applicable civil liability.) |
| 57 | 47 U.S.C. 228(e)(2) | *No cause of action may be brought in any court or administrative agency* against any common carrier or any of its affiliates on account of any act of the carrier or affiliate to terminate any pay-per-call service in order to comply with the regulations prescribed under ... Federal law unless the complainant demonstrates that the carrier or affiliate did not act in good faith. |
| 58 | 47 U.S.C. 230(c)(2) | *No provider or user of an interactive computer service shall be held liable* on account of [specified acts]. |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 59 | 47 U.S.C. 230(e)(3) | *No cause of action may be brought and no liability may be imposed* under any State or local law that is inconsistent with this section. |
| 60 | 47 U.S.C. 558 | *Nothing in this subchapter shall be deemed to affect the criminal or civil liability of cable programmers or cable operators pursuant to the Federal, State, or local law of libel, slander, obscenity, incitement, invasions of privacy, false or misleading advertising, or other similar laws*, except that cable operators shall not incur any such liability for any program carried on any channel designated for public, educational, governmental use or on any other channel obtained under section 532 of this title or under similar arrangements unless the program involves obscene material. |
| 61 | 47 U.S.C. 606(a) | Any carrier complying with any such order or direction for preference or priority herein authorized *shall be exempt from any and all provisions in existing law imposing civil or criminal penalties, obligations, or liabilities upon carriers* by reason of giving preference or priority in compliance with such order or direction. |
| 62 | 47 U.S.C. 615a(a) & 615a(b) | A [specified business and its officers and agents] *shall have immunity or other protection from liability...of a scope and extent that is not less than the scope and extent of immunity or other protection from liability* [that a similar entity or person has].... |

| # | Citation | Pertinent Excerpt |
|---|----------|-------------------|
| 63 | 47 U.S.C. 615a(c) | ... a PSAP, and its employees, vendors, agents, and authorizing government entity (if any) *shall have immunity or other protection from liability of a scope and extent that is not less than the scope and extent of immunity or other protection from liability* under applicable law accorded to such PSAP, employees, vendors, agents, and authorizing government entity, respectively.... |
| 64 | 47 U.S.C. 1201(e)(1) | Any commercial mobile service provider (including its officers, directors, employees, vendors, and agents) that transmits emergency alerts and meets its obligations under this chapter *shall not be liable to any subscriber to, or user of, such person's service or equipment* for [specified acts]. |
| 65 | 47 U.S.C. 1472(a) | A provider or user of Next Generation 9–1–1 services, a public safety answering point, and the officers, directors, employees, vendors, agents, and authorizing government entity (if any) of such provider, user, or public safety answering point, *shall have immunity and protection from liability under Federal and State law to the extent provided in subsection (b)* with respect to [specified matters]. |