**18-16700**

IN THE

# United States Court of Appeals

### FOR THE NINTH CIRCUIT
_____

REYNALDO GONZALEZ; THE ESTATE OF NOHEMI GONZALEZ;
BEATRIZ GONZALEZ, Individually and as Administrator
of the Estate of Nohemi Gonzalez; JOSE HERNANDEZ;
REY GONZALEZ; PAUL GONZALEZ,
*Plaintiffs and Appellants*,

—v.—

GOOGLE LLC,
*Defendant and Appellee*.
_____

On Appeal from the United States District Court for
the Northern District of California,
Case No. 4:16-cv-03282-DMR
Magistrate Judge Donna M. Ryu

## ANSWERING BRIEF OF APPELLEE

| | |
|---|---|
| David H. Kramer | Brian M. Willen |
| Lauren Gallo White | WILSON SONSINI GOODRICH & ROSATI, |
| Kelly M. Knoll | Professional Corporation |
| WILSON SONSINI GOODRICH & ROSATI, | 1301 Avenue of the Americas |
| Professional Corporation | 40th Floor |
| 650 Page Mill Road, | New York, NY 10019 |
| Palo Alto, CA 94304 | Tel: (212) 999-5800 |
| Tel: (650) 493-9300 | Fax: (212) 999-5899 |
| Fax: (650) 493-6811 | bwillen@wsgr.com |
| dkramer@wsgr.com | |

*Attorneys for Defendant-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendant-Appellee Google LLC states that Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company, and that no publicly traded company holds more than 10% of Alphabet Inc.'s stock.


/s/ *Brian M. Willen*
Brian M. Willen
*Attorney for Defendant-Appellee*
  *Google LLC*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

COUNTERSTATEMENT OF ISSUES PRESENTED............................3

STATUTORY PROVISIONS ..................................................................3

COUNTERSTATEMENT OF THE CASE...............................................3

    A.    YouTube's Online Video-Hosting Service ...........................3

    B.    ISIS's November 2015 Attack In Paris..................................4

    C.    Appellant's Efforts To Hold Google Liable For The
           Paris Attack .........................................................................5

    D.    The District Court Dismisses The Second Amended Complaint..........8

    E.    Appellants' Third Amended Complaint.................................8

    F.    This Court's Decision In *Fields* .........................................9

    G.    The District Court Dismisses The Third Amended Complaint ..........10

SUMMARY OF ARGUMENT ...............................................................11

ARGUMENT ........................................................................................13

I.    APPELLANTS' CLAIMS ARE BARRED BY SECTION 230..................13

    A.    Section 230 Bars Appellants' Core Theory Of Liability ....................14

          1.    Google Is An Interactive Computer Service Provider..............16

          2.    The Content At Issue Was Created And Developed By
                 Third Parties.....................................................................16

               a.    YouTube Does Not Create Or Develop Content By
                     Placing Ads Around It ..................................................17

        b.     YouTube Does Not Become A Content Developer By Inviting Or Promoting Third-Party Content .............21

    3.     Appellants' Claims Seek To Treat YouTube As A Publisher...................................................................24

  B.    Appellants Cannot Evade Section 230 By Invoking The Presumption Against Extraterritoriality ...............................28

  C.    Section 230's Exception For Federal Criminal Law Enforcement Does Not Apply To Private Civil Claims......................32

  D.    JASTA Does Not Repeal Or Abrogate Section 230 ...........................34

  E.    Section 230 Immunity Is Properly Applied Under Rule 12(b)(6) ......38

II.    APPELLANTS FAILED TO STATE A CLAIM UNDER THE ATA ........41

  A.    Appellants Failed To State A Claim For Direct Liability...................41

    1.     The District Court Correctly Found A Lack Of Proximate Causation Under This Court's Decision In *Fields*....................41

    2.     Google Did Not Knowingly Provide Material Support To ISIS...................................................................46

    3.     Appellants Did Not Allege Any Conduct By Google That Met The Other Elements Of "International Terrorism" ...........50

  B.    Appellants Failed To State A Claim For Secondary Liability............51

    1.     Appellants' Did Not State A Claim for Aiding And Abetting...................................................................52

    2.     Appellants' Did Not State A Claim For Conspiracy ...............55

CONCLUSION .........................................................................57

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Ahmad v. Christian Friends of Israeli Cmtys.*,
  2014 U.S. Dist. LEXIS 62053 (S.D.N.Y. May 5, 2014) ...................................47

*Ascentive, LLC v. Opinion Corp.*,
  842 F. Supp. 2d 450 (E.D.N.Y. 2011) ................................................................20

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ...................................................................*passim*

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ........................................................14, 31, 38, 40

*Branch v. Smith*,
  538 U.S. 254 (2003)....................................................................................34, 36

*Brill v. Chevron Corp.*,
  2017 U.S. Dist. LEXIS 4132 (N.D. Cal. Jan. 9, 2017)....................................51

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
  274 F. Supp. 2d 86 (D.D.C. 2003)....................................................................48

*Cain v. Twitter, Inc.*,
  2018 U.S. Dist. LEXIS 163457 (N.D. Cal. Sept. 24, 2018) ...............................5

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003) ...................................................................14, 26

*Cohen v. Facebook, Inc.*,
  252 F. Supp. 3d 140 (E.D.N.Y. 2017) .........................................................30, 32

*Copeland v. Twitter, Inc.*,
  352 F. Supp. 3d 965 (N.D. Cal. 2018)................................................................43

*Crosby v. Twitter, Inc.*,
  303 F. Supp. 3d 564 (E.D. Mich. 2018) .........................................48, 49, 53, 56

*Crowe v. Cty. of San Diego*,
  608 F.3d 406 (9th Cir. 2010) ...................................................................... 55-56

*Dart v. Craigslist, Inc.*,
  665 F. Supp. 2d 961 (N.D. Ill. 2009)................................................................21

*Doe II v. MySpace, Inc.*,
    175 Cal. App. 4th 561 (2009) ...........................................................26

*Doe v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016).................................................32, 33, 37

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ...........................................................14

*Dyroff v. Ultimate Software Grp., Inc.*,
    2017 U.S. Dist. LEXIS 194524 (N.D. Cal. Nov. 26, 2017) ..............23

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ...................................................*passim*

*Fields v. Twitter, Inc.*,
    200 F. Supp. 3d 964 (N.D. Cal. 2016)..............................................28

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016)............................................26

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ....................................................*passim*

*Force v. Facebook, Inc.*,
    304 F. Supp. 3d 315 (E.D.N.Y. 2018) ..............................................34

*Gavra v. Google Inc.*,
    2013 U.S. Dist. LEXIS 100127 (N.D. Cal. July 17, 2013) ...............16

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ..............................................48

*Green v. Am. Online*,
    318 F.3d 465 (3d Cir. 2003) .....................................................25, 39

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983)....................................................52-56

*Hawaii v. Office of Hawaiian Affairs*,
    556 U.S. 163 (2009).....................................................................34, 35

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)..............................................................................46

*Hinton v. Amazon.com. DEDC, LLC*,
    72 F. Supp. 3d 685 (S.D. Miss. 2014) ..............................................32

*Hui v. Castaneda,*
    559 U.S. 799 (2010)......................................................................37

*Huon v. Denton,*
    841 F.3d 733 (7th Cir. 2016) ...........................................................22

*Hussein v. Dahabshiil Transfer Servs. Ltd.,*
    230 F. Supp. 3d 167 (S.D.N.Y. 2017) ........................................ 48-49

*In re Terrorist Attacks on Sept. 11, 2001,*
    718 F. Supp. 2d 456 (S.D.N.Y. 2010) .............................................48

*Jones v. Dirty World Entm't Recordings LLC,*
    755 F.3d 398 (6th Cir. 2014) ....................................................*passim*

*Kemper v. Deutsche Bank AG,*
    911 F.3d 383 (7th Cir. 2018) ..................................................... 50-51

*Kimzey v. Yelp! Inc.,*
    836 F.3d 1263 (9th Cir. 2016) ..................................................*passim*

*Kingdomware Techs., Inc. v. United States,*
    136 S. Ct. 1969 (2016)...................................................................35

*Klayman v. Zuckerberg,*
    753 F.3d 1354 (D.C. Cir. 2014)................................................*passim*

*Lancaster v. Alphabet Inc.,*
    2016 U.S. Dist. LEXIS 88908 (N.D. Cal. July 8, 2016) ...................16

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018) ..................................................... 50-52

*Loomis v. Cornish,*
    836 F.3d 991 (9th Cir. 2016) ..........................................................38

*M.A. ex rel. P.K. v. Vill. Voice Media Holdings, LLC,*
    809 F. Supp. 2d 1041 (E.D. Mo. 2011) ...........................................33

*Microsoft Corp. v. AT&T Corp.,*
    550 U.S. 437 (2007)......................................................................29

*Morrison v. Nat'l Austl. Bank Ltd.,*
    561 U.S. 247 (2010)......................................................................30

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
    591 F.3d 250 (4th Cir. 2009) .............................................. 21-22, 39

*O'Kroley v. Fastcase, Inc.*,
  831 F.3d 352 (6th Cir. 2016) ..............................................................20

*Pennie v. Twitter, Inc.*,
  281 F. Supp. 3d 874 (N.D. Cal. 2017).................................................34

*Perez-Guzman v. Lynch*,
  835 F.3d 1066 (9th Cir. 2016) ............................................................38

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011)............................................................................35

*Radzanower v. Touche Ross & Co.*,
  426 U.S. 148 (1976)......................................................................34, 37

*Reno v. ACLU*,
  521 U.S. 844 (1997)............................................................................31

*RJR Nabisco, Inc. v. European Cmty.*,
  136 S. Ct. 2090 (2016)................................................................. 29-30

*SEC v. Fehn*,
  97 F.3d 1276 (9th Cir. 1996) ..............................................................53

*Sinclair v. Twitter, Inc.*,
  No. 4:17-cv-05710-SBA, slip op. (N.D. Cal. Mar. 20, 2019) ......43, 53

*Small Justice LLC v. Xcentric Ventures LLC*,
  873 F.3d 313 (1st Cir. 2017)...............................................................39

*Taamneh v. Twitter, Inc.*,
  343 F. Supp. 3d 904 (N.D. Cal. 2018).................................................43

*United States v. Borden Co.*,
  308 U.S. 188 (1939)............................................................................34

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) .................................................................47

*Wasco Prods. Inc. v. Southwall Techs., Inc.*,
  435 F.3d 989 (9th Cir. 2006) ..............................................................55

*Weiss v. Nat'l Westminster Bank PLC*,
  453 F. Supp. 2d 609 (E.D.N.Y. 2006) ................................................49

*Weiss v. Nat'l Westminster Bank PLC*,
  768 F.3d 202 (2d Cir. 2014) ...............................................................48

*WesternGeco LLC v. ION Geophysical Corp.*,
  138 S. Ct. 2129 (2018)............................................................. 29-30, 32

*Westlake Legal Group v. Yelp, Inc.*,
  599 F. App'x 481 (4th Cir. 2015) ......................................................39

*Yazoo & M.V.R. Co. v. Thomas*,
  132 U.S. 174 (1889)..........................................................................35

*Zeran v. Am. Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ....................................................*passim*

## STATUTES

18 U.S.C. § 2331(1) ................................................................13, 46, 50

18 U.S.C. § 2333 ..........................................................................*passim*

18 U.S.C. § 2333(a) ..........................................................................8, 41

18 U.S.C. § 2333(d) ......................................................................*passim*

18 U.S.C. § 2334 ................................................................................35

18 U.S.C. § 2339A ......................................................................8, 46, 47

18 U.S.C. § 2339B ........................................................................*passim*

28 U.S.C. § 1291 ..................................................................................3

47 U.S.C. § 230(c) ........................................................................*passim*

47 U.S.C. § 230(e) ................................................................... 30, 32-33

47 U.S.C. § 230(f) ..............................................................................16

## RULES

Fed. R. Civ. P. 12(b)(6)............................................................. 12, 38-39

## MISCELLANEOUS

Justice Against Sponsors of Terrorism Act ("JASTA")
  Pub. L. 114-222, 130 Stat. 852 (Sept. 28, 2016) ........................*passim*

## **INTRODUCTION**

International terrorism is a scourge that Google is deeply committed to fighting. But Appellants' effort to hold Google liable for ISIS's horrific 2015 terrorist attack in Paris, France is legally baseless and was correctly dismissed by the district court.

This is one of over a dozen cases in which Appellants' counsel have invoked the Anti-Terrorism Act, 18 U.S.C. § 2333 ("ATA"), to sue prominent online platforms—including Google, Facebook, and Twitter—for terrorist attacks all over the world. To date, every court that has ruled in these cases has dismissed the claims, holding either that the plaintiffs failed to state a valid cause of action under the ATA or that the claims were barred by the immunity that Congress provided to online services in Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c) ("Section 230"). Last year, in *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), this Court issued the first appellate decision in this line of cases, affirming the dismissal of a similar lawsuit against Twitter for lack of proximate cause—that is, a "direct" relationship" between Twitter's actions and the specific terrorist attack at issue.

In this case, the district court rejected Appellants' claims on both of these grounds. As the court explained, Appellants' allegations against Google suffer from the same problem this Court identified in *Fields*. There is simply no direct

causal link between Google's operation of YouTube and the terrible acts of violence that ISIS perpetrated in Paris. That such a link is missing here should be no surprise: far from inviting ISIS to its platform, Google strictly prohibits—and has made extensive efforts to remove from YouTube—videos and related content that promote terrorism.

In addition to correctly applying the controlling decision in *Fields*, the district court held that all of Appellant's claims are barred by Section 230. That holding was a straightforward application of this bedrock statutory protection. The premise of this lawsuit is that Google is responsible for the alleged consequences of videos that ISIS purportedly posted on YouTube, and that Google should have done more to stop ISIS from uploading such content. For over two decades, this Court and others have consistently held that Section 230 protects online services against exactly such efforts to hold them liable for third-party content. Appellants offer no viable basis for evading this established immunity.

While this Court need not go beyond *Fields* and Section 230 to affirm the district court's ruling, Appellants have not stated a claim under the ATA for other reasons. Their direct liability theory fails not only for lack of proximate cause, but also because Google did not itself commit an "act of international terrorism." And their secondary liability claims fail because the complaint alleges no facts plausibly

suggesting that Google knowingly provided substantial assistance to—or conspired with—the terrorists who committed the Paris attack.

While Google abhors what ISIS did in Paris and deeply sympathizes with Appellants for the pain inflicted on them by that terrible act, the law does not allow them to pursue these claims against Google.

## JURISDICTIONAL STATEMENT

Google agrees that this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.      Whether Section 230 of the CDA bars Appellants' claims, which seek to hold Google liable for material that third parties posted on YouTube.

2.      Whether Appellants' allegations state a viable cause of action under the Anti-Terrorism Act, 18 U.S.C. § 2333.

## STATUTORY PROVISIONS

All relevant statutes are contained in the addendum filed by Appellants, Dkt. 19, except for JASTA (130 Stat. 852) § 3, which appears in an addendum to this brief.

## COUNTERSTATEMENT OF THE CASE

### A.      YouTube's Online Video-Hosting Service

YouTube is an online service used by more than a billion people around the world to post, share, and comment on videos and related content on an immensely

vast range of topics. ER117 ¶¶179-184. YouTube account holders are generally free to post videos and other content directly to YouTube's platform, subject to YouTube's rules and regulations, which expressly prohibit material that incites or promotes violence. ER115 ¶¶164-165.

Google uses various automated and manual means to facilitate its review of content posted to the site, including employing Arabic speakers to review videos accused of spreading ISIS propaganda. ER177 ¶505. Google also works with governments around the world to prevent the dissemination of terrorist messages on its platform. ER177 ¶510. When YouTube discovers that users have posted terrorist or violent extremist content in violation of its guidelines, YouTube takes enforcement actions that include removing videos and other material and terminating accounts. ER174 ¶492; ER176 ¶502; ER178 ¶514.

## B. ISIS's November 2015 Attack In Paris

This case arises from the appalling attack that ISIS terrorists committed in Paris, France on November 13, 2015. ER135-71. Twelve ISIS terrorists, organized by a group of Belgian ISIS recruiting networks, were "directly involved" in the attack, ER136-37 ¶306, which took place over the course of several hours in multiple locations around Paris, ER159-62 ¶¶405-432.

That attack claimed the lives of Nohemi Gonzalez and more than 100 other people. Nohemi Gonzalez's estate, along with various members of her family, are

the Plaintiffs and Appellants in this action. ER88-89 ¶¶24-28. Appellants brought this lawsuit not against ISIS or anyone involved in planning or carrying out the attack, but instead against Google, based on its role as the owner and operator of YouTube. ER89 ¶29.

## C. Appellant's Efforts To Hold Google Liable For The Paris Attack

The case was originally filed by Reynaldo Gonzalez against Google, as well as Twitter and Facebook. ER203-04. Following resolution of a dispute regarding the administration of Nohemi Gonzalez's estate, and the joinder of her additional family members, Appellants filed a Second Amended Complaint ("SAC") against Google alone. ER210-11.[1]

Appellants did not allege that Google committed the Paris attack, but instead focused on the presence on YouTube of videos allegedly posted by ISIS and its supporters. ER117-19 ¶¶185-196. Appellants described in detail the contents of various videos that Appellants contended were used by ISIS to recruit, indoctrinate, incite fear, fundraise, and communicate messages about terror attacks. ER121-34 ¶¶211-289. Appellants made no claim that Google had anything to do with the creation or the content of these videos, nor that YouTube was aware of and declined to remove them. Indeed, Appellants admitted that all of the videos

---

[1] Plaintiffs' counsel brought a separate action arising from the Paris attack against Twitter, which was also dismissed. *Cain v. Twitter, Inc.*, No. 17-cv-02506-JD, 2018 U.S. Dist. LEXIS 163457(N.D. Cal. Sept. 24, 2018).

were created entirely by third parties—that is, allegedly, by ISIS and its supporters. ER121-24 ¶¶211-225.

Based on the purported effects of these videos, Appellants sought to hold Google directly and secondarily liable for the Paris attack under the ATA. The theory underlying their claims was that Google, through its operation of YouTube, caused or knowingly contributed to the Paris attack, an act of international terrorism. ER136 ¶¶299-304. These claims depended integrally on the content that they allege ISIS disseminated through YouTube. Appellants claimed, for example, that ISIS recruiting networks posted "sermons, speeches, news events, and other materials" to YouTube, which were intended "to lure, recruit, and indoctrinate young Muslims to travel to Syria and Iraq to join ISIS." ER137-38 ¶310; ER140 ¶¶333-334; ER145 ¶337. They included numerous pages of screen clips showing purported ISIS videos. ER141-47 ¶¶336-339; ER150 ¶358.

While Appellants sought to hold Google liable based on the content of various materials allegedly uploaded by ISIS, their theory for connecting YouTube to the Paris attack was attenuated. Appellants contended that YouTube's platform had on occasion been used by ISIS and its allies, that this use allowed ISIS to spread its message and recruit members, and that these efforts played some undefined role in helping to inspire or bring about the Paris attack. *See, e.g.*, ER117-35 ¶¶185-298; ER148-51 ¶¶349, 356-358, 362.

6

Appellants did not deny that YouTube bans content that encourages violence, including terrorism. They also acknowledged that Google worked in various ways to enforce these rules. For example, Appellants admitted that "Google suspended or blocked selected ISIS-related accounts at various times" (ER175 ¶493) and that it had a practice of "reviewing accounts reported by other YouTube users," including by "hiring Arabic speakers to serve as 'moderators' to review videos posted to YouTube." ER87-88 ¶20; ER177 ¶505.

But, according to Appellants, this was not enough: Appellants claimed that Google should have "actively" monitored the content posted by its hundreds of millions of daily users, ER174 ¶491, and should have made "substantial or sustained efforts to ensure that ISIS would not re-establish ... accounts using new identifiers," ER175 ¶493. In Appellants' view, Google's alleged failure to undertake more stringent control over the content that users uploaded made it responsible for ISIS's attack in Paris.

Based on this theory, Appellants asserted four claims under the ATA's civil-remedy provision, 18 U.S.C. § 2333. ER34-35. Counts I and II sought to hold Google secondarily liable under Section 2333(d) for "knowingly provid[ing] substantial assistance" and encouragement to ISIS, and "conspir[ing] with [ISIS]." 18 U.S.C. § 2333(d). Counts III and IV sought to hold Google directly liable under

Section 2333(a) based on the allegation that Google provided "material support" to terrorists in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339B.

### D.    The District Court Dismisses The Second Amended Complaint

Google moved to dismiss the claims in the SAC as barred by Section 230 and for failure to state a claim. The district court agreed that Appellants' claims were barred by Section 230. As Judge Ryu explained in her detailed and comprehensive ruling, imposing liability on Google for ISIS's attack would impermissibly "treat[]" Google as a "publisher or speaker of information provided by another," 47 U.S.C. § 230(c)(1). ER46-51. Though she dismissed the SAC under Section 230, Judge Ryu gave Appellants—who had already filed three versions of their complaint—another opportunity to amend. ER56-57.

### E.    Appellants' Third Amended Complaint

Appellants' Third Amended Complaint ("TAC") reasserted the same claims and advanced the same general theory of liability that the district court had previously rejected. ER2. Appellants also added several additional allegations and two new causes of action.

Some of the new allegations addressed an issue that had come up at oral argument on Google's first motion to dismiss: Appellants claim that Google had shared advertising revenue for certain videos with ISIS. ER56. In the SAC, Appellants had cryptically pointed to a screenshot of an advertisement displayed

alongside what they called an "ISIS video" and claimed it showed Google gave money to ISIS. But, as the district court recognized, Appellants failed to plead any facts showing "that the user who uploaded the video is a member of ISIS" or "connecting alleged revenue sharing with the Paris attacks." *Id.* The TAC added a single conclusory statement that the video "was created by ISIS and was posted by ISIS using a known ISIS account" and, "[o]n information and belief, … YouTube shared revenue with ISIS." ER181 ¶533. But Appellants still did not offer any actual factual allegations to support these assertions.

### F. This Court's Decision In *Fields*

Google moved to dismiss the TAC, again arguing that Appellants' claims were barred by Section 230 and failed to state a claim under the ATA. Google's motion also took account of this Court's intervening ruling in *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018). Like this case, *Fields* involved ATA claims seeking to hold an online service provider (Twitter) liable for an act of international terrorism. Affirming the dismissal of those claims, this Court held that an ATA "plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts to bring a successful ATA claim." *Id.* at 749. *Fields* held that this pleading requirement was not met where the plaintiff alleged that Twitter's "provision of material support to ISIS facilitated the organization's growth and ability to plan and execute terrorist acts." *Id.* at 749-50.

### G. The District Court Dismisses The Third Amended Complaint

The district court granted Google's motion to dismiss the TAC. Once again, Judge Ryu relied primarily on Section 230. The court held that, "[w]ith the exception of Plaintiffs' revenue sharing claims, the claims in the TAC are all premised on the theory that Google permitted ISIS and its supporters to use the YouTube platform to disseminate a terrorist message." ER30. That theory, Judge Ryu again explained, is barred by Section 230. *Id*.

As an alternative basis for dismissing Appellants' direct liability claims, the court applied *Fields* to hold the claims failed for lack of proximate cause. Judge Ryu explained that the TAC "contain[ed] numerous allegations that mirror those rejected as insufficient in *Fields*." ER30. And Judge Ryu further observed that Appellants did not "allege any direct causal connection between the Paris attack and any shared revenue provided to ISIS in connection with the single YouTube video alleged in the TAC." ER29-30.

Based on the combined effects of Section 230 and *Fields*, the district court dismissed all of Appellants' claims with prejudice, though it offered Appellants "one final opportunity" to amend their revenue-sharing claims "in a manner consistent with Rule 11." ER30. But Appellants, having nothing more to offer, declined to exercise this option. They did not file another amended complaint, but instead waited for the district court to enter final judgment. ER1.

## SUMMARY OF ARGUMENT

The district court rightly held that Appellants' effort to hold Google liable for ISIS's Paris attack fails as a matter of law. Appellants offer no basis for disturbing that ruling.

We start with Section 230 because it was the primary basis for the district court's ruling and because that statute bars all of the claims that Appellants have made against Google. As the district court found, this is a straightforward case for applying Section 230: Appellants seek to impose liability on Google for publishing—or failing to remove—material that third parties posted on YouTube. Their claims depend at every turn on the content of videos that ISIS allegedly uploaded to YouTube, videos that Appellants say helped spread ISIS's message and ultimately played some role in spurring the Paris attack. Appellants thus seek to do precisely what Section 230 forbids: to treat Google as the "publisher or speaker" of content posted by others. 47 U.S.C. § 230(c)(1). The statute's plain language—reinforced by decades of case law—leaves no doubt that Section 230 protects Google from claims like these.

Appellants make a series of arguments claiming that Section 230 should not apply at all to this case, but those arguments fail based on established law. *First*, this case does not involve an "extraterritorial" application of Section 230. Appellants are U.S. nationals who seek to bring claims in a federal court under

U.S. law. Applying Section 230 here is a wholly domestic use of the immunity. *Second*, as every court to address this issue has held, Section 230's narrow exception for "enforcement" of "federal criminal law" applies only to criminal prosecutions—not to private civil claims brought under statutes that establish federal crimes. *Third*, Section 230 was not repealed, impliedly or otherwise, by Congress's recent enactment of the Justice Against Sponsors of Terrorism Act ("JASTA"), which added secondary liability to the ATA. *Fourth*, it is well settled that Section 230 can be applied on a Rule 12(b)(6) motion where, as here, the relevant facts are clear from the complaint.

While Section 230 provides a complete basis for affirmance, the district court also correctly applied this Court's controlling decision in *Fields* to reject Appellants' claims. *Fields* holds that, to plead an ATA claim, "a plaintiff must show at least some direct relationship between the injuries that he or she suffered and the defendant's acts." 881 F.3d at 740, 744. That relationship is missing here, just as it was in *Fields*. Neither Appellants' highly attenuated theory that ISIS's purported use of YouTube helped the organization grow in strength and influence, nor their allegations about how one of the Paris attackers used YouTube, give rise to the kind of "direct" causal connection between Google's operation of its online platform and Nohemi Gonzalez's tragic death that the ATA requires.

12

Because the district court rejected Appellants' claims based on Section 230 and *Fields*, it did not need to address the other reasons that Google offered for dismissal. Appellants now take up those issues on appeal, but their arguments provide no basis for reviving their claims. As for direct liability, Appellants argue that Google violated the material support laws and thus committed an "act of international terrorism" under the ATA. This is doubly wrong: Appellants' allegations do not support any inference that Google knowingly provided material support to ISIS, much less that its activities "appeared to be intended" to advance one of the terrorist purposes set forth in the definition of "international terrorism." 18 U.S.C. § 2331(1)(B). As for secondary liability, nothing in the TAC remotely supports an inference that Google knowingly provided substantial assistance to, or conspired with, ISIS in its commission of the Paris attack. Appellants' pleading failures provide an alternative basis for affirming the district court's decision.

## ARGUMENT

## I.  APPELLANTS' CLAIMS ARE BARRED BY SECTION 230

The district court correctly held that Appellants' claims all arise from third-party material posted on YouTube and thus are barred by Section 230 of the CDA. Appellants' efforts to avoid this established protection are meritless.

**A.    Section 230 Bars Appellants' Core Theory Of Liability**

Congress enacted Section 230 of the CDA "for two basic policy reasons: to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.'" *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003); *see also Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003) ("Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the medium to a minimum."). To further those goals, the statute "protects certain internet-based actors from certain kinds of lawsuits." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099 (9th Cir. 2009).

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As this Court (and others) have recognized, this provision "protects websites from liability for material posted on the website by someone else." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016); *accord Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) ("any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230"); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) ("At its

core, § 230 bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content.'" (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997))).

In applying Section 230, "what matters is not the name of the cause of action … what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101-02. "Indeed, many causes of action might be premised on the publication or speaking of what one might call 'information content.'" *Id.* at 1101. Courts have consistently applied Section 230 to bar such claims—no matter what the cause of action or whether it arises under a federal statute like the ATA. *See id*.; *accord Roommates*, 521 F.3d 1157 (applying Section 230 to claims under the Fair Housing Act).

This Court has established a three-part test for applying Section 230. The statute "protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat … as a publisher or speaker (3) of information provided by another information content provider." *Barnes*, 570 F.3d at 1100-01. As the district court found, these elements are readily satisfied here. Appellants' contrary arguments have no support in the statute, the case law, or their own allegations.

15

1.    Google Is An Interactive Computer Service Provider

Google and YouTube readily qualify as "interactive computer service" providers under Section 230's broad definition. *See, e.g.*, *Lancaster v. Alphabet Inc.*, No. 15-cv-05299-HSG, 2016 U.S. Dist. LEXIS 88908, at *7 (N.D. Cal. July 8, 2016); *Gavra v. Google Inc.*, No. 5:12-CV-06547-PSG, 2013 U.S. Dist. LEXIS 100127, at *4-9 (N.D. Cal. July 17, 2013); *accord Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1268 (9th Cir. 2016) ("Yelp is plainly a provider of an 'interactive computer service,' *see* 47 U.S.C. § 230(f)(2), a term that we interpret 'expansively'."). Appellants do not argue otherwise.

2.    The Content At Issue Was Created And Developed By Third Parties

Appellants' claims also plainly arise from information provided by another "information content provider." Under Section 230, that term refers to "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

Appellants admit that Google did not "create any ISIS videos or any other ISIS content." Br. 56. Indeed, the TAC makes clear that all such material was created by ISIS or its supporters. *E.g.*, ER86-87 ¶¶11, 13, 15; ER118 ¶191; ER183 ¶540. There is no allegation that Google had any role in creating or producing terrorist content supposedly uploaded to YouTube. As the district court explained,

Google "do[es] nothing to enhance the unlawfulness of ISIS videos, encourage the posting of ISIS videos, or make posting ISIS videos easier." ER55. Appellants do not argue otherwise. Because the objectionable material at issue was created and placed on YouTube solely by third parties, this element of Section 230 is readily satisfied. *Accord Klayman v. Zuckerberg*, 753 F.3d 1354,1358 (D.C. Cir. 2014) (applying Section 230 protection where plaintiff's "complaint acknowledges that the objected-to information on the Third Intifada pages was provided by third party users, not Facebook itself").

That should end the analysis. But, having conceded that ISIS, not Google, authored and posted all the relevant content, Appellants persist in arguing that Google is somehow responsible for "creating" or "developing" that material under Section 230. Appellants make two arguments in support of their theory, both of which are contrary to settled law.

### a. *YouTube Does Not Create Or Develop Content By Placing Ads Around It*

Appellants first assert (without factual support) that Google "paired" ISIS content "with selected advertising and other videos"—thereby creating some kind of "mosaic" in which the ISIS material is just one fragment. Br. 55-58 ("[w]hat Google creates is not the content on its website, but *the mosaic* in which it is presented" (emphasis added)). This amounts to an argument that YouTube's system may algorithmically cause other third-party content—such as ads or

thumbnails for other user-submitted videos—to appear on pages where users can watch YouTube videos. Appellants say that, insofar as Google "combined third party content," including ISIS videos, it somehow became the creator or developer of that content and lost Section 230 protection for any claims relating to it. The district court was right to reject this argument. ER52-53.

This Court has expressly held that a service provider does not "develop" content merely by "augmenting the content generally"; instead, "a website helps to develop unlawful content" only where "it contributes materially to the alleged illegality of the conduct." *Roommates*, 521 F.3d at 1167-68. Immunity thus may be lost only where "it is very clear that the website directly participates in developing the alleged illegality." *Id.* at 1174; *accord Jones*, 755 F.3d at 410 ("A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful.").

In *Kimzey*, this Court applied the material contribution test in holding that Section 230 protected Yelp from claims that it was responsible for negative reviews of the plaintiff's business. The plaintiff argued that "Yelp designed and created its signature star-rating system, and thereby served as 'author' of the one-star rating given by [one of its users]." *Kimzey*, 836 F.3d at 1269. Rejecting that argument, this Court explained that Yelp's "rating system d[id] 'absolutely nothing

18

to enhance the defamatory sting of the message' beyond the words offered by the user." *Id*. at 1270 (quoting *Roommates*, 521 F.3d at 1172). The Court further explained that the way a website operator arranges and displays third-party information does not make it a creator or developer of that material. *Id*. ("We fail to see how Yelp's rating system, which is based on rating inputs from third parties and which reduces this information into a single, aggregate metric is anything other than user-generated data.").[2]

Appellants' mosaic argument does not come close to satisfying this strict material contribution requirement. That is because the other pieces of the supposed mosaic are wholly unrelated to Appellants' actual ATA claims against Google. As discussed above, those claims are based on allegations that ISIS used YouTube to post videos and other material that Appellants believe helped ISIS spread its terrorist message and carry out attacks. *E.g.*, ER118 ¶194. But that theory has

---

[2] Trying to avoid this rule, Appellants insist on a distinction between "development" and "creation" that has no support in the case law and makes no sense. Br. 55-56. Under Section 230, content "creation" is straightforward and rarely in dispute: the creator of the information is the person who authored it. *E.g.*, Merriam-Webster's Collegiate Dictionary (10th ed. 2001) (defining "creation" as "the act of making, inventing, or producing"). "Development," by contrast, is a more elusive (and potentially broader) term, which is why cases like *Roommates* focused on it. 521 F.3d at 1167-68. Here, Google clearly did not author or produce the ISIS content at issue. And there is no reason to ignore the established material-contribution test merely because Appellants seek to rely on a (baseless) theory of "creation." Doing so would be contrary to this Court's decision in *Kimzey*, which applied the material contribution test to find that Yelp was responsible for neither the "creation" nor the "development" of the allegedly unlawful content. 836 F.3d at 1269-70.

nothing to do with whether any of that terrorist content appeared alongside advertisements or other third-party material. Appellants do not even try to suggest that such collateral material was itself unlawful or that it played any role in bringing about the Paris attack. Nor do they contend that the appearance of such content in proximity to ISIS-related videos changed the content or the meaning of those videos. *Accord Roommates*, 521 F.3d at 1169 ("A website operator who edits user-created content … retains his immunity for any illegality in the user-created content, provided that the edits are unrelated to the illegality."); *O'Kroley v. Fastcase, Inc*., 831 F.3d 352, 355 (6th Cir. 2016) (service provider does not "develop" content by performing "automated editorial acts").

In short, Appellants' mosaic theory is misdirection. YouTube's supposed pairing of ISIS-related content with ads or other videos had no bearing on the illegality of that content. Google's arrangements of different pieces of user-created content simply did not contribute to "what makes the displayed content illegal or actionable." *Kimzey*, 836 F.3d at 1269 n.4. Appellants' argument suggests, at most, that Google generally "augments" content—exactly what this Court has held does not amount to "creation or development." *Roommates*, 521 F.3d at 1167-68; *accord Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 476 (E.D.N.Y. 2011) ("The fact that defendants invite postings and then in certain circumstances

alter the way those postings are displayed is not the 'development' of information for Section 230 purposes.").

        b.    *YouTube Does Not Become A Content Developer By Inviting Or Promoting Third-Party Content*

Appellants' second "development" argument is equally infirm. Asserting that Google "invites and promotes third-party content," Appellants make various assertions about how Google supposedly amplifies ISIS's message through tools designed to help users find engaging content on YouTube. Br. 58-60. This ignores both established law and Appellants' own allegations.

As for the law, an online service does not "develop" content merely by encouraging users to post material on its service. *See, e.g.*, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256-57 (4th Cir. 2009) (website did not develop content where it allegedly "'solicited' its customers' complaints" and "'steered them' into 'specific categories'"). All user-submitted-content platforms do that, so "to read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides." *Roommates*, 521 F.3d at 1167; *accord Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 969 (N.D. Ill. 2009). In *Jones*, the Sixth Circuit (applying this Court's decision in *Roommates*) squarely rejected the argument that a website owner "who intentionally encourages illegal or actionable third-party postings" thereby "becomes a 'creator' or 'developer' of that content." 755 F.3d at 413. The court

21

explained that such an encouragement test "would inflate the meaning of 'development' to the point of eclipsing the immunity from publisher-liability that Congress established." *Id*. at 414.

Here, Appellants' argument is even weaker. They do not (and could not) allege that Google encourages the posting of terrorist or other illegal content. To the contrary, Appellants acknowledge that Google specifically prohibits such material from appearing on YouTube and routinely acts to remove it. ER119 ¶200; ER175 ¶493; ER177 ¶506. Google cannot be charged with developing content that users posted to its service in violation of its own rules. *See Roommates*, 521 F.3d at 1171 (Section 230 immunity applied where "the website did absolutely nothing to encourage the posting of defamatory content—indeed, the defamatory posting was contrary to the website's express policies"); *Nemet*, 591 F.3d at 257 (applying *Roommates* to hold that "a website operator who does not 'encourage illegal content' or 'design' its 'website to require users to input illegal content' is 'immune' under § 230").[3]

Beyond that, Appellants target tools that work across the entire YouTube service to argue that YouTube engages users with user-submitted content. Despite

---

[3] Appellants point to *Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016), but that ruling did not turn on any purported "encouragement" of defamatory content by third parties. Instead, the Seventh Circuit accepted the plaintiff's allegations that defendant's *own employees* authored one or more of the defamatory comments at issue. *Id.* at 742. That holding is irrelevant here—Appellants have not (and could not have) alleged that YouTube created any of the allegedly unlawful videos.

their vague rhetoric—which has little connection to anything actually alleged in the TAC[4]—Appellants never suggest that Google does anything to specifically select and amplify the message of ISIS-related content. Instead, to the extent their assertions are discernable, Appellants seem to be claiming that the features of YouTube that make it an engaging platform for billions of legitimate videos on countless topics were also used by ISIS to help make its message more effective. While unpleaded and unsupported, these assertions are also contrary to law.

This Court has squarely held that "providing *neutral* tools to carry out what may be unlawful or illicit ... does not amount to 'development'" under Section 230. *Barnes*, 570 F.3d at 1101 n.6 (quoting *Roommates*, 521 F.3d at 1169); *accord Klayman*, 753 F.3d at 1358 ("a website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online"). That is true even if such tools help "steer users to unlawful content." *Dyroff v. Ultimate Software Grp., Inc.*, No. 17-cv-05359-LB, 2017 U.S. Dist. LEXIS 194524, at *21-26 (N.D. Cal. Nov. 26, 2017) (holding that algorithms and push notifications are neutral tools fully consistent with Section 230 protection).

---

[4] Appellants assert, for example, that "Google selectively favors or suppresses ISIS content depending on whether Google believes a given user will be galvanized by it." Br. 60. This rhetoric is wholly unsupported by the TAC. Appellants plead no facts that show Google recommended ISIS content based on whether users would be galvanized by it, nor could they.

Accordingly, providing neutral tools "is fully protected by CDA immunity, absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes." *Roommates*, 571 F.3d at 1174 n.37. Here, as the district court found, Google's "tools do not encourage … the posting of unlawful or objectionable material." ER22. Appellants offer no basis for disturbing that conclusion. The most they can muster is that YouTube supposedly helped ISIS "by distributing its messages much farther and with far more speed than other media possibly could." Br. 60. But that runs headlong into this Court's holding in *Kimzey*: "Simply put, proliferation and dissemination of content does not equal creation or development of content." 836 F.3d at 1271.

In short, it is clear that Google is neither the creator nor the developer of the ISIS-related content at issue in this case.

### 3. Appellants' Claims Seek To Treat YouTube As A Publisher

Finally, Appellants' claims under the ATA seek to treat Google as a "publisher or speaker" of third-party content. In applying this element, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1102.

As this Court has explained, "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content."

*Id.*; *see also Klayman*, 753 F.3d at 1359 ("the very essence of publishing is making the decision whether to print or retract a given piece of content"). Section 230 thus protects "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online." *Roommates*, 521 F.3d at 1170-71. That is exactly what Appellants' claims target. Their theory of liability is that Google impermissibly allowed ISIS material to be published on YouTube—or, put another way, that YouTube failed to do enough to block or remove ISIS content. ER87-88 ¶¶20-21; ER173-75 ¶¶486, 491, 493. According to Appellants, Google's actions allowed ISIS to disseminate its hateful message and ultimately helped bring about the Paris attack. *See* Br. 52-53.

By any measure, these claims would treat Google as a publisher. By seeking to impose liability on Google's decisions about who may use its service, what content may be posted, and when such content should be blocked or removed, Appellants aim directly at Google's "traditional editorial functions"—decisions regarding "whether to publish, withdraw, postpone, or alter content." *Jones*, 755 F.3d at 416 (quoting *Zeran*, 129 F.3d at 330). This is "precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230." *Roommates*, 521 F.3d at 1171-1172; *accord Green v. Am. Online*, 318 F.3d 465, 470-471 (3d Cir. 2003) (Section 230 "specifically proscribes liability" against online service for "decisions relating to the monitoring, screening, and deletion of

25

content from its network—actions quintessentially related to a publisher's role"); *Klayman*, 753 F.3d at 1359-60 (Section 230 barred claims based on "Facebook's allowing the Third Intifada pages to exist on its website in the first place").

Trying to evade this straightforward result, Appellants argue that they seek only to impose a "duty to not support terrorists"—a duty that applies to everyone, whether engaged in publication or not, and that "does not vary based on content." Br. 62.[5] Even if this was the theory advanced by Appellants' claims, it would not defeat Section 230 protection. *See, e.g.*, *Doe II v. MySpace, Inc.*, 175 Cal. App. 4th 561, 573 (2009) (claim seeking to ensure that online service did not allow certain types of users to communicate on its platform is barred because that "type of activity—to restrict or make available certain material—is expressly covered by section 230"); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1123 (N.D. Cal. 2016) ("providing accounts to ISIS is publishing activity" because "specifically prohibit[ing] ISIS members and affiliates from acquiring accounts … necessarily [would] target[] the content, ideas, and affiliations of particular account holders").

---

[5] Appellants also contend that YouTube's implementation of algorithms that recommend content on its service renders YouTube a "matchmaking or brokerage" service. Br. 62 n.21 (emphasis omitted). Appellants did not plead this theory or raise this argument before the district court. But even accepting this strained characterization of YouTube's service would hardly take YouTube outside of Section 230's protection. *See, e.g.*, *Carafano*, 339 F.3d at 1125 (Section 230 protects online publication of third-party content to recommend or match users' dating profiles).

But Appellants also ignore the actual claims they are advancing. They do not (and could not) assert a standalone cause of action against Google for providing material support to ISIS under the criminal material support laws. They instead are asserting civil claims under Section 2333 of the ATA. And providing material support is neither a necessary nor a sufficient condition for such claims. Bringing a cause of action under the ATA requires a showing that YouTube's actions proximately caused—that is, had a "direct relationship" to—the Paris attack. *Fields*, 881 F.3d at 748.

While Appellants fail to establish this essential element of their claim (as discussed below), their effort to make this showing depends entirely on the specific content that ISIS supposedly posted on YouTube. As the district court put it: "Plaintiffs rely on content to establish causation." ER48. That is why the TAC is replete with references to and descriptions of purported ISIS videos. ER124-25 ¶¶227, 230; ER127-28 ¶¶243, 245-246; ER130-33 ¶¶ 260-281; ER149-51 ¶¶357-358; ER153-54 ¶¶367-370. Indeed, the very first sentence of Appellants' brief charges that "YouTube has knowingly hosted ISIS terrorist videos, which feature gruesome murders of helpless ISIS prisoners." Br. 1.

Appellants' reliance on this content only underscores that they are seeking to hold YouTube liable as a publisher. The duty that Appellants contend YouTube failed to discharge was to prevent ISIS from posting such material—content that,

Appellants believe, helped bring about the Paris attack. On Appellants' theory, if YouTube had prevented ISIS from posting that content in the first place or had acted more quickly to remove it, Google would not be liable under the ATA. That runs squarely into Section 230. Accepting such claims would "inherently require[] the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101-02; *accord Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 973-74 (N.D. Cal. 2016) (explaining that "plaintiffs' arguments and allegations with respect to proximate causation are ... content-based" and thus clearly barred by Section 230).

### B. Appellants Cannot Evade Section 230 By Invoking The Presumption Against Extraterritoriality

Unable to evade Section 230's protection, Appellants make a series of arguments for why the immunity should not apply at all. These arguments all fail.

Appellants first invoke the presumption against extraterritoriality to claim that Section 230 somehow does not apply where the underlying conduct occurred abroad. Br. 31-39. But the presumption against extraterritoriality has nothing to do with this case. Section 230 is an immunity that protects online service providers against efforts to hold them liable for third-party material on their platforms. As the district court found, applying Section 230 here—to protect a U.S. company against claims brought by U.S. nationals under U.S. law in a U.S. court—was a wholly domestic application of that protection.

Appellants refer to the Supreme Court's "two-step framework for deciding questions of extraterritoriality." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018). But there is no good reason to apply that framework here. All the relevant cases addressing the presumption against extraterritorial application of U.S. laws involve statutes that regulate primary conduct—such as the antitrust laws, securities laws, and RICO. *E.g.*, *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016). In that context, the presumption helps "avoid the international discord that can result when U.S. law is applied to conduct in foreign countries" and to ensure that domestic law applies primarily to "domestic concerns." *Id.* at 2100.

Those concerns are not present when addressing an immunity statute. Section 230 limits what claims can be brought in court. It is not a substantive regulatory provision, and it does not require any private party to do (or not do) anything. When applied in domestic courts to domestic laws, there is no possibility of a clash between Section 230 and the laws of any other country and no concern that Congress is trying to "rule the world." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007). As such, where Section 230 is invoked to defeat a claim brought in a domestic court (and certainly if that claim is asserted under domestic law), there is no extraterritoriality issue. The analysis need go no further. In such

cases, Section 230 applies without regard to where the underlying conduct occurred or where the plaintiff claims to have been injured.

But even using the Supreme Court's extraterritoriality framework, this is an easy case. *See Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 159-60 (E.D.N.Y. 2017) (rejecting argument that Section 230 does not apply to ATA claim where terrorist attack at issue occurred abroad). The second step of that framework asks whether the case "involves a domestic application of the statute." *RJR Nabisco*, 136 S. Ct. at 2101. "Courts make this determination by identifying 'the statute's 'focus'' and asking whether the conduct relevant to that focus occurred in United States territory." *WesternGeco*, 138 S. Ct. at 2136.[6]

A statute's focus is "the object of its solicitude, which can include the conduct it 'seeks to "regulate"' as well as the parties and interests it 'seeks to "protect"' or vindicate.'" *WesternGeco*, 138 S. Ct. at 2137 (quoting *Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247, 267 (2010)). As "an immunity statute," *Roommates*, 521 F.3d at 1174, Section 230's focus is on protecting online service providers against liability. *Cf.* 47 U.S.C. 230(e)(3).[7] Because it is not a substantive

---

[6] Appellants chide the district court for jumping to this step (Br. 32-33), but it is the only relevant part of the analysis here. The first step asks "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco*, 136 S. Ct. at 2101. No one has argued that Section 230 has such indications.

[7] Appellants argue that, because Section 230 does not use the word "immunity," its focus is not on limiting liability, but instead on encouraging service providers to remove objectionable (especially sexual) content. Br. 34-36. This argument is

regulatory provision that dictates the primary conduct of private actors, Section 230's focus does not turn on the location of the underlying events that might support a substantive, affirmative claim. The interests that Section 230 seeks to "vindicate" are those of service providers who find themselves facing lawsuits based on their making third-party content available. *Accord Barnes*, 570 F.3d at 1100 (explaining that Section 230(c)(1) "bars courts from treating certain internet service providers as publishers or speakers"); *Zeran*, 129 F.3d at 334 ("Section 230 does not directly regulate the activities of interactive computer service providers like AOL. Instead, § 230 is addressed only to the bringing of a cause of action."). And the location that matters for that protection is where the claim against the service provider was brought.[8]

---

contrary to two decades of law, including this Court's en banc decision in *Roommates*, which described Section 230(c)(1) as an "immunity," 521 F.3d at 1174, and *Barnes*, which explained that Section 230 "protects certain internet-based actors from certain kinds of lawsuits," 570 F.3d at 1099. *See also, e.g.*, *Batzel*, 333 F.3d at 1028 (Section 230 "sought to prevent lawsuits from shutting down websites and other services on the Internet.").

[8] Appellants claim that the overall objective of the CDA (of which Section 230 was a part) was to regulate online content, and they point to Section 230(c)(2) as serving that same function. Br. 34-36. But the portions of the broader CDA that regulated and restricted online speech were invalidated by the Supreme Court in *Reno v. ACLU*, 521 U.S. 844 (1997), and have nothing to do with this case. Section 230(c)(2) is similarly irrelevant. *See Barnes*, 570 F.3d at 1105. And subsection (c)(2) works not by regulating online speech, but by providing "an additional shield from liability." *Id.* It only reinforces that the focus of Section 230 is on protecting service providers from claims asserted in court.

The court in *Cohen* explained this point clearly: "Given the statutory focus on limiting liability," the relevant location for Section 230 "cannot be the place in which the claims arise but instead must be where redress is sought and immunity is needed." 252 F. Supp. 3d at 160. That is "where the grant of immunity is applied, i.e. the situs of the litigation." *Id.* In this case, that was the Northern District of California. Applying Section 230 to a claim brought in that court "involves a permissible domestic application of the statute." *WesternGeco*, 138 S. Ct. at 2136. The presumption against extraterritoriality is beside the point.

## C. Section 230's Exception For Federal Criminal Law Enforcement Does Not Apply To Private Civil Claims

Appellants next make a token argument that Section 230 does not apply to this case because their claims are based, in part, on allegations that Google violated certain federal criminal statutes. Br. 63. Like every other court to have addressed this argument, the district court correctly rejected it.

Section 230 has an exception for federal criminal law: "Nothing in this section shall be construed to impair the enforcement of ... any ... Federal criminal statute." 47 U.S.C. § 230(e)(1). But it is well settled that this exception "does not limit Section 230(c)(1) immunity in civil actions based on criminal statutes but rather extends only to criminal prosecutions." *Cohen*, 252 F. Supp. 3d at 157 n.11; *see also, e.g.*, *Doe v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016); *Hinton v. Amazon.com.DEDC, LLC*, 72 F. Supp. 3d 685, 691 (S.D. Miss. 2014); *M.A. ex*

*rel. P.K. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1055 (E.D. Mo. 2011).

This uniformity is unsurprising. The plain meaning of "criminal" excludes civil claims. *Vill. Voice*, 809 F. Supp. 2d at 1055. And the "enforcement" of federal criminal law is handled by federal prosecutors, not by private plaintiffs. Indeed, as the First Circuit has explained, "the distinctions between civil and criminal actions—including the disparities in the standard of proof and the availability of prosecutorial discretion—reflect a legislative judgment that it is best to avoid the potential chilling effects that private civil actions might have on internet free speech." *Doe*, 817 F.3d at 24-25.[9]

Beyond that, Appellants' invocation of the exception rests on a false premise. Section 2333 of the ATA is not a criminal statute. It is entitled "Civil Remedies," and it authorizes private civil claims, not criminal prosecutions. No prosecutor can bring a charge based on this statute. Applying Section 230 to ATA claims thus could in no way "impair the enforcement" of federal criminal law.

---

[9] Where Congress actually intends to preclude Section 230's application to civil claims predicated on criminal statutes, it knows how to do so. *See* 47 U.S.C. § 230(e)(5)(A), (C) (exceptions for specific civil claims). Appellants' reading would render those provisions superfluous and override the drafting choices that Congress made. *Doe*, 817 F.3d at 23.

### D.     JASTA Does Not Repeal Or Abrogate Section 230

Appellants next argue that Section 230 can never apply to claims under Section 2333(d), which was enacted as part of the Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 ("JASTA"), because JASTA impliedly repealed or superseded Section 230. Br. 64-69. This argument too has been rejected by every court that has addressed it. *See, e.g.*, *Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874, 889 (N.D. Cal. 2017); *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 322-24 (E.D.N.Y. 2018). And for good reason: it has no basis in the text or legislative history of JASTA and departs from established principles of statutory interpretation.

It is "a cardinal principle of construction that repeals by implication are not favored," *United States v. Borden Co.*, 308 U.S. 188, 198 *(*1939), and will only be found where two statutes "are in irreconcilable conflict or where the latter act covers the whole subject of the earlier one and is clearly intended as a substitute." *Branch v. Smith*, 538 U.S. 254, 273 (2003); *accord Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 173-76 (2009). "In either case," Congress' intent to repeal must be "clear and manifest." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976).

There is nothing like that here. As the district court recognized, "JASTA does not reference any portion of the CDA either directly or indirectly, nor does it

address the responsibilities of or protections for interactive computer service providers." ER40. Nor does JASTA include any language—such as a "notwithstanding" clause—suggesting any intent to override the protections that Section 230 provides. *Accord PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-22 (2011). In short, JASTA evinces not the slightest hint that Congress wanted to displace Section 230—a well-known and important immunity that has been "understood to merit expansion … into new areas." *Jones*, 755 F.3d at 408.

Appellants try to overcome this silence by pointing to JASTA's statement of purpose—"to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against [terrorists and their supporters]." Br. 64 (emphasis omitted) (alteration in original) (quoting JASTA § 2(b)). This language does not support an implied repeal. It is well settled that (even when codified, which this one is not), such prefatory statements "cannot change the scope of the operative clause." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977-78 (2016) (citing *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174, 188 (1889)); *see, e.g.*, *Hawaii*, 556 U.S. at 173-76 (2009) (rejecting effort to use of preambular "whereas" clauses to impliedly repeal existing law).[10]

---

[10] In any event, Appellants are wrong about the meaning of JASTA's preamble. This language refers to concerns about personal jurisdiction and extraterritoriality that were raised when JASTA was first being considered. As first drafted, JASTA would have added a subsection (e) to 18 U.S.C. § 2334 to allow for *personal jurisdiction* "to the maximum extent permissible under the 5th Amendment to the

Indeed, JASTA's treatment of a different immunity confirms that Congress did not intend that result. JASTA expressly amended the Foreign Sovereign Immunities Act to eliminate foreign sovereign immunity for claims, including secondary liability claims under Section 2333(d) of the ATA, based on certain acts of international terrorism. JASTA § 3(a) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States ...."). Thus, as the district court observed, "where Congress intended JASTA to repeal existing statutory immunities, it made that clear." ER41. To read JASTA as surreptitiously repealing Section 230 would override the decisions that Congress actually made and render superfluous JASTA's express repeal of foreign sovereign immunity.

Applying Section 230 to claims under Section 2333(d) creates no "irreconcilable conflict" with JASTA. *Branch*, 538 U.S. at 273. While JASTA authorized a general cause of action for secondary liability arising out of acts of international terrorism, Section 230 immunity applies in the limited circumstance where such claims seek to hold online service providers liable for publishing third-

---

Constitution of the United States," mirroring the "Purpose" language that Plaintiffs cite. *See* S. 2040, 114th Cong., §§ 2(b), 5 (introduced Sept. 16, 2015); H.R. 3143, 113th Cong., 1st Sess., §§ 2(b), 5 (introduced Sept. 19, 2013). The enacted version of JASTA deleted the personal jurisdiction provision, but retained the preamble without explanation. While that was likely an oversight, there certainly is no reason to believe that this vestigial preambular language was intended to expand substantive ATA liability to the limits of the Constitution (whatever that might mean) without regard for established immunities.

party content. Far from being some intractable conflict, it is simply the normal interaction of an immunity statute with a liability provision.

*Hui v. Castaneda*, 559 U.S. 799 (2010), is instructive. There, the Supreme Court rejected an argument that a later-enacted liability statute impliedly repealed an existing immunity. The Court found no "irreconcilable conflict" merely because the older "more comprehensive immunity" would protect some defendants from liabilities created by the new law. *Id.* at 810-11. The same reasoning applies here. Indeed, courts have consistently applied Section 230 to immunize service providers against claims arising under other federal statutes—including later enacted ones. *See, e.g.*, *Doe*, 817 F.3d at 22 (claims under the Trafficking Victims Protection Reauthorization Act of 2008).

Because the two statutes are capable of co-existence, Appellants' argument that JASTA should override Section 230 because it is "more specific" is beside the point. *See* Br. 66-69. But this argument is misguided in any event. JASTA and Section 230 are separate provisions covering "quite different" subjects (*Radzanower*, 426 U.S. at 157). It is equally plausible to argue that JASTA is the more general statute: it generally authorizes secondary liability claims by American victims of international terrorism, whereas Section 230 covers only the specific category of claims against online services arising from third-party content. In such cases, as Appellants' own case makes clear, "the general-specific canon" is

37

of little value: it "does not help to *clearly* discern Congress's intent as to which section should take precedence," where the statutes are "specific in certain respects and general in others." *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075-76 (9th Cir. 2016).

Finally, Appellants' argument that Section 230 only confers immunity by virtue of "common law interpretations" (Br. 66) should be rejected out of hand. Appellants effectively ask this Court to reverse decades of its own Section 230 case law in favor of Appellants' proposed construction of JASTA. But decisions like *Barnes*, *Batzel*, and *Roommates* are not "common law" rulings; they are careful (and correct) interpretations of the binding language of a duly enacted federal statute. *See, e.g.*, *Barnes*, 570 F.3d at 1100 (explaining that Court's application of Section 230 was based on "careful exegesis of the statutory language"). The relevant language of Section 230 has not changed, and JASTA evinces no intention to limit or impliedly repeal it.

## E. Section 230 Immunity Is Properly Applied Under Rule 12(b)(6)

Appellants' final effort to escape Section 230 is to argue that its protections cannot be applied on a motion to dismiss under Rule 12(b)(6). This argument was not raised before the district court and thus was waived. *See Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016). But it is also contrary to settled law. As the D.C. Circuit has explained, Section 230 can support a motion to dismiss "if the

statute's barrier to suit is evident from the face of the complaint." *Klayman*, 753 F.3d at 1357. In keeping with that understanding, this Court has repeatedly affirmed district court decisions granting 12(b)(6) motions to dismiss based on Section 230. *See, e.g.*, *Kimzey*, 836 F.3d 1263; *Barnes*, 570 F.3d 1096; *Roommates*, 521 F.3d at 1162. So have numerous other federal appeals courts. *See, e.g.*, *Small Justice LLC v. Xcentric Ventures LLC*, 873 F.3d 313 (1st Cir. 2017); *Green v. Am. Online (AOL)*, 318 F.3d 465 (3d Cir. 2003); *Westlake Legal Group v. Yelp, Inc.*, 599 F. App'x 481 (4th Cir. 2015). Appellants cite no authority that casts doubt on this established procedure.

Here, the application of Section 230 to protect Google was evident from the facts alleged in the TAC. As discussed above, those allegations make clear: (1) that Google is the provider of an "interactive computer service"; (2) that the content at issue was created and developed in all relevant respects by third parties; and (3) that Appellants' claims impermissibly seek to treat Google as a publisher of that third-party content. As such, it was entirely appropriate for the district court to decide this issue on a motion to dismiss. Doing so is consistent with the rule that Section 230 immunity should be applied "at the earliest possible stage of the case because that immunity protects websites not only from 'ultimate liability,' but also from 'having to fight costly and protracted legal battles.'" *Nemet*, 591 F.3d at 255 (quoting *Roommates*, 521 F.3d at 1175).

* * *

When it enacted Section 230, "Congress made a policy choice … not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran*, 129 F.3d at 330-31. Applying that protection here is fully consistent with Congress's policy choice. Appellants seek to hold Google liable because its efforts at self-regulation did not, in their view, do enough to stop potentially harmful content from being disseminated through its platform. Far from being a "dramatic expansion" of the statute (Br. 69),[11] the district court's application of Section 230 was a straightforward application of an immunity that for two decades has helped "maintain the robust nature of Internet communication" and "keep government interference in the medium to a minimum." *Batzel*, 333 F.3d at 1027 (quoting *Zeran*, 129 F.3d at 330). That ruling should be affirmed.

---

[11] The district court's holding would not immunize a service from "deliberately and openly" assisting ISIS. Br. 69. As this Court recognized in *Roommates*, "[w]here it is very clear that the website directly participates in developing the alleged illegality," Section 230 does not apply. *See Roommates*, 521 F.3d at 1174. But there is nothing like that in this case. Nor does the district court's decision extend immunity "to an ISIS operative who publishes on YouTube." Br. 69 (emphasis omitted). Protecting Google for claims based on content provided by third parties does not mean "that the original culpable party who posts [unlawful] messages will escape accountability." *Zeran*, 129 F.3d at 330.

## II. APPELLANTS FAILED TO STATE A CLAIM UNDER THE ATA

While the district court correctly applied Section 230 to bar all of Appellants' claims, the judgment below can alternatively be affirmed because Appellants failed to allege facts to state a viable cause of action under the ATA.

### A. Appellants Failed To State A Claim For Direct Liability

Appellants' claims for direct liability rest on the premise that Google itself committed an "act of international terrorism" that proximately caused the Paris terrorist attack that killed Nohemi Gonzalez. As the district court held, however, these claims are foreclosed by this Court's decision in *Fields*, which holds that liability under the ATA requires a "direct relationship" between the defendant's actions and the plaintiff's injuries—a connection that does not exist here. Beyond that, Appellants did not come close to plausibly alleging that Google committed an act of international terrorism through its operation of YouTube.

#### 1. The District Court Correctly Found A Lack Of Proximate Causation Under This Court's Decision In *Fields*

In order to bring a claim under the ATA, a plaintiff must have sustained injuries "by reason of" an "act of international terrorism" committed by the defendant. 18 U.S.C. § 2333(a). In *Fields*, this Court held that the ATA's "by reason of" language "requires a showing of proximate causation"—specifically, a "direct relationship" between the plaintiff's injuries and the defendant's alleged terrorist act. 881 F.3d at 744-49.

41

*Fields* arose from allegations similar to those in this case. As here, the plaintiffs sued a popular online platform, Twitter, under the ATA based on an attack committed abroad by a terrorist organization. This Court categorically rejected a loose approach to proximate cause that would allow ATA plaintiffs to sue service providers only indirectly linked to a given terrorist attack. As the Court explained:

> Communication services and equipment are highly interconnected with modern economic and social life, such that the provision of these services and equipment to terrorists could be expected to cause ripples of harm to flow far beyond the defendant's misconduct. Nothing in § 2333 indicates that Congress intended to provide a remedy to every person reached by these ripples.

*Id.* at 749. Applying that rule, *Fields* held that the plaintiffs' allegations did not establish proximate cause because they "have not pleaded that Twitter's provision of communication equipment to ISIS … had any direct relationship with the injuries that [they] suffered. At most, the SAC establishes that Twitter's alleged provision of material support to ISIS facilitated the organization's growth and ability to plan and execute terrorist acts." *Id.* at 749-50.

The same is true here. In holding that Appellants failed to establish the required direct relationship, the district court carefully considered Appellants' allegations but concluded that they were insufficient. ER28. "[T]he actual allegations supporting these claims are far too attenuated and speculative to

establish proximate causation between Google's operation of YouTube and the Paris attacks." *Id.* (quoting *Fields*, 881 F.3d at 749).

On appeal, Appellants focus on the same types of indirect connections that this Court rejected in *Fields*. They speculate that because YouTube has allegedly been used by ISIS to recruit support and post messages, YouTube had something to do with the Paris attack. Br. 52. But that argument reflects the very theory that *Fields* forbids: that YouTube may be held liable based merely on a claim that its service was a "substantial factor in the sequence of responsible causation" and that the attack was "reasonably foreseeable." *Fields*, 881 F.3d at 746-48. Every court to consider such allegations has held that they fail to establish proximate cause under the ATA. *See, e.g.*, *Sinclair v. Twitter, Inc.*, No. 4:17-cv-05710-SBA, slip op. at 5-9 (N.D. Cal. Mar. 20, 2019); *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 974-74 (N.D. Cal. 2018); *Taamneh v. Twitter, Inc.*, 343 F. Supp. 3d 904, 912-15 (N.D. Cal. 2018).

Appellants try to dilute *Fields* by arguing that they need only show "some" direct relationship between a defendant's acts and a plaintiff's injuries—that "any" direct relationship, no matter how minimal, will do. Br. 52-53. But that is not what this Court said. *Fields* holds that a plaintiff must allege "*at least* some direct relationship," 881 F.3d at 748 (emphasis added)—not that any such relationship automatically suffices. To the contrary, the Court expressly rejected the notion that

"*any* reckless contribution to a terrorist group or affiliate, no matter its attenuation, must result in civil liability." *Id.* at 749.

Appellants also try to distinguish their causal allegations from those in *Fields*. They point to several allegations, all of which the district court addressed and correctly found wanting. ER28-30. *First*, Appellants claim that ISIS sympathizers used YouTube to boast retrospectively about the Paris attack. But, almost by definition, such after-the-fact activity creates no causal link (direct or otherwise) between YouTube's alleged wrongdoing and the Paris attack. YouTube could not have helped bring about the terrible events in Paris by allegedly not doing more to remove videos posted *after* the attack occurred.

*Second*, Appellants argue that YouTube was used by the Zerkani Network, one of the ISIS recruiting networks linked to the Paris attack. Br. 53-54. But that distorts Appellants' allegations. What the complaint actually alleges is that the Zerkani Network "used and relied on *social media.*" ER140 ¶332 (emphasis added). If Appellants had a good-faith basis for believing that the Network actually used YouTube, they would have alleged that. But they did not, and the district court rightly held that this generalized allegation did not create the kind of direct relationship between YouTube and the Paris attack that *Fields* requires. ER28-29.

*Third*, Appellants argue that the "lead commander of the Paris attacks" (Abdelhamid Abaaoud) "was radicalized by ISIS videos on YouTube." Br. 53-54.

This too departs from what the complaint actually alleges. The paragraphs that Appellants cite (ER148-50, 160, 172) allege that "Abaaoud was an active user of social media, including YouTube, Facebook, and Twitter" (ER148 ¶349); that he "posted a link on his Facebook account to an ISIS recruiting video on YouTube" (ER149 ¶356); and that Abbaaoud was featured in an ISIS video on YouTube from March 2014 (ER149-51 ¶¶ 357-358). None of this is an allegation that Abaaoud was "radicalized" by ISIS videos on YouTube.

The allegations that Appellants actually made about Abaaoud simply do not establish any direct link between YouTube's alleged wrongdoing and the Paris attack. There is no suggestion that Abaaoud's activity on YouTube had any direct connection to the attack in Paris, and the mere claim that Abaaoud used YouTube does not meaningfully differ from the insufficient allegation in *Fields* that Twitter "facilitated the organization's growth and ability to plan and execute terrorist acts." *Fields*, 881 F.3d at 749-50. Even more significantly, Appellants do not even try to connect the actual violation of the ATA that they allege—Google's purported provision of material support—to Abaaoud's activity. There is no allegation that Google knew that Abaaoud was using the service and failed to act to stop that conduct. Without that, Abaaoud's alleged connection to YouTube cannot amount to a connection between Google's alleged wrongdoing and the Paris attack that could give rise to a claim under the ATA. *See id.* at 746.

In short, Appellants' attempt to link Google's operation of YouTube to the Paris attack would "stretch[] the causal chain" too far "beyond the first step" to satisfy the ATA's "direct relationship requirement." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10-11 (2010). The district court was right to reject that effort.

### 2. Google Did Not Knowingly Provide Material Support To ISIS

Even if they could satisfy *Fields*, Appellants' direct liability claim would still fail because they have not plausibly alleged that Google itself committed an act of international terrorism. While the district court had no occasion to address this issue, it provides an independent basis for affirming its decision.

The term "act of international terrorism" is expressly defined in the ATA. That definition requires, first, that the defendant committed "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States." 18 U.S.C. § 2331(1)(A). In an effort to meet this requirement, Appellants rely on two provisions of the material support laws: 18 U.S.C. § 2339A and § 2339B. But the facts alleged in the complaint fail to plausibly establish that Google violated either of these criminal statutes.

***Section 2339A:*** This provision has a stringent scienter requirement: material support must have been provided "knowing or intending" that it be used "in preparation for, or in carrying out" a terrorist act. 18 U.S.C. § 2339A(a); *accord*

46

*United States v. Stewart*, 590 F.3d 93, 113 (2d Cir. 2009) (defendant must know or intend "that such resources be used to commit specific violent crimes"); *Ahmad v. Christian Friends of Israeli Cmtys.*, No. 13 Civ. 3376 (JMF), 2014 U.S. Dist. LEXIS 62053, at *7-12 (S.D.N.Y. May 5, 2014) (dismissing ATA claim where complaint "allege[d] no facts suggesting that Defendants were aware—or even deliberately indifferent to the possibility—that the financial support they provided to 'the Settlers' would be used to support any violent activity"), *aff'd*, 600 F. App'x 800 (2d Cir. 2015).

Here, Appellants did not proffer any allegations to support a claim that Google provided its service to any user with the specific knowledge or intent that it would be used to carry out acts of terrorism. Unable to argue otherwise, Appellants contend that "Google knew that ISIS terrorists were using YouTube to facilitate terrorism." Br. 50. That does not come close to meeting the requirement of specific knowledge or intent imposed by Section 2339A, and any purported knowledge or intent is further negated by Appellants' own acknowledgment that Google has consistently removed ISIS videos from YouTube when it has become aware of them. ER174-78 ¶¶492-493, 502, 511.

***Section 2339B:*** Appellants' reliance on Section 2339B is similarly misguided. This provision requires a showing that the defendant "knowingly provide[d]" material support to a designated foreign terrorist organization.

47

18 U.S.C. § 2339B; *accord Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014) ("[T]o fulfill § 2339B(a)(1)'s scienter requirement, … Plaintiffs must show that NatWest *both* knew that it was providing material support to Interpal *and* knew that Interpal engaged in terrorist activity." (emphasis added)).

Appellants' allegations failed to meet this standard. *First*, Appellants failed to allege facts sufficient to show that Google provided any "material support" to ISIS. Providing material support requires more than simply making a general service available to the public at large that an FTO might use. *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 486 (E.D.N.Y. 2012); *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010); *accord Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 576-77 (E.D. Mich. 2018) (allegations "that the defendants provided 'routine' services knowing only generally that some (unidentified) users could be affiliated with terrorism" insufficient for material support). Instead, the defendant must have intentionally provided services to someone it knew to be an FTO. *See Hussein v. Dahabshiil Transfer Servs. Ltd.*, 230 F. Supp. 3d 167, 176-77 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 40 (allegations that defendants provided "routine" banking services insufficient unless they "had reason to believe that their customers were terrorists or were assisting terrorists"); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003)

(bank not liable for material support where it provided "routine banking service[s]").

There is nothing like that here. Appellants alleged that YouTube is a video-sharing service that is widely available for public use, with clear rules that prohibit terrorist groups from using the service (ER119 ¶200), which YouTube enforces by removing ISIS-related content that it is aware of (ER174-78 ¶¶492-493, 502, 511). At most, those allegations suggest that Google provides an everyday, publicly available service, one that ISIS happened to use (along with millions of other people and organizations). This is not enough to violate Section 2339B. *See, e.g.*, *Crosby*, 303 F. Supp. 3d at 576-77.

*Second*, Appellants fail to allege that Google acted "knowingly." Section 2339B requires more than a general awareness that YouTube might at some point be used by some who are affiliated with ISIS. Appellants needed to plead "non-conclusory allegations that [Google was] 'on notice' of the terrorist connections" to the material support itself. *Hussein*, 230 F. Supp. 3d at 176 (citing *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 626-27 (E.D.N.Y. 2006) (defendants learned "of [recipients'] terrorist identities *prior to receiving and transferring funds to and from them*" (emphasis added)). Appellants' allegations that ISIS supporters used YouTube to post content designed to recruit and fundraise, and that Google could have done more to block such use, come nowhere close to

49

meeting this strict scienter requirement. There is no allegation that Google was aware of any videos or accounts linked to ISIS that it deliberately allowed to remain on YouTube. Google did not knowingly provide material support to ISIS.

### 3. Appellants Did Not Allege Any Conduct By Google That Met The Other Elements of "International Terrorism"

Even if Appellants had plausibly alleged a criminal violation, that would not be enough to establish that Google committed an act of "international terrorism" as defined under the ATA. *See* 18 U.S.C. § 2331(1). "[T]o qualify as international terrorism, a defendant's act must *also* involve violence or endanger human life," and "[f]urther, [it] must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) (quoting § 2331(1)(A)-(B)) (vacating ATA judgment where jury was erroneously charged that a violation of 2339B was sufficient for liability); *see also Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018) (affirming dismissal of ATA claim against bank based on material support allegation where plaintiff failed to allege that defendant actions "appear intended to intimidate or coerce any civilian population or government").

Here, as in *Linde* and *Kemper*, Appellants' allegations did nothing to establish that Google's operation of YouTube involved activities "dangerous to human life" or that appeared to have been intended to achieve a specific terrorist purpose. Appellants do not even try to argue otherwise. They instead argue that

material support alone meets this standard. Br. 50-51. Both the Second and Seventh Circuits rightly rejected that argument: "[P]roviding routine … services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to ... compel a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327; *see also Kemper*, 911 F.3d at 390 (bank's "doing business with companies and countries that have significant legitimate operations" "was not 'violent' or 'dangerous to human life'" and did not appear intended to "intimate or coerce"); *accord Brill v. Chevron Corp.*, No. 15-cv-04916-JD, 2017 U.S. Dist. LEXIS 4132, at *16 (N.D. Cal. Jan. 9, 2017) (illegal payments by company with "blind eye" to whether they might be funneled to Hussein regime did not establish "outward appearance" of intent to support terrorist acts).

In a case like this, therefore, it is now well established that an alleged material support violation is not enough to state a direct liability claim under the ATA. That provides an independent reason to reject Appellants' claims here.

## B. Appellants Failed To State a Claim For Secondary Liability

In addition to their direct liability claims, Appellants also asserted claims for aiding and abetting and conspiracy under Section 2333(d), which was added to the ATA by JASTA. The district court rightly invoked Section 230 to dismiss these

secondary liability claims, but that ruling can be affirmed on alternative grounds as well. Section 2333(d) provides that "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). Appellants did not come close to stating a claim under this provision.

### 1. Appellants' Did Not State A Claim For Aiding And Abetting

An aiding and abetting claim under Section 2333(d) requires that the defendant "knowingly provid[ed] substantial assistance" to the "person who committed" the relevant act of international terrorism. *Linde*, 882 F.3d at 320. In enacting this provision, Congress indicated that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), provides the "proper legal framework" for evaluating aiding and abetting liability. JASTA § 2(a)(5). Appellants' allegations fail to establish that Google had the knowledge or provided the assistance required by the ATA.

***Mens Rea.*** Under *Halberstam*, the mens rea required for aiding and abetting has two components: the defendant must "knowingly" "assist the principal violation"; and he must be "generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance." 705 F.2d at 477, 487-88. Such knowledge is totally missing here. Appellants' offered no concrete factual allegations to suggest that Google *knowingly* provided any assistance whatsoever—to ISIS or anyone else—in connection with the principal violation at

issue here (the Paris attack). Appellants' failure to allege mens rea by itself dooms any ATA aiding and abetting claim in this case. *See, e.g.*, *Crosby*, 303 F. Supp. 3d at 574 (no aiding and abetting where plaintiffs failed to allege that defendants "knew anything at all about [the attacker] or his plans before he carried out the horrific attack"); *Sinclair*, slip op. at 10 (same).

*Substantial Assistance:* Separate from knowledge, aiding and abetting also requires "substantial" assistance—that is, assistance that was actually meaningful in connection with the underlying crime. *Accord SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996) (aiding and abetting requires "'substantial assistance' in the commission of the primary violation").

*Halberstam* identified six factors that bear on "how much encouragement or assistance is substantial enough": (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance. 705 F.2d at 478, 483-84. These factors underscore that a defendant can only be liable if he acted in some deliberate way to assist the main actor in carrying out the principal violation. *See Linde*, 882 F.3d at 239-331 (discussing *Halberstam* factors in ATA context and explaining that "aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct").

Appellants try to compare this case to *Halberstam*, but the two cases are worlds apart. There, the D.C. Circuit considered an aiding-and-abetting claim against the wife of a long-time criminal, who lived in the same house as her husband while he engaged in a five-year-long crime spree and helped him keep account of the proceeds of his crimes, but who claimed to have no knowledge of his activity. *Halberstam*, 705 F.2d at 474-76. Here, in contrast, Appellants allege that Google operates a video-sharing platform used by more than a billion people around the world, some tiny percentage of whom are claimed to be ISIS sympathizers or affiliates. Appellants did not allege that Google took any deliberate action to "encourage" or help bring about the Paris attack. They offered no plausible suggestion that Google was "essential" to the attack, that it was present during its commission, or that it had any relationship with ISIS, much less with the attackers. Consideration of the *Halberstam* factors in this case thus rules out any suggestion of "substantial assistance."

Perhaps recognizing this deficiency, Appellants try to water down *Halberstam*'s test, arguing that "[l]ess support might be sufficient" in the terrorism context. Br. 45. But in enacting Section 2333(d), Congress expressly instructed that *Halberstam* provided the right framework for evaluating aiding and abetting claims in the ATA context. It would be improper to disregard that framework merely because it does not allow Appellants here to assert a viable claim.

54

Finally, Appellants argue that their allegation that "Google profited from its arrangement with ISIS" established "substantial assistance" under *Halberstam*. Br. 46-47. Not so. Appellants did not allege anything to indicate that Google actually profits from "facilitat[ing] interest in ISIS videos." Br. 46. Nor could they, given their acknowledgment that YouTube prohibits terrorist content and works to remove it. ER173-78 ¶¶482-514. And while the TAC made general reference to Google's revenue-sharing practices, Appellants did not identify any instance where Google shared revenue with anyone whom it knew to be part of ISIS, much less that any hypothetical revenue sharing had any connection to the Paris attack. ER29-30. In any event, YouTube's general practice of earning or sharing revenue in connection with a wide array of user-submitted content in no way suggests that Google was in a close relationship with ISIS or was motivated to assist its destructive goals.

### 2. Appellants' Did Not State A Claim For Conspiracy

Finally, Appellants can do nothing to save their conspiracy claim. At the heart of conspiracy is "an agreement to do an unlawful act or a lawful act in an unlawful manner." *Halberstam*, 705 F.2d at 487. There can be no liability without "the existence of an agreement or meeting of the minds." *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010); *accord Wasco Prods. Inc. v. Southwall*

*Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (agreement to commit wrongful acts is "the most basic and fundamental element of a civil conspiracy").

Appellants have no basis for suggesting that Google entered into some unlawful agreement with ISIS, much less with the Paris attackers. So they argue that a jury should be allowed to "infer the existence of a tacit agreement between ISIS and Google," based on the theory that Google and ISIS "worked in tandem'" because Google supposedly "tolera[ted] … ISIS' presence on YouTube." Br. 48. That is not the law. A civil conspiracy claim requires, at a minimum, that "each participant must at least share the common objective of the conspiracy." *Crowe*, 608 F.3d at 440. Nothing of the sort was alleged here. Appellants did not offer a single fact to suggest that Google knowingly tolerated terrorist content on its platform, much less that YouTube was a "willing partner" of ISIS, or one that knowingly agreed "to participate in an unlawful act." *Halberstam*, 705 F.2d at 477, 486. Without an actual "meeting of the minds," Appellants have no claim. *See, e.g.*, *Crosby*, 303 F. Supp. 3d at 575 (dismissing similar conspiracy claims where plaintiffs pleaded no facts suggesting that defendants "made any agreement with [the attacker] (or, for that matter, with ISIS, or any identified person or entity associated with its cause of promoting international terrorism)").

## **CONCLUSION**

For these reasons, this Court should affirm the district court's judgment.

Dated: April 5, 2019

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Brian M. Willen*
       Brian M. Willen

*Attorneys for Defendant-Appellee*
Google LLC

## **STATEMENT OF RELATED CASES**

Counsel for Appellee is aware of the following related cases pending in this

Court:

1.  *Taamneh v. Twitter, Inc.*, No. 18-17192

2.  *Copeland v. Twitter, Inc.*, No. 18-17327 (stayed pending issuance of mandate in *Taamneh*, No. 18-17192, and *Clayborn*, No. 19-15043).

3.  *Clayborn v. Twitter, Inc.*, No. 19-15043

4.  *Sinclair v. Twitter, Inc.*, No. 19-15625

Each of the cases identified above raises issues that are the same or closely related

to those presented by this case.


Dated: April 5, 2019          Respectfully submitted,

                              WILSON SONSINI GOODRICH & ROSATI
                              Professional Corporation


                              By: /s/ *Brian M. Willen*
                                    Brian M. Willen


                              *Attorneys for Defendant-Appellee*
                              Google LLC

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 18-16700

I am the attorney or self-represented party.

**This brief contains** | 13,530 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
  - ○ it is a joint brief submitted by separately represented parties;
  - ○ a party or parties are filing a single brief in response to multiple briefs; or
  - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [          ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Brian M. Willen | **Date** | 4/5/2019

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/2018*

# <u>ADDENDUM OF STATUTORY PROVISIONS<br>AND UNPUBLISHED OPINIONS</u>

All relevant statutes and opinions are contained in the addendum filed by

Appellants, ECF No. 19, except for the following, included herein:

Justice Against Sponsors of Terrorism Act ("JASTA"),
  Pub. L. 114-222, 130 Stat. 852 (Sept. 28, 2016)

*Sinclair v. Twitter, Inc.*,
  No. 4:17-cv-05710-SBA, slip op. (N.D. Cal. Mar. 20, 2019)

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

9   DANELLE SINCLAIR AS GUARDIAN AD        Case No:  C 17-5710 SBA
    LITEM FOR A. TUCKER AND O.
10  TUCKER, AND ISABELLA TUCKER,           **ORDER PARTIALLY GRANTING**
                                           **DEFENDANTS' MOTION TO**
11               Plaintiffs,               **DISMISS**

12          vs.                            Dkt. 54

13  TWITTER, INC., GOOGLE LLC, and
    FACEBOOK, INC.,
14
                 Defendants.
15

16          The instant action arises from the tragic death of Jared Tucker ("Decedent"), who

17  was among a number of individuals killed in a horrific terrorist attack carried out by alleged

18  ISIS member, Younes Abouyaaquob ("Abouyaaquob"), in Barcelona, Spain, on August 17,

19  2017.  Plaintiffs, the children of the Decedent, bring the instant action against Defendants

20  Twitter, Inc. ("Twitter"), Google LLC ("Google") and Facebook, Inc. ("Facebook"), all of

21  which operate social media platforms allegedly used by ISIS to promote its agenda.

22          The operative pleading is the First Amended Complaint ("FAC"), which claims that

23  Defendants provided material support to a terrorist organization in violation of the

24  Antiterrorism Act of 1990 ("ATA"), Pub. L. No. 1-1-519, § 132, 104 Stat. 2240 (1990)

25  (codified at 18 U.S.C. § 2333(a)), and aided and abetted and/or conspired with a person

26  who committed an act of international terrorism in violation of the ATA, as amended by the

27  Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852

28

(2016) (codified as 18 U.S.C. § 2333(d)).  The pleadings further allege state law claims for negligent infliction of emotional distress ("NIED") and wrongful death.

The parties are presently before the Court on Defendants' Motion to Dismiss First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6).  Dkt. 54.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion to dismiss as to Plaintiffs' federal claims, which are dismissed without leave to amend.  The Court declines to assert supplemental jurisdiction over Plaintiffs' state law causes of action, which are dismissed without prejudice.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I.  BACKGROUND

## A.  FACTUAL SUMMARY[1]

On August 17, 2017, ISIS, a known terrorist organization, carried out numerous terrorist attacks across Spain, including one in Barcelona (the "Barcelona Attack").  FAC ¶ 347, Dkt. 50.  The attack occurred at a popular tourist destination called La Rambla, which is a main thoroughfare in Barcelona.  Id. ¶ 399-401.  La Rambla is a two-way boulevard with a large pedestrian promenade located in the center of the roadway.  Id. ¶ 400. There are a number of markets, bars, and restaurants on the promenade.  Id.

At around 5:20 p.m. on August 17, 2017, Abouyaaqoub drove a large three-ton van down the pedestrian lane of La Rambla, increasing his speed and steering the vehicle in the dense crowd of people.  Id. ¶ 399.  Reaching speeds of up to 50 miles per hour, Abouyaaqoub maneuvered the van through the promenade, driving in zig-zag pattern to severely or fatally injure as many people as possible.  Id. ¶ 402.  In the space of 18 seconds, Abouyaaqoub killed 13 people, including the Decedent, and injured more than 100 others.  Id. ¶ 404.  After crashing the van into a newspaper kiosk, Abouyaaqoub exited the van and escaped into the crowd.  Id. ¶ 405.  He later commandeered a car, stabbed the driver to

---

[1] The following facts are taken from the FAC, which, for purposes of the instant motion, are taken as true.

death, and escaped.  Id. ¶ 406.  ISIS subsequently claimed responsibility for the attack, describing Abouyaaqoub and other "executors" of the attacks as "soldiers of the Islamic state."  Id. ¶¶ 407-411.

According to Plaintiffs, Defendants are responsible for the Barcelona Attack by virtue of allowing ISIS to utilize their respective social media platforms to recruit, fund and encourage terrorist attacks.  Id. ¶ 68, 152.  For example, ISIS has launched campaigns on Twitter to raise funds to purchase weapons and ammunition.  Id. ¶¶ 176, 178, 229.  Similarly, ISIS has utilized YouTube (which is owned by Google) to generate support for its cause, to publicize its violent activities, to spread its propaganda, and as a means of instilling fear and terror in the public.  Id. ¶¶ 23, 183, 190, 285, 309.  Among other things, ISIS has used YouTube to disseminate videos and images of mass beheadings, burning captives alive and other barbaric activities.  Id. ¶¶ 23.  The pleadings do not allege that ISIS used social media to direct the Barcelona Attack.  However, Plaintiffs claim that "Abouyaaqoub was radicalized by ISIS's use of social media" and thereafter carried out the attack.  Id. ¶ 516.

### B.  PROCEDURAL HISTORY

Plaintiffs filed the instant action against Defendants on October 4, 2017.  On December 12, 2017, the Court, upon stipulation of the parties, stayed the action pending the Ninth Circuit's resolution of Fields v. Twitter, Inc., 9th Cir. No. 16-17165.  One of the issues in that appeal was the requisite showing of causation to sustain a claim under the ATA.  Dkt. 33, 34.  Fields held that a primary liability claim under the ATA requires a showing of a direct relationship between the defendant's conduct and the plaintiff's injury.  881 F.3d 739, 744 (9th Cir. 2018).[2]  On March 20, 2018, the Ninth Circuit issued its mandate in Fields and the Court thereafter vacated the stay of the instant proceedings.  Dkt. 33, 35.

---

[2] As will be discussed in more detail below, the ATA provides for primary or direct liability claims as well as secondary or indirect liability claims for providing substantial assistance and conspiracy.

On June 25, 2018, Plaintiffs filed a FAC, which alleges six federal claims and two supplemental state law causes of action, as follows: (1) aiding and abetting liability under the ATA, 18 U.S.C. § 2333(a), (d); (2) conspiracy under the ATA, id.; (3) provision of material support to terrorists, id. §§ 2339A, 2333(a); (4) provision of material support and resources to a designated foreign terrorist organization in violation of the ATA, id. §§ 2339B(a)(1), 2333(a); (5) NIED; (6) concealment of material support and resources to a designated foreign terrorist organization in violation of 18 U.S.C. §§ 2339C(c), 2333(a); (7) provision of funds, goods and services to or for the benefit of specially designated global terrorists in violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, 31 C.F.R. Part 594, Executive Order 13224 and 18 U.S.C. 2333(a); and (8) wrongful death. FAC ¶¶ 523-569.

Defendants have now filed a motion to dismiss, pursuant to Rule 12(b)(6). In their motion, Defendants argue, inter alia, that Plaintiffs' ATA primary liability claims under section 2333(a) (Counts III, IV, VI and VII of the FAC) are infirm due to the lack of facts establishing proximate causation. As to the secondary liability claims for aiding and abetting (Count I) and conspiracy (Count II) under section 2333(d), Defendants argue that the pleadings fail to show the requisite assistance or agreement, respectively, to state a claim. Finally, Defendants assert that because Plaintiffs' primary liability claims fail, so too must Plaintiffs' state law causes of action for wrongful death and NIED. The motion has been fully briefed and is ripe for adjudication.

## II.  LEGAL STANDARD

Rule 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The

court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007). Where a complaint or claim is dismissed, leave to amend generally is granted, unless further amendment would be futile. Cervantes v. Countrywide Home Loans, Inc., 656 F.3d 1034, 1041 (9th Cir. 2011).

## III.  DISCUSSION

### A.  ATA CLAIMS

Enacted in 1992, the ATA imposes criminal liability for: providing material support to terrorists, 18 U.S.C. § 2339A; providing material support or resources to designated foreign terrorist organizations, id. § 2339B; and concealing material support or resources to designated foreign terrorist organizations, id. § 2339C. A violation of any of these criminal provisions "can provide the basis for a [civil] cause of action under [18 U.S.C.] § 2333(a)." Fields, 881 F.3d at 743. Section 2333(a) states that "[a]ny national of the United States injured in his or her person ... by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold ... damages." 18 U.S.C. § 2333(a). This provision creates what is commonly referred to as a primary or direct liability claim. Taamneh v. Twitter, Inc., 343 F. Supp. 3d 904, 910 (N.D. Cal. 2018) (citing Rothstein v. UBS AG, 708 F.3d 82, 97 (2d Cir. 2013)).

#### 1.  Primary Liability

To state a claim for primary liability under the ATA, a plaintiff must allege facts that plausibly demonstrate that the injury at issue was "*by reason of* an act of international terrorism...." 18 U.S.C. § 2333(a) (emphasis added). Here, Defendants argue that Plaintiffs' primary liability claims under the ATA must be dismissed for failure to sufficiently allege proximate causation consistent with Fields' direct relationship standard. Alternatively, they assert that Plaintiffs have not plausibly alleged that Defendants committed an "act of international terrorism" for purposes of demonstrating a violation of

the aforementioned criminal provisions of the ATA.  The Court need only address the first argument, which is dispositive.

In <u>Fields</u>, an ISIS-affiliated terrorist, Anwar Abu Zaid ("Abu Zaid"), shot and killed two contractors, who were working at a police training facility in Jordan.  The decedents' survivors sued Twitter under the ATA for providing material support to ISIS, which had claimed responsibility for the attack.  In particular, they claimed that Twitter's direct-messaging feature allowed ISIS to:  communicate with potential recruits; raise funds; facilitate its operations; post instructional and promotional videos; and spread propaganda and fear.  Twitter moved to dismiss the action based on the plaintiffs' failure to adequately plead that they were injured "by reason of" Twitter's conduct.  The district court granted the motion to dismiss, and the plaintiffs appealed.

On appeal, the Ninth Circuit addressed the contours of the phrase "by reason of an act of international terrorism," as used in section 2333(a).  The plaintiffs argued that proximate causation under the ATA is established when a defendant's conduct is a "substantial factor in the sequence of responsible causation, and the injury at issue was reasonably foreseeable or anticipated as a natural consequence."  <u>Id.</u> at 744.  The court rejected the plaintiffs' argument.  Citing Supreme Court authority interpreting the same "by reason of" causation language used in the Racketeer Influenced and Corrupt Organizations Act and antitrust statutes, the Ninth Circuit agreed with Twitter that the ATA imposes a "higher" showing of causation.  <u>Id.</u>  More specifically, "a plaintiff must show at least some *direct relationship* between the injuries that he or she suffered and the defendant's acts."  <u>Id.</u>  In other words, the plaintiffs had to "articulate a connection between Twitter's [conduct] … and [the plaintiffs'] injuries."  <u>Id.</u> at 750.  The panel concluded that the plaintiffs' primary liability claims were properly dismissed because the pleadings contained "no facts indicating that *Abu Zaid's attack* was in any way impacted, helped by, or the result of ISIS's presence on the social network."  <u>Id.</u> (emphasis added).

Here, as in <u>Fields</u>, Plaintiffs fail to allege facts demonstrating a "direct relationship" between Defendants' conduct and Abouyaaqoub's terrorist attack in Barcelona.  The gist of

Plaintiffs' direct liability claims is that Defendants operated social media platforms that ISIS used to recruit members, raise funds, spread propaganda and promote terror attacks throughout the world. Plaintiffs further claim that ISIS's use of social media led Abouyaaqoub to become "radicalized" and thereafter carried out the Barcelona Attack. The lengthy pleadings, however, are devoid of any facts demonstrating a direct relationship between Defendants' conduct (i.e., hosting ISIS's content) and the attack that killed the Decedent. Plaintiffs' allegations are essentially indistinguishable from those rejected by Fields. See 881 F.3d at 750; accord Clayborn v. Twitter, Inc., No. 17-CV-06894-LB, 2018 WL 6839754, at *7-*8 (N.D. Cal. Dec. 31, 2018) (finding that ISIS' reliance on Twitter to disseminate propaganda, recruit members, connect its members, raise funds, plan and carry out attacks, publicize its exploits, and strike fear in others was insufficient to demonstrate proximate causation under Fields); Gonzalez v. Google, 335 F. Supp. 3d 1156, 1178 (N.D. Cal. 2018) (allegations that Google permitted ISIS and its supporters to use the YouTube platform to disseminate terrorist messages "do not support a finding of proximate causation under the Fields standard.").

Plaintiffs argue that their claim is distinguishable from those at issue in Fields because they aver that "Abouyaaqoub was radicalized by ISIS's use of social media." See FAC ¶ 516; Opp'n at 12. That allegation is entirely conclusory, however. No facts are alleged that ISIS used any particular social media platform—including those operated by Defendants—to direct its members or others to carry out the Barcelona Attack. Nor are any facts alleged that Abouyaaqoub, in fact, personally viewed any of ISIS's materials on-line, let alone that he did so using Defendants' social media platforms. Although ISIS claimed responsibility for the attack after it occurred, courts have rejected the notion that a post-attack claim of responsibility is sufficient to satisfy the direct relationship standard of proximate causation. E.g., Clayborn, 2018 WL 6839754, at *7 (citing cases).

Even if Abouyaaqoub had observed ISIS propaganda on YouTube, Facebook and/or Twitter, and, in turn, became inspired to carry out the Barcelona Attack, the nexus between Defendants' conduct and Abouyaaqoub's actions is too attenuated to satisfy the "direct

- 7 -

relationship" standard established in Fields.[3]  881 F.3d at 749 ("Communication services and equipment are highly interconnected with modern economic and social life, such that the provision of these services and equipment to terrorists could be expected to cause ripples of harm to flow far beyond the defendant's misconduct.  Nothing in § 2333 indicates that Congress intended to provide a remedy to every person reached by these ripples; instead, Congress intentionally used the 'by reason of' language to limit recovery.").

In sum, the Court finds that Plaintiffs' fact-barren assertion that Abouyaaqoub's radicalization through unspecified social media platforms led to the Barcelona Attack is too conclusory to state a claim for direct liability under the ATA.  E.g., Copeland v. Twitter, Inc., 352 F. Supp. 3d 965, 974 (N.D. Cal. 2018) ("The general allegations that Bouhlel was 'radicalized' because of the ISIS content on defendants' sites are no different from the allegations made and rejected by the Ninth Circuit in Fields…."); Taamneh, 343 F. Supp. 3d at 914 (finding claim that an ISIS-affiliated operative was "radicalized by ISIS's use of social media" too conclusory to demonstrate proximate causation under Fields and dismissing ATA direct liability claims with prejudice); Pennie v. Twitter, Inc., 281 F. Supp. 3d 874, 877 (N.D. Cal. 2017) (pre-Fields decision finding allegations that a mass shooter was radicalized after viewing postings by Hamas on the internet and social media sites were conclusory and failed to demonstrate proximate causation under the ATA under the more

---

[3] Plaintiffs also contend that Fields was wrongly decided.  Opp'n at 11.  Fields, however, is binding on this Court.  Hart v. Massanari, 266 F.3d 1155, 1175 (9th Cir. 2001) ("A district court bound by circuit authority ... has no choice but to follow it, even if convinced that such authority was wrongly decided.").

lenient "substantial factor" test).[4]  The Court therefore grants Defendants' motion to

dismiss Plaintiffs' primary liability claims (Counts III, IV, VI and VII) under the ATA.

### 2. Secondary Liability

As originally enacted, the ATA only provided for primary liability claims.  In

September 2016, however, Congress enacted the JASTA, which expanded the ATA by

creating secondary liability for aiding and abetting or conspiring with a person engaging in

a terrorist act.  Section 2333(d), as amended by JASTA, states as follows:

> (2) **Liability**.—In an action under subsection (a) [of section 2333] *for an injury arising from an act of international terrorism* committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization ..., liability may be asserted as to any person who *aids and abets*, by knowingly providing substantial assistance, or who *conspires with the person who committed such an act of international terrorism.*

18 U.S.C. § 2333(d)(2) (emphasis added).  Plaintiffs allege both "aiding and abetting" and

"conspiracy" claims, pursuant to section 2333(d)(2).

### a) Aiding and Abetting

In enacting JASTA, Congress identified Halberstam v. Welch, 705 F.2d 472 (D.C.

Cir. 1983), as providing "the proper legal framework" to analyze aiding and abetting

liability.  Owens v. BNP Paribas, S.A., 897 F.3d 266, 277 (D.C. Cir. 2018).  In Halberstam,

the D.C. Circuit stated that:  "Aiding-abetting includes the following elements: (1) the party

whom the defendant aids must perform a wrongful act that causes an injury; (2) the

defendant must be generally aware of his role as part of an overall illegal or tortious activity

at the time that he provides the assistance; (3) the defendant must *knowingly and*

---

[4] In the alternative, Defendants argue that they are immune from liability under the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(1), which immunizes "Interactive Service Providers" for claims based on third-party content.  Mot. at 15-19. Although the district court in Fields ruled that the CDA shielded Twitter from liability, the Ninth Circuit declined to reach the issue, finding the proximate causation issue dispositive. 881 F.3d at 750.  In view of the rulings on Plaintiffs' ATA primary liability claims, the Court likewise declines to reach Defendants' alternative argument.  See Cain v. Twitter Inc., No. 17-CV-02506-JD, 2018 WL 4657275, at *3 (N.D. Cal. Sept. 24, 2018) ("Because plaintiffs fail to state a claim under the ATA, the Court need not reach Twitter's arguments under the Communications Decency Act, 47 U.S.C. § 230.").

*substantially assist* the principal violation."  705 F.2d at 477 (emphasis added).  Halberstam

suggested six factors bearing on "'how much encouragement or assistance is substantial

enough' to satisfy the third element: (1) the nature of the act encouraged, (2) the amount of

assistance given by defendant, (3) defendant's presence or absence at the time of the tort,

(4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of

defendant's assistance."  Linde v. Arab Bank, PLC, 882 F.3d 314, 329 (2d Cir. 2018)

(citing Halberstam, 705 F.2d at 483-84).

Focusing on the third element of the Halberstam test for aiding and abetting,

Defendants persuasively argue that the FAC does not allege any allegations showing that

they provided any encouragement or assistance to Abouyaaqoub, "the person who

committed" the Barcelona Attack, see 18 U.S.C. § 2333(d).  Although the pleadings

describe the attack and aftermath in detail, absent are any facts that Defendants provided

him with any type of assistance in planning or carrying out the attack or were present at the

incident or had any relationship with Abouyaaqoub.  See Halberstam, 705 F.2d at 483-84.

The lack of such facts is fatal to Plaintiffs' aiding and abetting claim.  See, e.g., Crosby,

303 F. Supp. 3d at 573 (stating that plaintiffs "have not alleged any facts that plausibly

suggest that any of the defendants [alleged secondary tortfeasors] 'aided or abetted' the

person (Mateen) who committed the night club attack").

Plaintiffs counter that they need only show that Defendants provided substantial

assistance to ISIS, and not to Abouyaaqoub specifically.  Opp'n at 14-15.  As an initial

matter, this contention is contrary to the plain language of section 2333(d).  Section 2333(d)

allows any "national of the United States" to sue for any injury arising from an act of

international terrorism committed, planned, or authorized by a designated foreign terrorist

organization.  18 U.S.C. § 2333(a), (d)(2).  However, liability is imposed only where the

defendant has aided and abetted or conspired with "*the person* who committed" the terrorist

act.  Id. § 2333(d)(2) (emphasis added).  Notably, the salient portion of the statute does not

state—as Plaintiffs contend—that liability is imposed for merely aiding and abetting or

conspiring with a "terrorist organization."  See Taamneh, 343 F. Supp. 3d at 916

("Congress chose to refer to aiding/abetting or conspiring with a person who committed 'an act of international terrorism,' not aiding and abetting or conspiring with a foreign terrorist organization.") (citing Linde, 882 F.3d at 329). Had Congress intended to impose liability for aiding and abetting or conspiring with a terrorist organization, it could have stated as such. Toor v. Lynch, 789 F.3d 1055, 1062 (9th Cir. 2015) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting Russello v. United States, 464 U.S. 16, 23 (1983)) (internal quotations omitted).

Moreover, Linde does not, as Plaintiffs suggest, stand for the proposition that merely supporting a terrorist organization is sufficient to state an aiding and abetting claim. Linde recognizes that the *second* element of the Halberstam test for aiding and abetting requires "the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." 882 F.3d at 329 (citing Halberstam, 705 F.2d at 477). But the secondary actor's "awareness" is distinct from the third element of the Halberstam test, which focuses on the level of "substantial assistance" provided by the secondary actor in connection with the terrorist attack. Id. at 331. As to the *third* element, the Linde court found that the evidence germane to the six Halberstam factors for evaluating substantial assistance were in dispute and could not be resolved on appeal. Id. at 330-31. Notably, the court did not address the issue of whether substantial assistance to the *terrorist organization*, as opposed to the *person* who committed the attack, would suffice to sustain an aiding and abetting claim under the ATA.

In sum, the Court finds that the FAC fails to allege facts sufficient to state a claim for aiding and abetting under section 2333(d)(2). The Court grants Defendants' motion to dismiss Plaintiffs' indirect liability claim for aiding and abetting (Count I).

### 3. Conspiracy

"The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity." Halberstam, 705

F.2d at 478.  Defendants move to dismiss Plaintiffs' conspiracy claim on the grounds that

no facts are alleged in the FAC to establish the requisite agreement.  Plaintiffs do not

respond to this argument.  As a result, the claim is waived.  Jenkins v. Cty. of Riverside,

398 F.3d 1093, 1095 n.4 (9th Cir. 2005).  The Court therefore grants Defendants' motion to

dismiss Plaintiffs' secondary liability claim for conspiracy (Count II).

### B.    IEEPA

In Count VII, Plaintiffs allege that Defendants violated the IEEPA, including

regulations promulgated thereunder.[5]  Plaintiffs allege that, in violation of Executive Order

13224, 31 C.F.R. Part 594 and 50 U.S.C. § 1705, "Defendants knowingly and willfully

engaged in transactions with, and provided funds, goods, or services to or for the benefit of,

Specially Designated Global Terrorists ... including ISIS, its leaders, and members…."

FAC ¶ 561.  According to Plaintiffs, Defendants provided "services" to ISIS by allowing it

to use their respective social media platforms to conduct terrorist operations.  Opp'n at 9.

The IEEPA is a criminal statute that also allows for the imposition of civil penalties.

50 U.S.C. § 1705.  Subsection (a) provides that "[i]t shall be unlawful for a person to

violate, attempt to violate, conspire to violate, or cause a violation of any license, order,

regulation, or prohibition issued under this chapter."  Id. § 1705(a).  Under subsection (b),

"A civil penalty may be imposed on any person who commits an unlawful act described in

subsection (a)."  Id. § 1705(b).  Finally, subsection (c), "A person who willfully commits,

willfully attempts to commit, or willfully conspires to commit, or aids or abets in the

commission of, an unlawful act described in subsection (a) shall" be subject to a term of

imprisonment and/or fine.  Id. § 1705(c).

On September 23, 2001, President George H.W. Bush, acting pursuant to the

IEEPA, issued Executive Order 13224, which blocks all property of foreign persons

---

[5] Defendants characterize Count VII as a primary liability claim under the ATA,
presumably because Plaintiffs predicate Defendants' liability on the ATA, 18 U.S.C.
§ 2333(a).  See FAC ¶ 516.  Plaintiffs do not dispute this.  As such, independent of the
reasons for dismissal discussed in this section, Count VII is subject to dismissal based on
Plaintiffs' failure to plausibly allege proximate causation under the Fields standard.

designated as a Specially Designated Global Terrorist.  See Executive Order 13224, 66 Fed. Reg. 49,079, 49, 079 (Sept. 23, 2001), 2001 WL 34773846.  In addition, federal regulations promulgated under Executive Order 13224 and the IEEPA prohibit any "U.S. person [from] engag[ing] in any transaction or dealing in property or interests in property of persons whose property and interests in property are blocked ... including ... [t]he making of any contribution or provision of funds, goods, or *services* by, to, or for the benefit of any person whose property and interests in property are blocked...."  31 C.F.R. § 594.204(a) (emphasis added).

Defendants contend that Plaintiffs' claim under the IEEPA and its implementing regulations fails to sufficiently allege that they acted willfully in providing support to a designated terrorist organization.  Mot. at 11.  "Willfulness" for purposes of imposing criminal liability under the IEEPA requires a showing that the defendant "knew he was acting unlawfully."  United States v. Mousavi, 604 F.3d 1084, 1094 (9th Cir. 2010); see also United States v. Zhi Yong Guo, 634 F.3d 1119, 1123 (9th Cir. 2011) ("To convict Defendant of willfully violating § 1705(a), the government was required to prove beyond a reasonable doubt that … Defendant intended to violate the law….").  No facts are alleged in the FAC suggesting that any Defendant knew it was acting unlawfully.[6]

Plaintiffs counter that IEEPA does not require that Defendants had actual knowledge that ISIS was using their sites to conduct terrorist activities; rather, it is enough, they claim, to allege that they were "willfully blind" to ISIS's activities.  Opp'n at 8.  However, Plaintiffs fail to cite any authority holding that willful blindness is sufficient for purposes of establishing a criminal violation of the IEEPA.  Moreover, Plaintiffs' contention is contrary

---

[6] Although the parties concur that willfulness is required to sustain Count VII, it bears noting that the IEEPA permits the imposition of a civil penalty, which does not require a showing of willfulness.  See 50 U.S.C. § 1705(b).  However, the FAC relies on Defendants' alleged criminal violation of IEEPA and its implementing regulations as the foundation for the recovery of damages under the ATA.  See FAC ¶ 563 ("Defendants are liable pursuant to 18 U.S.C. § 2333(a) for any and all damages…."); see also Opp'n at 8 (acknowledging that a criminal violation under the IEEPA is the equivalent to a violation of the ATA, 18 U.S.C § 2339B). For that reason, a showing of willfulness is required in this instance.

1   to the Ninth Circuit's holdings in <u>Mousavi</u> and <u>Zhi Yong Guo</u>.  The Court therefore grants

2   Defendants' motion to dismiss Plaintiffs' claim under the IEEPA (Count VII).

3          C.    STATE LAW CAUSES OF ACTION

4          Plaintiffs' remaining claims are two state law causes of action for wrongful death

5   and NIED.  Under California law, the elements of a wrongful death cause of action are

6   "(1) a 'wrongful act or neglect' on the part of one or more persons that (2) 'cause[s]' (3) the

7   'death of [another] person.'"  <u>Norgart v. Upjohn Co.</u>, 21 Cal. 4th 383, 390 (1999) (citing

8   Cal. Code Civ. Proc. § 377.60).  NIED is not an independent claim, but is simply a claim of

9   negligence, the elements of which are duty, breach, causation and damages.  <u>Burgess v.</u>

10  <u>Superior Court</u>, 2 Cal. 4th 1064, 1072 (1992).  In terms of causation, a plaintiff bringing a

11  wrongful death or negligence claim must demonstrate that the defendant's conduct was a

12  substantial factor in bringing about the injury or death.  <u>See, e.g.</u>, <u>Rutherford v. Owens-</u>

13  <u>Illinois, Inc.</u>, 16 Cal. 4th 953, 968 (1997).

14         Defendants do not expressly address whether the facts alleged suffice to state a

15  claim for wrongful death or negligence.  Instead, they contend that because the FAC fails to

16  plausibly allege proximate causation as to Plaintiffs' federal primary liability ATA claims,

17  the claims for wrongful death and negligence must fail as well.  However, in <u>Fields</u>, the

18  Ninth Circuit rejected the substantial factor standard of causation in favor of the more

19  stringent direct relationship standard.  881 F.3d at 744.  Given that Plaintiffs' state law

20  claims are subject to a less stringent showing of causation, it does not logically follow that

21  the Court's analysis of Plaintiffs' ATA primary liability claims controls the outcome of

22  their state law claims.  Tellingly, Defendants fail to meaningfully address this distinction in

23  their motion.  Given the absence of such analysis, the Court therefore declines to dismiss

24  Plaintiffs' causes of action for wrongful death and NIED for failure to state a claim.  <u>See</u>

25  <u>Hibbs v. Dep't of Human Res.</u>, 273 F.3d 844, 873 n. 34 (9th Cir. 2001) (finding argument

26  too undeveloped to be capable of assessment).

27         The above notwithstanding, the Court need not proceed further with the Plaintiffs'

28  wrongful death and NIED claims.  A district court may decline to exercise supplemental

jurisdiction over state law claims if it has dismissed all claims over which it has original

jurisdiction.  28 U.S.C. § 1367(c)(3); <u>Sanford v. MemberWorks, Inc.</u>, 625 F.3d 550, 561

(9th Cir. 2010).  "'[I]n the usual case in which all federal-law claims are eliminated before

trial, the balance of factors to be considered under the pendent jurisdiction doctrine—

judicial economy, convenience, fairness, and comity—will point toward declining to

exercise jurisdiction over the remaining state-law claims.'"  <u>Sanford</u>, 625 F.3d at 561

(quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988), <u>superseded on

other grounds by statute as recognized in</u> <u>Fent v. Okla. Water Res. Bd.</u>, 235 F.3d 553, 557

(10th Cir. 2000)).  Having now dismissed all federal claims alleged against Defendants, the

Court declines to assert supplemental jurisdiction over Plaintiffs' remaining claims.  <u>See

City of Colton v. Am. Promotional Events, Inc.-West</u>, 614 F.3d 998, 1008 (9th Cir. 2010)

(holding that district court acted within its discretion in declining to exercise supplemental

jurisdiction after granting summary judgment on all federal claims).

## IV.  **CONCLUSION**

For the reasons stated above,

IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is GRANTED as

to all federal claims alleged in the FAC.  Because Plaintiffs have failed to identify any facts

that could cure the deficiencies discussed above, these claims are dismissed without leave

to amend.  The Court declines to assert supplemental jurisdiction over Plaintiffs' wrongful

death and NIED claims, which are dismissed without prejudice.  The Clerk shall close the

file.

IT IS SO ORDERED.

Dated:  3/20/19

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
Senior United States District Judge



PUBLIC LAW 114–222—SEPT. 28, 2016

JUSTICE AGAINST SPONSORS OF TERRORISM
ACT

130 STAT. 852 PUBLIC LAW 114–222—SEPT. 28, 2016

Public Law 114–222
114th Congress

An Act

Sept. 28, 2016
[S. 2040]

To deter terrorism, provide justice for victims, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Justice Against
Sponsors of
Terrorism Act.
18 USC 1 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Justice Against Sponsors of Terrorism Act".

18 USC 2333
note.

**SEC. 2. FINDINGS AND PURPOSE.**

(a) FINDINGS.—Congress finds the following:

(1) International terrorism is a serious and deadly problem that threatens the vital interests of the United States.

(2) International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.

(3) Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.

(4) It is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code.

(5) The decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.

(6) Persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.

(7) The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the

PUBLIC LAW 114–222—SEPT. 28, 2016          130 STAT. 853

court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries.

(b) PURPOSE.—The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

**SEC. 3. RESPONSIBILITY OF FOREIGN STATES FOR INTERNATIONAL TERRORISM AGAINST THE UNITED STATES.**

(a) IN GENERAL.—Chapter 97 of title 28, United States Code, is amended by inserting after section 1605A the following:

**"§ 1605B. Responsibility of foreign states for international terrorism against the United States**          28 USC 1605B.

"(a) DEFINITION.—In this section, the term 'international terrorism'—

    "(1) has the meaning given the term in section 2331 of title 18, United States Code; and

    "(2) does not include any act of war (as defined in that section).

"(b) RESPONSIBILITY OF FOREIGN STATES.—A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—

    "(1) an act of international terrorism in the United States; and

    "(2) a tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

"(c) CLAIMS BY NATIONALS OF THE UNITED STATES.—Notwithstanding section 2337(2) of title 18, a national of the United States may bring a claim against a foreign state in accordance with section 2333 of that title if the foreign state would not be immune under subsection (b).

"(d) RULE OF CONSTRUCTION.—A foreign state shall not be subject to the jurisdiction of the courts of the United States under subsection (b) on the basis of an omission or a tortious act or acts that constitute mere negligence.".

(b) TECHNICAL AND CONFORMING AMENDMENTS.—

    (1) The table of sections for chapter 97 of title 28, United States Code, is amended by inserting after the item relating to section 1605A the following:          28 USC 1602 prec.

"1605B. Responsibility of foreign states for international terrorism against the United States.".

    (2) Subsection 1605(g)(1)(A) of title 28, United States Code, is amended by inserting "or section 1605B" after "but for section 1605A".

130 STAT. 854          PUBLIC LAW 114–222—SEPT. 28, 2016

**SEC. 4. AIDING AND ABETTING LIABILITY FOR CIVIL ACTIONS REGARDING TERRORIST ACTS.**

(a) IN GENERAL.—Section 2333 of title 18, United States Code, is amended by adding at the end the following:

"(d) LIABILITY.—

"(1) DEFINITION.—In this subsection, the term 'person' has the meaning given the term in section 1 of title 1.

"(2) LIABILITY.—In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.".

<span style="float:left">18 USC 2333 note.</span>

(b) EFFECT ON FOREIGN SOVEREIGN IMMUNITIES ACT.—Nothing in the amendment made by this section affects immunity of a foreign state, as that term is defined in section 1603 of title 28, United States Code, from jurisdiction under other law.

<span style="float:left">Claims.<br>Courts.<br>18 USC 1605B note.</span>

**SEC. 5. STAY OF ACTIONS PENDING STATE NEGOTIATIONS.**

(a) EXCLUSIVE JURISDICTION.—The courts of the United States shall have exclusive jurisdiction in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1605B of title 28, United States Code, as added by section 3(a) of this Act.

(b) INTERVENTION.—The Attorney General may intervene in any action in which a foreign state is subject to the jurisdiction of a court of the United States under section 1605B of title 28, United States Code, as added by section 3(a) of this Act, for the purpose of seeking a stay of the civil action, in whole or in part.

(c) STAY.—

<span style="float:left">Certification.</span>

(1) IN GENERAL.—A court of the United States may stay a proceeding against a foreign state if the Secretary of State certifies that the United States is engaged in good faith discussions with the foreign state defendant concerning the resolution of the claims against the foreign state, or any other parties as to whom a stay of claims is sought.

(2) DURATION.—

(A) IN GENERAL.—A stay under this section may be granted for not more than 180 days.

(B) EXTENSION.—

(i) IN GENERAL.—The Attorney General may petition the court for an extension of the stay for additional 180-day periods.

(ii) RECERTIFICATION.—A court shall grant an extension under clause (i) if the Secretary of State recertifies that the United States remains engaged in good faith discussions with the foreign state defendant concerning the resolution of the claims against the foreign state, or any other parties as to whom a stay of claims is sought.

PUBLIC LAW 114–222—SEPT. 28, 2016          130 STAT. 855

### SEC. 6. SEVERABILITY.

If any provision of this Act or any amendment made by this Act, or the application of a provision or amendment to any person or circumstance, is held to be invalid, the remainder of this Act and the amendments made by this Act, and the application of the provisions and amendments to any other person not similarly situated or to other circumstances, shall not be affected by the holding.

18 USC 2333 note.

### SEC. 7. EFFECTIVE DATE.

The amendments made by this Act shall apply to any civil action—

    (1) pending on, or commenced on or after, the date of enactment of this Act; and

    (2) arising out of an injury to a person, property, or business on or after September 11, 2001.

Applicability.
18 USC 2333 note.

 

Mac Thornberry
*Speaker of the House of Representatives pro tempore.*

John Cornyn
*Acting President of the Senate pro tempore.*

 

IN THE SENATE OF THE UNITED STATES,

*September 28, 2016.*

The Senate having proceeded to reconsider the bill (S. 2040) entitled "An Act to deter terrorism, provide justice for victims, and for other purposes.", returned by the President of the United States with his objections, to the Senate, in which it originated, it was

*Resolved,* That the said bill pass, two-thirds of the Senators present having voted in the affirmative.

Julie E. Adams
*Secretary.*

I certify that this Act originated in Senate.

Julie E. Adams
*Secretary.*

130 STAT. 856          PUBLIC LAW 114–222—SEPT. 28, 2016

IN THE HOUSE OF REPRESENTATIVES, U.S.

*September 28, 2016.*

The House of Representatives having proceeded to reconsider the bill (S. 2040) entitled "An Act to deter terrorism, provide justice for victims, and for other purposes.", returned by the President of the United States with his objections, to the Senate, in which it originated, and passed by the Senate on reconsideration of the same, it was

*Resolved,* That the said bill do pass, two-thirds of the House of Representatives agreeing to pass the same.

Karen L. Haas

*Clerk.*

---

LEGISLATIVE HISTORY—S. 2040:

CONGRESSIONAL RECORD, Vol. 162 (2016):
    May 17, considered and passed Senate.
    Sept. 9, considered and passed House.
DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2016):
    Sept. 23, Presidential veto message.
CONGRESSIONAL RECORD, Vol. 162 (2016):
    Sept. 28, Senate and House overrode veto.

○

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 5, 2019. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: April 5, 2019                    By:  _/s/ Brian M. Willen_____
                                             Brian M. Willen