# 18-16700

IN THE

## United States Court of Appeals

FOR THE NINTH CIRCUIT



REYNALDO GONZALEZ; THE ESTATE OF NOHEMI GONZALEZ;
BEATRIZ GONZALEZ, Individually and as Administrator
of the Estate of Nohemi Gonzalez; JOSE HERNANDEZ;
REY GONZALEZ; PAUL GONZALEZ,

*Plaintiffs-Appellants,*

*v.*

GOOGLE LLC,

*Defendant-Appellee.*

Appeal From the United States District Court for
the Northern District of California, Oakland
*Case No. 4:16-cv-03282-DMR, Magistrate Judge Donna M. Ryu*

## JOINT REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Keith L. Altman
Daniel W. Weininger
EXCOLO LAW
*Attorneys for Plaintiff-Appellant*
  *Reynaldo Gonzalez*
26700 Lahser Road, Suite 401
Southfield, Michigan 48033
516-456-5885

Robert J. Tolchin
Meir Katz
THE BERKMAN LAW OFFICE, LLC
*Attorneys for Plaintiffs-Appellants*
  *The Estate of Nohemi Gonzalez,*
  *Beatriz Gonzalez, Individually and*
  *as Administrator of the Estate of*
  *Nohemi Gonzalez, Jose Hernandez,*
  *Rey Gonzalez and Paul Gonzalez*
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627

# **Table of Contents**

TABLE OF AUTHORITIES ..................................................................*iii*

ARGUMENT

I.   Section 230 May Not Be Considered ........................................... 3

    A.   Section 230 Does Not Apply Overseas ............................... 3

    B.   Section 230 Has Been Raised Prematurely ....................... 10

II.   ISIS Is Not Your Typical Internet User ..................................... 12

III.   The Complaint Adequately Supports Plaintiffs' Claims ........................... 15

    A.   Google Ignores Reasonable Inferences Flowing from the Complaint ................................................................ 15

    B.   Plaintiffs Adequately Alleged Google's Secondary Liability ......... 18

        1.   Aiding and Abetting ............................................... 18

        2.   Conspiracy ............................................................ 20

    C.   Plaintiffs Adequately Alleged Proximate Causation ...................... 21

    D.   Plaintiffs Adequately Alleged Google's "International Terrorism" .................................................... 22

IV.   The First Amendment Does Not Support Google .................................... 25

    A.   This Court Should Not Consider EFF's Arguments ....................... 25

    B.   This Court Should Not Consider the Constitutionality of the ATA ......................................................... 26

    C.   Google Is Not Engaged in Expression so No First Amendment Rights Are Implicated ................................... 27

    D.   The Rights of All "Internet Users" Are Not Implicated ................. 28

    E.   ISIS Has No Protected Speech Rights ............................................ 29

    F.   The First Amendment Creates No Right to Materially Support Terrorists .................................................. 29

V.   The CDA Does Not Support Google .......................................... 32

A.  *HomeAway.com* Forecloses Google's Assertion That Plaintiffs' Claims Treat It as a "Publisher"......................................32

B.  Google Is a Content "Creator" and "Developer" ............................36

C.  The CDA's Purpose Is to Facilitate Removal of Offensive Content, Not to Protect Internet Speech............................................39

D.  If the CDA and ATA Conflict, the ATA Controls...........................41

CONCLUSION ....................................................................................................49

CERTIFICATE OF COMPLIANCE

## **Table of Authorities**

### **Cases**

*Am. Trucking Associations v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ........................................................................ 26

*Ashcroft v. ACLU*,
   535 U.S. 564 (2002) ........................................................................................ 9

*Barnes v. Yahoo!*,
   570 F.3d 1096 (9th Cir. 2009) ...............................................5, 8, 10-11, 44, 46

*Boim v. Holy Land Found.*,
   549 F.3d 685 (7th Cir. 2008) (*en banc*)................................................... 23, 25

*Boim v. Quranic Literacy Inst. & Holy Land Found.*,
   291 F.3d 1000 (7th Cir. 2002) .................................................................23-25

*City of Chicago v. StubHub!*,
   624 F.3d 363 (7th Cir. 2010) ....................................................5, 8, 10-11, 44

*Doe v. Backpage.com*,
   817 F.3d 12 (1st Cir. 2016) ........................................................................... 42

*Doe v. Internet Brands*,
   824 F.3d 846 (9th Cir. 2016) ..........................................................5-6, 33, 39

*Erie Ins. v. Amazon.com*,
   2019 WL 2195146 (4th Cir. May 22, 2019)................................................... 35

*Fair Hous. Council v. Roommates.com*,
   521 F.3d 1157 (9th Cir. 2008) (*en banc*)......................................... 1, 8, 37, 46

*Fields v. Twitter*,
   881 F.3d 739 (9th Cir. 2018) ..................................................................21-22

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983)................................................................18-21

*Haskell v. Harris*,
    745 F.3d 1269 (9th Cir. 2014) ........................................................................ 26

*Holder v. Humanitarian L. Project*,
    561 U.S. 1 (2010) ........................................................................13, 24, 29-31

*HomeAway.com v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ..........................................................1, 14, 33-35

*Hui v. Castaneda*,
    559 U.S. 799 (2010) ........................................................................................ 46

*Huon v. Denton*,
    841 F.3d 733 (7th Cir. 2016) ....................................................................37-38

*J.S. v. Village Voice*,
    359 P.3d 714 (Wash. 2015) ..................................................................... 33, 37

*Kemper v. Deutsche Bank*,
    911 F.3d 383 (7th Cir. 2018) ....................................................................24-25

*Kimzey v. Yelp!*,
    836 F.3d 1263 (9th Cir. 2016) ........................................................................ 37

*Kiobel v. Royal Dutch Petroleum*,
    569 U.S. 108 (2013) ....................................................................................3-5

*Linde v. Arab Bank*,
    882 F.3d 314 (2d Cir. 2018) ....................................................................23-24

*Mahoney v. Sessions*,
    871 F.3d 873 (9th Cir. 2017) ........................................................................ 15

*Morrison v. Nat'l Australia Bank*,
    561 U.S. 247 (2010) ....................................................................................3-4

*Rangel v. PLS Check Cashers*,
    899 F.3d 1106 (9th Cir. 2018) ........................................................................ 26

*Reno v. ACLU*,
    521 U.S. 844 (1997) ....................................................................................8-9

*RJR Nabisco v. European Community*,
   136 S.Ct. 2090 (2016) ..................................................................3-5

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ......................................................................... 27

*Shame On You Productions v. Banks*,
   893 F.3d 661 (9th Cir. 2018) ......................................................... 26

*Shirk v. U.S.*,
   773 F.3d 999 (9th Cir. 2014) ......................................................... 26

*Tellabs, Inc. v. Makor Issues & Rights*,
   551 U.S. 308 (2007) ...................................................................15-16

*WesternGeco v. ION Geophysical*,
   138 S.Ct. 2129 (2018) .................................................................6-7, 9

*Zeran v. AOL*,
   129 F.3d 327 (4th Cir. 1997) ........................................................... 7

## Statutes, Regulations, and Rules

2 U.S.C. 30a ....................................................................................... 44

18 U.S.C.:
   §2331 ......................................................................14, 20, 22-24
   §2333 ..................................................................................*passim*
   §2339A .............................................................12-13, 24, 31, 41
   §2339B.............................................................13, 24, 29-30, 41

28 U.S.C. 1604 .................................................................................. 45

47 U.S.C.;
   §223 ...................................................................................... 8
   §230 ..................................................................................*passim*

Allow States and Victims to Fight Online Sex Trafficking Act of 2017,
   Pub. L. 115-164, 132 Stat 1253 ("Trafficking Act of 2017")........................ 42

Anti-Terrorism Act ("ATA"),
  18 U.S.C. 2331, *et seq.* ............................................................*passim*

Child Online Protection Act,
  Pub. L. 105-277, 112 Stat. 2681-736 ............................................ 9

Communications Decency Act of 1996 ("CDA"),
  Title V, Subtitle A, of the Telecommunications Act of 1996. Pub. L. 104-
  104, 110 Stat. 133 ...................................................................*passim*

Justice Against Sponsors of Terrorist Act ("JASTA"),
  Pub. L. 114-222, 130 Stat. 852 ..................................................*passim*

Fed. R. Civ. P. 12 ........................................................................ 15, 24

## Federal Authority

H.R.Rep. 104-458 (1996) (Conf. Rep.) ................................................ 10

H.R.Rep. 115-572 (2018) ................................................................ 43

Statement of Alan Kreczko on S. 2465,
  Before the Subcommittee on Courts and Administrative Practice (July 25,
  1990), https://www.state.gov/documents/organization/28458.pdf ............... 41

## Other Authority

Black's Law Dictionary, *enforcement* (10th ed. 2014) ......................................... 42

EFF's brief in *Force v. Facebook*, 2d Cir. No. 18-397, DE 170 (Jan. 24, 2019) . 26

Pierre N. Leval,
  *Judging Under the Constitution: Dicta About Dicta*,
  81 N.Y.U. L. Rev. 1249 (2006) ...................................................... 7

Restatement (Second) of Torts §876 (1979) ........................................... 20

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

Google seeks an exemption from generally applicable law—unavailable to brick-and-mortar businesses, never intended by Congress, and recently rejected by this Court:

> We have consistently eschewed an expansive reading of the statute that would render unlawful conduct "magically...lawful when [conducted] online," and therefore "giv[ing] online businesses an unfair advantage over their real-world counterparts...." [T]he CDA does not provide internet companies with a one-size-fits-all body of law. Like their brick-and-mortar counterparts, internet companies must also comply with [background laws] concerning, for example, employment, tax, or zoning.

*HomeAway.com v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1164 & n.15 (9th Cir. 2008) (*en banc*)). Just as Internet companies must comply with tax and employment law, they must also comply with the ATA.

Google struggles to support the district court's astounding conclusion that a provision of the CDA (the 'D' is for "*decency*") protects corporations that illegally support terrorism when they do so online. (Appellee's Br.13-40). While touting "uniformity" and "consisten[cy,]" (Appellee's Br.2, 15, 33, 37), Google disregards *HomeAway.com*, this Court's most recent relevant opinion, decided March 13, 2019 (after plaintiffs filed their opening brief but nearly a month before Google filed its brief).

The biggest problem with Google's position appears in its footnote 11. There, Google admits that a defendant who "deliberately and openly" gives support to terrorists in the course of its business can be liable under the ATA, despite the CDA. (Appellee's Br.40; *see* Appellants' Br.69).[1] It also admits that an ISIS operative publishing directions of an ISIS commander on YouTube can be liable under the ATA, despite the CDA. (Appellee's Br.40; *see* Appellants' Br.69-70). Google does not reconcile these admissions with its broad doctrinal statements on the CDA; indeed, Google's ivory-tower assertions about how the CDA should operate contradict these admissions.

Worse, Google offers no cogent justification for the district court's decision to even reach or apply the CDA here. Nor does it plausibly explain how it could avoid the ATA, but-for its reliance on the CDA.

---

[1] Google retorts that "there is nothing like" "deliberate[] and open[]" support of terrorism "in this case." (Appellee's Br.40). Because Google is responding to a hypothetical, any differences between the hypothetical and this case are irrelevant to analysis of the hypothetical. Regardless, the complaint more than adequately supports the inference that Google's knowing support of ISIS over many years amounts to "deliberate and open" support.

-2-

## **ARGUMENT**

### **I.    Section 230 May Not Be Considered**

#### A.    Section 230 Does Not Apply Overseas

1.     This case presents a straightforward application of the presumption against extraterritoriality. (Appellants' Br.31-33). Neither the full CDA nor §230 gives "clear indication of...extraterritorial application." *See Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 255 (2010). It thus has none. *Id.*; *RJR Nabisco v. European Community*, 136 S.Ct. 2090, 2101 (2016); (Appellants' Br.31-33). Google agrees. (Appellee's Br.30 n.6).

The Court's inquiry should end here.

2.     Acknowledging that it cannot avoid the presumption against extraterritoriality, Google invents its own jurisprudence. It says because "immunity statute[s]" are not "substantive regulatory provision[s,]" they are *always* exempt from the presumption against extraterritoriality. (Appellee's Br.28-29).

Google forfeited this argument by not raising it below.

It is also wrong. The presumption against extraterritoriality even "constrain[s] courts considering causes of action that may be brought" under a "strictly jurisdictional" statute that "does not directly regulate conduct or afford relief." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013). While the CDA is not jurisdictional and creates an affirmative defense, not a private right of action, those

distinctions make no difference. This passage in *Kiobel* means simply that *all* legislation must be read with a presumption against extraterritorially.

That should be unsurprising. The utility of the presumption, explained the Supreme Court, demands that it apply *always*: "Rather than guess anew in each case, we apply the presumption in ***all cases***, preserving a stable background against which Congress can legislate with predictable effects." *Morrison*, 561 U.S. at 261 (emphasis added). For that background to remain stable and its effects predictable, the CDA should be treated no differently.

The Supreme Court's cases leave no doubt that the presumption applies to statutes like the CDA. *First*, it held that the mere fact that the effects of a statute will be felt domestically is insufficient. *Morrison*, 561 U.S. at 256-57, 261, 272-73. *Contra* (Appellee's Br.29-30) (asserting "there is no possibility" that the effects of §230 will be felt abroad, implicitly applying the defunct "effects test"). *Second*, in both *Kiobel*, *supra*, and *RJR Nabisco*, the Supreme Court held the presumption applies against a civil cause of action arising overseas even where the underlying criminal offenses apply extraterritorially. 136 S.Ct. at 2106-08. That the causes of action do not independently regulate conduct was irrelevant. In both instances, the Court held the causes of action were improperly invoked over extraterritorial conduct, though both causes of action—which authorized suit in federal court—were

-4-

to be exercised in the U.S. *Id.* at 2111; *Kiobel*, 569 U.S. at 124-25. So too here: That the CDA's protections are to be applied in federal court is irrelevant.

3. Google's contention that the CDA does not regulate conduct (Appellee's Br.29) is absurd. *First*, the singular provision Google focuses on, §230(c)(1), must be viewed within the context of the entire CDA, which certainly was intended to regulate material posted on the Internet. (Appellants' Br.20-24).

*Second*, §230(c)(1), as Google understands it, *does* regulate conduct. Google believes it creates an Internet exception to nearly all tort law, "an all[-]purpose get-out-of-jail-free card," *Doe v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016), enabling Internet giants to act with impunity while violating laws of general applicability. Section 230(c)(1) regulates tortious conduct no less than the torts it supposedly excuses. The underlying tort prohibits conduct while §230(c)(1) permits the same conduct.

*Third*, §230(c)(1) is *not* an "immunity" statute. *Barnes v. Yahoo!*, 570 F.3d 1096, 1100 (9th Cir. 2009); *see also City of Chicago v. StubHub!*, 624 F.3d 363, 366 (7th Cir. 2010) (Easterbrook, *J.*) ("[S]ubsection (c)(1) does not create an 'immunity' of any kind."). It is an ordinary affirmative defense. (Appellants' Br.25-26, 39-40).

4. After finally turning to governing law, Google concedes the first step of the extraterritoriality analysis: The CDA does not reveal congressional intent for extraterritorial application. (Appellee's Br.30 n.6). Google skips to step two, despite

never showing that the second step applies. *Id.* It does not apply because this case features *no* domestic conduct. (Appellants' Br.32-33).

5.      Not only was Google unjustified in moving to step two, it also got that step wrong. As plaintiffs explained, without response from Google, step two asks about the focus of an *entire enactment*, not just a phrase of particular interest. (Appellants' Br.33-34) (citing, *e.g.*, *WesternGeco v. ION Geophysical*, 138 S.Ct. 2129, 2137 (2018)).

"[T]he object of [the CDA's] solicitude" is objectionable and offensive material on the Internet. (Appellants' Br.34-36). The CDA aims to facilitate removal of objectionable material from the Internet, partially through user-directed blocking and filtering. Enacted under the title "Online Family Empowerment" (Appellants' Br. Addendum a6), §230 implements that objective by removing the threat of liability for editing third-party content. (Appellants' Br.21-24, 34-35); *Internet Brands*, 824 F.3d at 851-52 ("[T]he purpose of [§230(c)(1)] is to provide protection for 'Good Samaritan' blocking and screening of offensive material." (cleaned up)).

Plaintiffs further demonstrated the CDA's focus by examining its text and legislative history. (Appellants' Br.20-24, 34-36). Google chooses to ignore the text and legislative history, substituting what it calls "two decades of law, including this Court's en banc decision in *Roommates*...." (Appellee's Br.30-31 n.7). But all the language Google relies on is dicta; none of it is "law." As plaintiffs explained, some

of that dicta is wrong or misleading and should be rejected. (Appellants' Br.24-25). Court statements about what a statute does and what it was intended to do cannot trump the statute's language and legislative history. When, as here, those statements are not binding, this Court should look to the original sources, not the mythology surrounding them.

*Zeran v. AOL*, 129 F.3d 327 (4th Cir. 1997), for example, was *not* an extraterritoriality case and did not determine the CDA's "focus." It does, however, seek to identify two objectives that motivated §230. *First*, without support, *Zeran* says §230 was enacted "in part" to protect Internet speech. *Zeran*, 129 F.3d at 330-31. *Zeran* was wrong. It provided no evidence for this statement, provided only scant analysis, and had no need to reach the issue to resolve the defamation claim at issue. It has no precedential value here. Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1255-56, 1260-63, 1274-75 (2006).[2] *Zeran* continues: "Another important purpose of §230 was to encourage service providers to self-regulate the dissemination of offensive material over their services." *Id.* at 331. But, as this Court noted, all available evidence shows that this

---

[2] Even if the relevant language from *Zeran* were not dicta, and even if it were an extraterritoriality case, it still would not mean much. The Supreme Court has made clear that the *means* a statute uses to achieve its objective are not necessarily its focus—the objective itself. *WesternGeco*, 138 S.Ct. at 2138.

"other" goal was the *only* motivating factor behind §230. *Roommates.com*, 521 F.3d at 1163 n.12.

Nothing in this Court's prior decisions on this point requires correction. *Roommates.com*, for example, says only that Congress' sole objective in passing the CDA was to clean up the Internet, *id.*, and that §230(c)(1) creates an "immunity," intended to shield Internet business from liability for "the *removal* of user-generated content, not the *creation* of content." *Id.* at 1163 (emphasis in original). The first point is certainly correct and supports plaintiffs' position. The second point is also correct, assuming "immunity" is understood in its non-technical sense as simply a "defense." *Barnes*, 570 F.3d at 1100 (noting that §230 does *not* create an "immunity"); *accord StubHub!*, 624 F.3d at 366.

Google elsewhere asserts that the entire CDA, aside from §230, was "invalidated by the Supreme Court in *Reno v. ACLU*, 521 U.S. 844 (1997)[,]" and thus only §230 may be considered. (Appellee's Br.31 n.8). This would be a non-sequitur were it true. Even abrogated provisions reflect on Congress' focus in the enactment. The provisions struck by *Reno* indeed reveal much about the focus of the CDA. In any event, Google's contention is false. Only certain subparagraphs within 47 U.S.C. 223(a) and (d) were reviewed in *Reno*. 521 U.S. at 858-60. The CDA, as enacted, created far more law regulating Internet content than just that. (Appellants' Br.20-21 & Addendum a2-a8). Moreover, later amendments to the CDA, which

likewise inform the focus of the CDA, replace much of what *Reno* invalidated. *Ashcroft v. ACLU*, 535 U.S. 564, 569 (2002); Child Online Protection Act, Pub. L. 105-277, 112 Stat. 2681-736. (See Appellants' Br.23 about Congress' findings in the Child Online Protection Act.)

6.     Realizing that the overall focus of the CDA does not fit its narrative, Google attempts to distill the focus of just §230(c)(1), as if Congress enacted that provision independently and meant it to operate in a vacuum. Indeed, Google argues the focus of §230(c)(1) can and should be discerned without regard to the statute's next sentence, §230(c)(2), because the latter has "nothing to do with this case." (Appellee's Br.31). That contention contradicts *WesternGeco*, 138 S.Ct. at 2137 ("When determining the focus of a statute, we do not analyze the provision at issue in a vacuum. If the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions.") (internal citation omitted)).

The text of §230(c)(1) focuses on Internet content, not liability limitation. This is made clear by §230(c)(2), which uses clear language to limit liability, while §230(c)(1) does not. Differing language indicates Congress' different intent. (Appellants' Br.34-35). Additionally, §230(b)(4) addresses "remov[ing] disincentives for the development and utilization of blocking and filtering technologies," §230(b)(5) addresses "vigorous enforcement of Federal criminal laws

to deter and punish trafficking in obscenity, stalking, and [digital] harassment," and §230(d) obligates Internet providers to inform customers of the availability of blocking and filtering technologies. None of these provisions belongs in §230 if the statute's focus were liability limitation. Finally, the unusual language of §230(c)(1), which appears just 68 times in the United States Code, was used by Congress only *once* to express liability limitation. In that instance, Congress did it explicitly by calling the relevant activities not "prohibited." Congress did not so convey here, showing that its focus was *not* liability limitation but rather regulation of the Internet. (Appellants' Br.35-36).

The legislative history of §230, summarized in the opening brief, is clear: The focus of §230 is to facilitate private regulation of Internet content. (Appellants' Br.21-23); *see also* H.R.Rep. 104-458 at 194 (1996) (Conf. Rep.). Google offers no response.

## B. Section 230 Has Been Raised Prematurely

Because §230(c)(1) provides an affirmative defense, it may not be reached on a motion to dismiss unless "the statute's barrier to suit is evident from the face of the complaint." (Appellants' Br.39-41). Google agrees. (Appellee's Br.38-39).[3]

---

[3] Google cites a Fourth Circuit case for the proposition that the CDA's "immunity" needs to be applied at the "earliest possible stage of the case." (Appellee's Br.39). But the CDA does not create "immunity." *Barnes*, 570 F.3d at

The parties differ only on the second step: Whether the complaint *inevitably* establishes §230(c) applicability. (Appellants' Br.40-41; Appellee's Br.39). Google has the burden of showing that, accepting all the complaint's allegations as true and drawing all reasonable inferences in favor of the plaintiffs, the complaint makes §230(c)'s application not merely correct but *inevitable*. It did not meet that burden below (Appellants' Br.40) or here (*see* Appellee's Br.39). Indeed, even as Google tries to defend the district court's premature application of §230(c)(1), it does not cite (let alone quote or analyze) the complaint. *See id.*

Since it cannot defend the district court's ruling, Google pursues a different tack. In a single sentence, it suggests this argument has been forfeited because it was "not raised before the district court." (Appellee's Br.38). Google omits to mention that during oral argument before Magistrate Ryu, plaintiffs' counsel asserted that §230 provides an affirmative defense (198-99[*]),[4] arguing that she should have asked

---

1100; *StubHub!*, 624 F.3d at 366. If the Fourth Circuit's dicta says otherwise, it is wrong. In any event, that dicta merely begs the question: 'When is the earliest *possible* stage to raise the CDA?' Precedent cited by Google answers that unless the complaint makes the CDA's defense inevitable, it may not be raised before an answer is filed.

[*] Unless otherwise noted, parenthetical page citations reference plaintiffs' Record Excerpts.

[4] Counsel imprecisely used the word "takeaway" rather than "affirmative defense." But the meaning of "takeaway" is clear in context. (199).

first whether "we have stated a claim under the ATA" and only then asked whether "[§]230 take[s] it away." (200). Plainly, the argument was raised.

## II. ISIS Is Not Your Typical Internet User

Google treats ISIS as just another YouTuber. But ISIS is a designated terrorist organization. ISIS and its operatives are *persona non grata*. No one may give them aid, even in arm's-length commercial transactions. 18 U.S.C. 2333(a) and (d), 2339A(b) (defining "material support"); (Appellants' Br.49-54).

This error repeats throughout Google's brief. For example, Google asserts immunity from liability because the services it provides to ISIS are no different from the services it provides to other YouTube users. (Appellee's Br.23). But treating ISIS like everyone else is *illegal*. Similarly, Google asserts that the CDA immunizes Internet providers that merely "arrange[] and display[] third-party [content]." (Appellee's Br.19). Even if that were what the CDA says (it is not), Google misses the distinction between arranging and displaying content produced by benign third-parties and ISIS. Displaying original content produced by non-terrorists is generally legal; displaying content produced by ISIS is not.

Even as Google discusses the ATA, it fails to appreciate that knowingly providing substantial services—of nearly any kind—to a designated terrorist organization is illegal and tortious. Thus, Google states that knowingly providing services to ISIS "does not come close to meeting the requirements of specific

knowledge...imposed by [the ATA]." (Appellee's Br.47). But that is *precisely* what the ATA prohibits. 18 U.S.C. 2339A, 2339B; *Holder v. Humanitarian L. Project*, 561 U.S. 1, 7-9, 16-18 (2010). Similarly, Google claims a defense because it merely provided ISIS with "'routine' services." (Appellee's Br.48).[5] Again, the ATA, on its plain terms, prohibits anyone from providing terrorists with nearly any substantial service, no matter how "routine." §2339A(b). Google also argues that a "general practice of earning or sharing revenue" with terrorists is not grounds for liability because that arm's-length relationship "in no way suggests that Google was in a close relationship with ISIS." (Appellee's Br.55). But the ATA prohibits arm's-length transactions and has no "close relationship" requirement. §2339A(b).

Google seems not to know that its provision of its "neutral" or "routine" services to ISIS—the same ones it provides to everyone else—violates its obligations under the ATA.[6] Thus, even if making Internet-based services

---

[5] Google cites several district court opinions to support this claim. (Appellee's Br.48). None of them does and, in any event, the contention is wrong as it directly contradicts the plain language of the ATA. 28 U.S.C. 2339A(b)(1) (defining "material support" to include virtually "any[thing]...except medicine or religious materials"); (Appellants' Br.8-9).

[6] Google irresponsibly trivializes its obligations under the ATA, recasting them as simply a duty "to prevent ISIS from posting [its] material" or to more quickly "remove it." (Appellee's Br.27-28). Both are necessary but neither is sufficient. Google's *relationship* with ISIS is illegal. It knowingly does business with terrorists, a clear violation of the ATA.

universally available might be insufficient to negate the CDA in other contexts, it is enough here.

Google counters that "providing material support is neither a necessary nor a sufficient condition for such [ATA] claims." (Appellee's Br.27). But all of plaintiffs' ATA claims require either some showing of support or some other criminal counterterrorism violation, which forms the duty imposed by the ATA. 18 U.S.C. 2331(1)(A). By providing support to terrorists, Google violates that duty.

True, the ATA also requires a showing of proximate causation (either by Google or, as to the secondary liability claims, by ISIS) and Google's general support of ISIS does not, by itself, meet that requirement. But that is beside the point because the CDA's application turns on the *duty* asserted, not on each of the various elements of the tort. *HomeAway.com*, 918 F.3d at 682-83. The underlying prohibition, "international terrorism," §2333(a), (d), is generally violated by knowingly providing material support or other assistance to terrorists. Google violated that prohibition even if its violation did not proximately cause plaintiffs' injuries. Thus, while the ultimate viability of plaintiffs' ATA claims may depend, in part, on third-party content, that does not change the fact that Google, through its illegal provision of support to ISIS, violated the *duties* imposed by the ATA.

## III.   The Complaint Adequately Supports Plaintiffs' Claims

Google contorts to reach conclusions about the complaint that lack the slightest support in either law or fact. Plaintiffs rely in the main on their opening brief (Appellants' Br.8-26, 41-54) and, due to space limitations, respond here only to some of Google's more significant assertions.

### A.   Google Ignores Reasonable Inferences Flowing from the Complaint

Google makes many false assertions about what the complaint purportedly fails to allege, while rarely attempting to show the absence of pertinent allegations. While perhaps Google's failure to cite the complaint can be attributed to its rhetorical position that the pertinent allegations are not there, Google has no excuse for not responding to the opening brief, which cites the complaint often for points that Google says were not alleged. If Google objects to the description of the complaint in the opening brief, it should have said so.

Perhaps some of the precise language Google searches for is not in the complaint. But a complaint need not expressly allege every factual contention that a party might later assert. Rather, the complaint must allege facts that, when taken together with the plausible inferences that flow from them, adequately support the plaintiff's claims. Under Rule 12(b)(6), a court must draw "all inferences" in the plaintiff's favor, *Mahoney v. Sessions*, 871 F.3d 873, 877 (9th Cir. 2017), and must consider the complaint in its entirety, together with "matters of which a court may

take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007).

Each of Google's assertions that plaintiffs failed to allege pertinent facts is wrong. For example:

• Google falsely says plaintiffs failed to allege "any relationship" between Google and ISIS. (Appellee's Br.54). *See* (Appellants' Br.7-18); (63-64, 87-88, 117-20, 126, 134, 140, 173-86).

• Google falsely says plaintiffs "did not offer a single fact to suggest that Google knowingly tolerated terrorist content on [YouTube]...." (Appellee's Br.56). *See* (Appellants' Br.8-11); (63-64, 87-88, 120, 174-79, 186). Indeed, a U.K. parliamentary committee charged Google with "*consciously* failing to combat the use of [its] sites to promote terrorism and killings." (186) (emphasis added).

• Google falsely says plaintiffs failed to allege Google's knowledge (either actual or constructive) of its long-standing and continuing assistance to ISIS. (Appellee's Br.49, 52)*.* See prior paragraph.

• Google falsely says plaintiffs failed to allege that Google intended to support ISIS' activities. (Appellee's Br.53). Google's intent can be plausibly inferred from its knowing acquiescence over time for its own pecuniary benefit.

- Google falsely says plaintiffs failed to allege that Google knowingly acted to "encourage" ISIS' terror activities. (Appellee's Br.54). Google's encouragement of ISIS can be plausibly inferred for the same reasons.

- Google falsely says plaintiffs failed to allege that "Google actually profits from" its work to facilitate public interest in ISIS' videos or knowingly shared revenue with ISIS. (Appellee's Br.55). *See* (Appellants' Br.16-17); (134, 178-83).

- Google falsely says plaintiffs failed to allege that ISIS and Google mutually benefit from Google's generation of interest for ISIS's YouTube content. (Appellee's Br.23, 56). ISIS' benefit is beyond question. (Appellants' Br.6-18). That Google benefits from increased web traffic on YouTube can be easily inferred from the simple fact that Google is an advertising business. (Appellants' Br.16); (178-81). More traffic means more advertising revenue. Google's benefits from the arrangement can also be inferred from Google's actions: Google, a publicly-traded company with a duty to maximize shareholder profit, knowingly permitted, and sometimes authorized, ISIS terrorists to operate on YouTube. (*E.g.*, 174-77, 179-81, 185-86).

- Google falsely says plaintiffs failed to allege that its services to ISIS amount to, in part, "matchmaking or brokerage." (Appellee's Br.26). In fact, the complaint uses those words almost precisely: "Google serves as a *broker or*

*match-maker* between like-minded people, introducing users to other users and videos that they will be interested in based on the video and account information and characteristics" without user input. (184-85) (emphasis added).

### B.   Plaintiffs Adequately Alleged Google's Secondary Liability

Google acknowledges that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), governs secondary liability claims under the ATA. (Appellee's Br.52). But it only pays lip service to *Halberstam*.

#### 1.   *Aiding and Abetting*

Plaintiffs explained that aiding and abetting claims under the ATA have three elements: 1) causation by the primary actor, 2) that "the defendant [was] *generally* aware of his role" in the "*overall* illegal or tortious activity," and 3) that the defendant "knowingly provid[ed] substantial assistance" to the primary actor. (Appellants' Br.43) (emphasis added); 18 U.S.C. 2333(d). *Halberstam* holds that any person who assists the primary actor may be held "liable for other reasonably foreseeable acts done" even if the defendant was ignorant of the primary actor's specific intent. (Appellants' Br.43-44).

Google does not contest the first element.

Google oddly combines the second and third elements, labeling them both a "*mens rea*" requirement. It proceeds to convert the second element into a requirement that the defendant act with specific knowledge of the tortious acts that

-18-

immediately injured the plaintiff. (Appellee's Br.52-53). That is precisely contrary to *Halberstam*. It also contradicts JASTA, which enacted the governing substantive provision (§2333(d)). In JASTA, Congress found that a knowing provider of "material support or resources," even "indirectly," to anyone who "pose[s] a significant risk of committing acts of terrorism" should anticipate being held responsible and that the U.S. has a "vital interest" in holding terror supporters responsible. JASTA §2(a)(6), (a)(7). The articulated purpose of JASTA is to give victims of terrorism "the broadest possible basis...to seek relief against persons...that have provided material support...to foreign [terrorist] organizations," such as ISIS. JASTA §2(b). JASTA is not limited to those material supporters who had specific knowledge of a coming terror attack. *Id.*[7]

The third element requires knowledge only of the terrorist status of the recipient of "substantial assistance." That is clear from both *Halberstam* and the governing substantive provision: "[L]iability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance...[to the terrorist]." §2333(d). The word "knowingly" does not modify anything connected to "the

---

[7] True, the "by reason of" language in §2333(a) makes the ATA subject to a proximate causation requirement. But secondary liability claims under the ATA demand only that the *primary* actor (ISIS) proximately caused the injury. *See* §2333(d)(2). The secondary actor (Google) is liable for merely knowingly providing substantial assistance. It is unnecessary to show that the secondary actor proximately caused the injury. *See id.*

principal violation at issue here (the Paris attack)," as Google would have it. (Appellee's Br.52-53). Rather, "knowingly" modifies the phrase "providing substantial assistance," meaning that the substantial assistance to a terrorist must be provided with knowledge.

The remaining issue is whether the considerable services Google provided to ISIS (Appellants' Br.4-18) constitutes "substantial assistance" under §2333(d). Plaintiffs spent nearly three pages explaining how Google's assistance to ISIS is "substantial." (Appellants' Br.45-47). Google virtually ignores all of it and invents its own doctrine bearing no resemblance to *Halberstam* or the Restatement provision on which *Halberstam* is based. *Compare Halberstam*, 705 F.2d at 477-78, 488 (quoting Restatement (Second) of Torts §876 (1979)) *and* (Appellants' Br.45-47), *with* (Appellee's Br.53-55).

Finally, Google complains that ISIS' accounts make up "some tiny percentage" of YouTube's accounts, as if that excuses its support of ISIS. (Appellee's Br.54). But, as *Halberstam* makes clear, the substantiality of assistance to a terrorist must be viewed from the perspective of the terrorist organization, not its supporter. (Appellants' Br.45).

### 2.    *Conspiracy*

Google's response about plaintiffs' conspiracy claim is even weaker. Citing *Halberstam*, plaintiffs showed they are not obligated at *any* stage in the litigation to

prove the existence of any formal agreement between the conspiring parties. (Appellants' Br.48-49). At the pleading stage, they must merely "plausibly allege circumstances suggesting [that] Google and ISIS tacitly worked in tandem to achieve ISIS' 'international terrorism,' as defined by §2331(1)." The complaint meets that low standard. *Id.*

Google dislikes that rule so it argues that a conspiracy claim requires a "meeting of the minds." (Appellee's Br.56). Plaintiffs do not disagree. Their point is that the meeting of the minds between Google and ISIS can be a mere "tacit" agreement and that no formalized document is necessary. Google does not respond.

Google also argues that conspiracy requires that both parties "share the common objective of the conspiracy." (Appellee's Br.56). If Google means that all parties to a conspiracy must share the same subjective intent, Google is wrong. *Halberstam* holds an agreement to support some common objective, regardless of individual motives, is all that is required. 705 F.2d at 479, 487. The common objective here is furthering ISIS's influence on YouTube. Google's reason for doing so is obvious: selling advertisements for profit. (Appellants' Br.48-49).

## C.   Plaintiffs Adequately Alleged Proximate Causation

Successfully pleading causation in a primary liability ATA claim requires only allegations supporting the inference that there was "at least some direct relationship between a defendant's acts and a plaintiff's injuries." *Fields*, 881 F.3d

739, 748 (9th Cir. 2018); (Appellants' Br.51-53). Google suggests this Court's word "some" should be ignored. (Appellee's Br.43). Never mind that *Fields* uses the phrase "some direct relation[ship]" *15* times. *Fields*, 881 F.3d at 744-49. According to Google, *Fields* meant that proximate causation under the ATA requires a defendant's acts immediately and exactly cause a plaintiff's injuries. Google even chides plaintiffs for failing to link Google's support of ISIS directly to the very bullet that killed Nohemi Gonzalez. (Appellee's Br.45). *Fields* is quite clear and Google quite mistaken.

Admittedly, the complaint cannot tie any particular act that Google took on behalf of ISIS directly to Nohemi's murder. It is unlikely any single YouTube posting, single dollar that Google gave to ISIS, or any other single act Google did was the but-for cause of the murder. But *Fields* does not require but-for causation. *Fields* requires only that the complaint "tie the defendant to the plaintiff's injuries." (Appellants' Br.51). Plaintiffs more than adequately did so, alleging Google's illegal acts benefited YouTube in ways that contributed directly to Nohemi's murder. (Appellants' Br.52-54). Google does not argue otherwise.

### D. Plaintiffs Adequately Alleged Google's "International Terrorism"

Plaintiffs' claims for direct liability under §2333(a) (but not their claims for secondary liability under §2333(d)) require allegations that Google is responsible for "an act of international terrorism," a term of art defined by §2331(1).

-22-

"International terrorism" has three components: 1) "acts dangerous to human life that are a violation of the criminal laws of the United States" that 2) "*appear* to be intended" to intimidate the general population, influence government policy, or affect government conduct, and 3) "transcend national boundaries in terms of...the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate." *Id.* (emphasis added). Relying on *Boim v. Quranic Literacy Inst. & Holy Land Found.*, 291 F.3d 1000, 1015 (7th Cir. 2002), *Boim v. Holy Land Found.*, 549 F.3d 685, 690 (7th Cir. 2008) (*en banc*), and *Linde v. Arab Bank*, 882 F.3d 314, 325-26 (2d Cir. 2018), plaintiffs argued that mere knowing provision of resources to a terrorist organization satisfies all three components of "international terrorism." (Appellants' Br.50-51). ISIS' *raison d'être* is spreading murder, fear, and hate. Google's support of such an organization certainly 1) is both dangerous and illegal, 2) creates at least the objective suggestion (in the eyes of the public) that the support was intended to further ISIS' objectives of intimidation, influence, and coercion, and 3) mainly does so overseas as ISIS' operatives are (or were) mainly in Syria and Iraq and the people most vulnerable to ISIS are those living nearby.

Google ignores virtually everything plaintiffs said and invents its own doctrine instead. It argues, for example, that "international terrorism" requires a showing of some "specific terrorist purpose" for the defendant's support of the terror organization. (Appellee's Br.50). Google made that up. Congress defined

"international terrorism" carefully. Google's attempt to constrict that definition beyond recognition should be rejected.[8]

Google notes, correctly, that *Linde* vacated a jury verdict because the jury was not properly charged on the distinction between "material support" under §2339B, and "international terrorism" defined by §2331(1). (Appellee's Br.50). But it fails to consider the posture of *Linde*. The fact that *Linde* followed a jury trial was significant. (Appellants' Br.51). It held that, *at trial*, a jury must find that the terms of "international terrorism" have all been met. To do so, the jury must be instructed specifically on each element of that definition. *Linde* held only that because the jury had not been properly instructed, a new trial was necessary. *Linde*, 882 F.3d at 327-28. This appeal, however, arises from a Rule 12(b)(6) motion. Plaintiffs' burden is only to create, through their allegations, the plausible inference that Google's support of ISIS constitutes "international terrorism." Under the circumstances, the mere fact of Google's knowing and long-standing support of ISIS supports that inference.

Google also argues that Seventh Circuit law stands against the plaintiffs, citing *Kemper v. Deutsche Bank*, 911 F.3d 383, 390 (7th Cir. 2018), but conveniently

---

[8] Google also tries to rewrite 18 U.S.C. 2339A, 2339B. Nothing it says adheres to the statutory language or controlling law. Plaintiffs rest on their opening brief (Appellants' Br.49-50) and again invoke *Holder*, 561 U.S. at 30-31, 33, and *Boim*, 291 F.3d at 1012-15.

ignoring the two *Boim* decisions on which plaintiffs rely. (Appellee's Br.50; *see* Appellants' Br.50-51). *Kemper*, far from helping Google, proves plaintiffs' point. *Kemper* involved an ATA suit against Deutsche Bank as a member "in an Iranian conspiracy to commit acts of terror." 911 F.3d at 386. *Kemper* held that because the Iranian beneficiaries of Deutsche Bank's support have "significant legitimate operations," any incidental support it may have given terrorists does not necessarily meet the definition of "international terrorism." *Id.* at 388, 390. It distinguished *Boim* on the ground that *Boim* "dealt with direct donations to a known terrorist organization." *Id.* at 390 Thus, held the Seventh Circuit, when a defendant knowingly gives money or other resources directly to a terrorist, as Google did, *it has committed "international terrorism." See id.*

## IV.    The First Amendment Does Not Support Google

Proposed Amicus Electronic Frontier Foundation ("EFF") suggests this Court should affirm on First Amendment grounds. (DE 30-2). Its arguments lack merit.

### A.    This Court Should Not Consider EFF's Arguments

EFF seeks to expand the scope of this litigation dramatically. Most of its brief pertains to the First Amendment and a body of law never before mentioned by any party or court throughout this litigation. Indeed, EFF admits that the issues it raises were "not presented by either party." (DE 30-1 at 2). Because Google has not asked this Court to address any of EFF's issues, it should not. *First*, this is "a court of

-25-

review, not one of first view." *Shirk v. U.S.*, 773 F.3d 999, 1007 (9th Cir. 2014);

*Haskell v. Harris*, 745 F.3d 1269, 1271 (9th Cir. 2014). *Second*, this Court's practice

is not to consider issues when raised only by *amici*. *Am. Trucking Associations v.

City of Los Angeles*, 559 F.3d 1046, 1053 n.11 (9th Cir. 2009) ("We decline to

consider the amicus brief..., which seeks to raise issues not raised or briefed by the

parties...and order it stricken."). *Third*, EFF's arguments were forfeited by Google's

failure to raise them. *Rangel v. PLS Check Cashers*, 899 F.3d 1106, 1112 n.6 (9th

Cir. 2018); *Shame On You Productions v. Banks*, 893 F.3d 661, 671 (9th Cir. 2018).[9]

## B. This Court Should Not Consider the Constitutionality of the ATA

EFF hardly mentions the ATA. Without analysis or discussion, EFF falsely

asserts that plaintiffs' ATA claims would "hold [Google] liable for hosting user-

generated content discussing or promoting...terrorism." (EFF Br.6). EFF then

erroneously hypothesizes that plaintiffs' claims against Google presume ISIS'

---

[9] EFF's arguments should also be disregarded over its lack of candor with the Court about whom it represents. In its motion for leave to file an *amicus* brief, EFF claimed to have "more than 31,000 contributing members." (DE 30-1 at 1). Yet EFF recently represented to the Second Circuit that it has "more than 37,000 members." *Force v. Facebook*, 2d Cir. No. 18-397, DE 170 p. 1 (Jan. 24, 2019). Both figures appear to be false. EFF's IRS Form 990 for the year ending June 2017 (the most recent publicly-available 990) declares EFF has no "members or stockholders." (DE 35-2 at 6 (part VI question 6)). Caught in this misrepresentation, EFF now says when it earlier claimed to have "more than 31,000 contributing members," it really meant it has 31,000 *donors*. (DE 37 at 2).

speech enjoys no constitutional protection, adding that the only relevant speech that lacks any constitutional protection is speech that incites violence. *Id.* So, EFF erroneously assumes, plaintiffs either seek to hold Google liable for constitutionally protected speech or for incitement. (EFF Br.6-8).

EFF has built a house of cards. In all its construction, it fails to state its underlying assumption: The ATA is unconstitutional. (*See* EFF Br.25).

This Court should avoid EFF's issues, which are unnecessary to resolve this appeal. Since these issues were neither briefed nor considered below and the parties never had a chance to create an appropriate record, this Court likely *cannot* resolve them.

> ### C. Google Is Not Engaged in Expression so No First Amendment Rights Are Implicated

Unsurprisingly, given its CDA arguments, Google asserts it neither created nor developed any of the material at issue. (Appellee's Br.16-24). Having disavowed a creative relationship with that material, Google can assert no First Amendment right to communicate it. *See Rumsfeld v. FAIR*, 547 U.S. 47, 65-66 (2006).

EFF, though, asserts Google is entitled to First Amendment protection as a communicator, engaged in some sort of creative expression. Because Google has claimed otherwise, EFF's position must be disregarded; Google has no constitutionally protected interest.

### D.   The Rights of All "Internet Users" Are Not Implicated

EFF asserts that everyone has a "right to receive...information." It thus claims a right to have Google inform it of controversial matters, such as terrorism. (EFF Br.4, 10-12). EFF is wrong: Even if individuals have a constitutional right to receive information, that right does not extend to create a general right to compel *private* actors (such as Google) to convey information.

Moreover, even if there were such a right to compel private actors to speak, it is not implicated here. Plaintiffs seek a holding that Google is liable under the ATA for its past knowing provision of material resources to ISIS. They do not seek to enjoin Google from communicating with the public or punish it for prior communication.

To the extent EFF is really just asking this Court not to hold Google liable as a matter of *policy*, concerned that a judgment against Google might influence its future actions, Congress has already determined federal policy. U.S. policy is to oppose terrorism and *all* who support it, giving victims of terrorism tools to gain redress against even indirect financial supporters of terrorism. JASTA §2(a)(7); (Appellants' Br. Addendum a10-11). The authority of such victims of terrorism to gain redress against supporters of terrorism is limited *only* by the U.S. constitution. JASTA §2(b); (Appellants' Br.64-65).

### E.    ISIS Has No Protected Speech Rights

This lawsuit does not seek to silence ISIS. It merely vindicates the federal interest in prohibiting Google from providing services to ISIS and facilitating its operations. There is no applicable constitutional prohibition.

Even if so prohibiting Google raised constitutional questions, the supposed constitutional injury is suffered by ISIS, not Google (and certainly not EFF). ISIS is not a party. It is a designated terrorist organization that has murdered and maimed many innocent people (102-13), including Nohemi Gonzalez. (158-62). If ISIS desires to assert any rights it may have, it can come to court and do so.

Even if ISIS were here, the notion that its rights are threatened would have to be rejected. *First*, nearly all the material complained of involves true threats or incitement to violence, which, as EFF admits, are not constitutionally protected. (EFF Br.6). *Second*, nothing in the record suggests that ISIS or any of its terrorists are U.S. nationals or residents entitled to constitutional speech protections.

### F.    The First Amendment Creates No Right to Materially Support Terrorists

The Supreme Court has already answered EFF's essential question. It upheld 18 U.S.C. 2339B, one of the material support provisions at issue, against a constitutional speech challenge. *Holder*, 561 U.S. at 25-39. It specifically noted that §2339B criminalized as "material support" certain forms of speech. *Id.* at 26. The

statute did so with great precision: "Congress and the Executive are uniquely positioned to make principled distinctions between activities that will further terrorist conduct and undermine [U.S.] foreign policy, and those that will not." *Id.* at 35. Congress carefully crafted the provisions to limit deprivation of constitutional rights as much as possible. The Court identified several examples, noting that §2339B is limited to federally designated foreign terrorist organizations, which have the right to "seek judicial review of the designation." *Id.* And "Congress has...displayed a careful balancing of interests in creating limited exceptions to the ban on material support." *Id.* at 36. "Finally, and most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups." *Id.* In short, "the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id.* at 26.

Consider what supporters of ISIS' terrorism *may* do under the ATA: They "may say anything they wish on any topic," including on YouTube. *Id.* at 25-26. "They may speak and write freely about [ISIS], the Government[] of [France], human rights, and international law." *Id.* They may even advocate in support of ISIS and terrorism. *Id.* at 31-32. Mere speech, if not in the form of expert advice or assistance with logistics, is likely not provision of material support.

-30-

While Congress did not generally prohibit speech about terrorism, it did prohibit speech knowingly made for or in coordination with terrorists. *Id.* at 26. *Holder* upheld that prohibition while acknowledging that it involved content-based restrictions on speech. Without expressly adopting any particular standard of review, the Court implicitly upheld those restrictions under strict scrutiny. *Id.* at 28 (noting "the Government's interest in combating terrorism is an urgent objective of the highest order"); *id.* at 26, 35-36 (explaining that Congress' work was adequately narrowly tailored).

This case is easier than *Holder*. It does not involve prohibitions of speech *about* terrorism. It involves prohibitions on speech *by* terrorists. The reproduction of any speech (regardless of content) by ISIS in the furtherance of its mission is prohibited under the ATA if that reproduction constitutes a "service" to, and thus "material support" of, ISIS. 18 U.S.C. 2339A(b). The content of any specific message is important here only for assessing proximate causation. But the underlying prohibition ("international terrorism" (§2333(a)) does not depend on content. *Holder*, which authorized even content-based restrictions on similar speech, forecloses EFF's arguments in this content-neutral context.

Google's targeted reproduction of ISIS' messages on ISIS' behalf facilitates ISIS' internal and external communications in real time, ensuring its messages reach their intended targets rapidly and inexpensively—sometimes even for *profit*. It is an

-31-

exceptionally valuable "service," essential to ISIS' operations, and thus violates the ATA. The First Amendment does not dictate otherwise.

## V.    The CDA Does Not Support Google

### A.    *HomeAway.com* Forecloses Google's Assertion That Plaintiffs' Claims Treat It as a "Publisher"

Plaintiffs do ***not*** assert Google's "responsib[ility] for the...consequences of videos that ISIS...posted on YouTube." (*Contra* Appellee's Br.2). They do not even "seek to hold Google liable for material that third parties posted on YouTube." (*Contra id.* at 3). Nor do they assert that the ATA imposes on Google a general duty to monitor the content of YouTube. (*Contra id.* at 2, 7).[10] Rather, Google's liability arises from *its* violations of the ATA, which prohibits Google from knowingly providing support to terrorists, even indirectly. Google's illegal support came partially through its revenue sharing schemes, in which <u>it paid money directly</u>

---

[10] Google adulterates the complaint. Relying on ¶¶491-93, it casts the complaint as alleging "failure to undertake more stringent control over the content that users upload[]" to YouTube. (Appellee's Br.7). That is bizarre considering that the complaint—both there and elsewhere—and opening brief say otherwise. The cited paragraphs of the complaint allege that Google "refused to actively monitor [YouTube]" and, *instead*, "knowingly permitted ISIS and ISIS's members and affiliates to use [YouTube]." (174). It adds that even where Google "received complaints about ISIS's use of [YouTube]," that is, where it had actual knowledge, Google refused to act. *Id.* And where Google did act to suspend or block an ISIS account, it did nothing to prevent ISIS from re-establishing that account. (175). Recasting those allegations as simply "failure to monitor" is irresponsible.

to ISIS, an activity having *nothing* to do with the content of any ISIS material. Even regarding Google's support that directly involves ISIS material on YouTube, the content of that material does not affect Google's obligations under the ATA. The ATA prohibits Google from giving ISIS a forum, no matter how ISIS ultimately uses that forum. By knowingly allowing ISIS and its operatives to use YouTube as a forum to communicate with others (and to do a great deal more as well), on *any topic*, Google violated its obligations under the ATA.

All this was exceedingly clear when plaintiffs filed their opening brief. *See*, *e.g.*, *Internet Brands*, 824 F.3d at 851-53. The CDA's protections extended only as to claims that attribute language uttered by third-parties to a defendant as though the defendant had itself articulated the tortious language. The CDA does not protect defendants whose own alleged actions are criminal. *Id.*; *J.S. v. Village Voice*, 359 P.3d 714, 722-23 (Wash. 2015) (Wiggins, *J.*, concurring) (citing cases, including *Roommates.com*); (Appellants' Br.61-63).

A month later, but still before Google filed its answering brief, this Court removed any remaining doubt:

> We do not read *Internet Brands* to suggest that CDA immunity attaches any time a legal duty might lead a company to respond with monitoring or other publication activities. It is not enough that third-party content is involved; *Internet Brands* rejected use of a "but-for" test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content. *Id.* at 853. We look instead to what the duty at issue actually requires:

specifically, whether the duty would *necessarily* require an internet company to monitor third-party content. *See id.* at 851, 853.

*HomeAway.com*, 918 F.3d at 682 (emphasis added). A bit later:

> The text of the CDA is "clear that neither this subsection nor any other declares a general immunity from liability deriving from third-party content." *Barnes*, 570 F.3d at 1100. To provide broad immunity "every time a website uses data initially obtained from third parties would eviscerate [the CDA]." *Barnes*, 570 F.3d at 1100 (quoting *Roommates.com*, 521 F.3d at 1171 (9th Cir. 2008) (en banc)). That is not the result that Congress intended.

*Id.* Rather, the CDA's defense turns on what the duty asserted by the plaintiff actually requires of the defendant. *Id.* at 682-83. Whether the duty asserted by the plaintiff might, as a practical matter, require the defendant to remove third-party content from its platform is *irrelevant. Id.* The only pertinent question is whether the duty asserted is itself an obligation to remove that third-party content. If (as here) that duty—the legal obligation the defendant violated—does not "proscribe, mandate, or even discuss" that third-party content, §230(c) does not exempt the defendant. *Id.* Interpreting §230(c) differently would have it "create a lawless no-man's-land on the Internet." *Id.*[11]

---

[11] Google wrongly conflates duty and causation. It argues that because plaintiffs need to look to ISIS content to prove causation, the CDA excuses Google's conduct. (Appellee's Br.27-28). That gets the inquiry backwards, as *HomeAway.com* holds. The inquiry is not whether the claim or an element of it demands reference to third-party content. The inquiry is whether the **duty** that Google violated attributes

The Fourth Circuit recently followed suit, holding Amazon.com unprotected by the CDA for claims related to third-party content on its website. It explained:

> The products liability claims asserted by Erie in this case are not based on the publication of another's speech. The underpinning of Erie's claims is its contention that Amazon was the *seller* of the headlamp and therefore was liable as the seller of a defective product. There is no claim made based on the *content of speech published* by Amazon — such as a claim that Amazon had liability as the publisher of a misrepresentation of the product or of defamatory content. While the Communications Decency Act protects interactive computer service providers from liability *as a publisher of speech*, it does not protect them from liability as the seller of a defective product.

*Erie Ins. v. Amazon.com*, 2019 WL 2195146 at *3 (4th Cir. May 22, 2019) (emphasis in original) (internal citations omitted).

This Court, like so many others, rightly "eschew[s] an expansive reading of [§230(c)] that would render unlawful conduct 'magically...lawful when [conducted] online,'" opting instead to "hew[] closely to the statutory language" and its objective, as reflected by its title: "'Protection for '[G]ood Samaritan' blocking and screening of offensive material.'" *HomeAway.com*, 918 F.3d at 683-84.

---

content to Google or imposes on it a monitoring requirement. The duties imposed by the ATA do neither.

## B. Google Is a Content "Creator" and "Developer"

Plaintiffs explained why the content on YouTube is largely "creat[ed] or develop[ed]" by Google, at least "in part," making Google an "information content provider" excluded from §230(c)(1)'s defense. §230(c)(1) & (f)(3); (Appellants' Br.55-60). Rather than respond, Google cherry-picks quotes it likes, ignores or misrepresents those it does not,[12] and attacks a strawman.[13] For example, Google asserts that plaintiffs "do not argue" that Google "do[es] anything to enhance the unlawfulness of ISIS *videos*." (Appellee's Br.17) (emphasis added). That is technically true, but irrelevant and misleading. Plaintiffs explained how Google "contributes materially to the alleged illegality" of ISIS's *postings* on YouTube, and is thus a developer of content. (Appellants' Br.58-60). Plaintiffs do not claim that Google doctored ISIS's material. But Google used and presented that material in ways that "contribute[] materially" to violations of the ATA. *Id.* Nothing more is required.

---

[12] For example, Google asserts that plaintiffs "do not...allege that Google encourages the posting of terrorist or other illegal content." (Appellee's Br.22). Yet the complaint contains many allegations that support this plausible inference. (178-86).

[13] Google also questions whether plaintiffs' factual assertions are adequate. But plaintiffs need not plead around affirmative defenses. (Appellants' Br.39-40). If Google believes the facts are inadequate to defeat its CDA defense, it can move for summary judgment after discovery.

Google hopes to escape liability as a developer of content by citing *Kimzey v. Yelp!*, 836 F.3d 1263 (9th Cir. 2016), for the proposition that "the way a website operator arranges and displays third-party information does not make it a creator or developer of that material." (Appellee's Br.19, 24). Google misrepresents *Kimzey*, which is inapposite. *Kimzey* held that Yelp's use of a star-rating system, "which is based on rating inputs from third parties and...reduces [those inputs] into a single, aggregate metric," is merely "user-generated data" being presented in a slightly different form. *Kimzey*, 836 F.3d at 1270. Yelp's mere restatement or reorganization of that third-party data is obviously not "development" of it.

But "steer[ing] users" to particular information or people and "encourage[ing] illegal content" or activity both constitute "development" under §230. *Roommates.com*, 521 F.3d at 1167, 1171, 1174-75; *Village Voice*, 359 P.3d at 717-18 (*en banc*) (holding website designed to facilitate routine violations of statute unprotected by the CDA). Likewise, active *use* (not mere recapitulation, as in *Kimzey*) of third-party illegal content in the course of business is "development." *Roommates.com*, 521 F.3d at 1172. So too "inducing another to post, or otherwise actively participating" in the process. *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016). *Huon* found the Internet provider's intention to "monetize" the offending content, delighting its advertisers, a pertinent consideration in assessing the

plausibility of allegations of inducement. *Id.* Google has done all this and a lot more. (Appellants' Br.58-60).

Google virtually ignores plaintiffs' argument that Google is a "creat[or]" of content, relegating its response to a single footnote. Google asserts that plaintiffs' argument "makes no sense" because "content 'creation' is straightforward and rarely in dispute: the creator of the information is the person who authored it." (Appellee's Br.19). Again, Google has not responded. Plaintiffs argued that although Google did not create the ISIS material itself, Google created "the mosaic in which it is presented." (Appellants' Br.56). They explained:

> A mosaic is the creation of the artist who assembled it, despite that the artist created neither the stones, nor the color they display, nor the grout adhering them. Rather, he takes objects fully formed before coming into his possession and simply arranges them.

*Id.* Google might be history's most effective creator of mosaics. ISIS' material, in its raw state, is worth relatively little. (*See* 102-09, 125) (describing ISIS's Internet platform pre-YouTube). By arranging and presenting that material, together with other material Google supplies, Google makes the resulting product tremendously valuable—both to ISIS and to Google—enabling ISIS to reach global influence in ways previously unimaginable. (114-35). Along the way, Google constructed something that did not exist previously. That certainly is "content creation," defined as "straightforward[ly]" as can be.

-38-

* * *

Google admits, reluctantly in a footnote buried at the end of its discussion on the CDA, that an ISIS operative may be held liable for posting the directions of an ISIS commander on YouTube. (Appellee's Br.40; Appellants' Br.69-70). It thus knows that context matters. Posting third-party content can be grounds for liability, despite the CDA, even if the defendant did not alter the posted content. The mere fact that the defendant gives the post a forum, if (as here) doing so is illegal, can *itself* constitute creation or development. Having made that admission, Google's request for different rules should not be entertained.

### C. The CDA's Purpose Is to Facilitate Removal of Offensive Content, Not to Protect Internet Speech

Plaintiffs showed in their opening brief (Appellants' Br.20-24, 34-39) and above (on extraterritoriality) that the purpose of the CDA was to "Empower[]" (Appellants' Br. Addendum a6) families and providers of Internet services to make the Internet "Decen[t]." (*Id.* at a2); *see also Internet Brands*, 824 F.3d at 851-52. Much of Google's argument turns on erroneous assertions about the CDA's purpose, so plaintiffs incorporate that discussion again here.

Language in §230(a), reflecting Congress' findings on several topics about Internet use, does not suggest a different purpose for the CDA generally or §230 specifically. Congress, in enacting significant legislation governing communication

on the Internet, articulated germane findings, as it often does, without intending those findings to communicate legislative purpose. Subsection 230(b) takes those findings a step further by articulating federal policy. But even there, Congress does not articulate a "focus" or a "purpose" for the CDA or §230. While Congress made findings and articulated policy about "the continued development of the Internet" and "the vibrant and competitive free market that presently exists for the Internet," it did so merely to set the stage for the specific method Congress used to achieve its broader objective of cleaning up the Internet. Through §230(c), Congress engages the private sector by enabling it to act toward the CDA's objectives. Subsections 230(a) and (b) justify and explain Congress' rationale for choosing the particular method in §230(c).

Other clauses within §230(b) reveal that Congress had a lot more on its mind than protecting Internet speech. For example, it is federal policy "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." §230(b)(4). That statement and others like it have nothing to do with the broad speech protections Google says §230 embodies.

This Court's cases do not hold otherwise. Some place much emphasis—perhaps undue emphasis—on isolated clauses in §230(b), but none of them goes so

far as to speculate that the purpose of §230 or the CDA was to do anything besides regulate Internet content.

### D.   If the CDA and ATA Conflict, the ATA Controls

The parties agree that the CDA and ATA can be, and thus *should* be, harmonized. They disagree only on how. If this Court disagrees with both sides and finds the CDA and ATA in conflict, the ATA must control. Plaintiffs articulated five distinct reasons for that conclusion. (Appellants' Br.63-69). Google fails to address any of them adequately. (Appellee's Br.32-38). We address each point in the order they appear in the opening brief:

1.   Section 230(c)(1) does not apply to "impair the enforcement of...any...Federal criminal statute." §230(e)(1). The ATA is intended to aid the enforcement of federal criminal statutes, such as 18 U.S.C. §§2339A, 2339B. *See Linde v. Arab Bank*, 706 F.3d 92, 112 (2d Cir. 2013); Statement of Alan Kreczko on S.2465, Before Subcommittee on Courts (July 25, 1990), https://www.state.gov/documents/organization/28458.pdf. Thus, if §230(c)(1) would require dismissal of an ATA case, it would improperly impair the enforcement of the related criminal statutes. (Appellants' Br.19, 63).

Google retorts that it is "well settled" that §230(e)(1)'s limitation applies "only to criminal prosecutions." (Appellees' Br.32). The next lines of its brief prove otherwise; Google cites three district court opinions from outside this Circuit and

just one appellate opinion, *Doe v. Backpage.com*, 817 F.3d 12 (1st Cir. 2016). (Appellee's Br.32-33). Google fails to mention that Congress abrogated *Backpage.com* with the Trafficking Act of 2017.[14] Three district court opinions from around the country "settle" nothing and a single, poorly reasoned and abrogated opinion of another Circuit hardly forecloses more inquiry.

While *Backpage.com* did find the "plain-language reading" of §230(e)(1) to "exclude[] civil suits," 817 F.3d at 23, its conclusion is wrong, as we explain immediately below. In any event, *Backpage.com* is easily distinguishable because the plaintiffs there presented no evidence that *Congress* intended the underlying tort to aid in the enforcement of related criminal provisions. (The subsequently enacted Trafficking Act of 2017 so intended, but it was not the statute at issue in *Backpage.com*.) Here, plaintiffs presented considerable evidence that Congress intended the ATA to aid in the enforcement of related criminal counterterrorism laws. (Appellants' Br.19-20, 63). *Backpage.com's* conclusions about a different statute have nothing to do with this case.

The "plain-language reading" of "enforcement" is "[t]he act or process of compelling compliance with a law...." Black's Law Dictionary, *enforcement* (10th ed. 2014). Nothing in the CDA's phrase "enforcement of...any...Federal criminal

---

[14] Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. 115-164, 132 Stat 1253 ("Trafficking Act of 2017").

statute" implies that this sort of "enforcement" is limited to criminal prosecutions. Indeed, the entire paragraph in which that phrase appears reveals that "enforcement" is *not* limited to criminal prosecutions:

> Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

§230(e)(1). If "enforcement" meant only criminal prosecution, the specific statutory references (*e.g.*, "section 223") would be superfluous. It would have been enough to state that the CDA does not "impair the enforcement of any Federal criminal statute." Inclusion of specific examples makes sense only if "enforcement" is read more broadly and the specific examples are meant to include forms of *civil* litigation excluded from the CDA's reach. That was indeed Congress' intent in passing the Trafficking Act of 2017, the express purpose of which is to "*clarify* that section 230...does not prohibit the *enforcement* of [certain] Federal and State criminal *and civil* law...." *Id.* (emphasis added). Its legislative history bemoans that §230 "has complicated enforcement" of anti-trafficking laws, noting "civil litigation" against Backpage.com as the prime example. H.R.Rep. 115-572 at 4 (2018).

Following *Backpage.com's* dubious lead, Google asserts that "enforcement" means only the work of "federal prosecutors, not...private plaintiffs." (Appellee's Br.33). Google once again ignores the statutory text. There is no basis to conclude

that "enforcement," as used in §230(e)(1), means only one particular type of enforcement.

2.    JASTA's plain text reveals Congress' intent to supersede all contrary statutes to the extent of any conflict. (Appellants' Br.64-65). Google misstates this argument, pretending it to be an argument that JASTA *repealed* the CDA, and attacks that strawman. (Appellee's Br.34-35). It thus failed to respond.

Congress often provides rules of construction signifying that one statute or group of statues will trump contrary statutes. For example, Congress directed that "[n]otwithstanding any other provision of Federal...law, no elected official of the legislative branch...shall be required to serve on a grand or petit jury...." 2 U.S.C. 30a(a). That provision does not *repeal* every federal statute compelling jury service. It merely creates an exception, revealing that the quoted provision trumps any contrary provision elsewhere, without naming each one specifically. So too here: JASTA, reflects Congress' intent that JASTA gets primary treatment over other statutes, including the CDA. (Appellants' Br.65). That Congress did not use the word "notwithstanding" changes nothing.[15]

---

[15] Google strains to find in JASTA §3 proof that Congress did not intend JASTA §2 to supersede contrary law. It analogizes to JASTA's amendment of the Foreign Sovereign Immunities Act, noting that JASTA §3 expressly abrogates foreign sovereign immunity while JASTA §2 does not expressly abrogate CDA "immunity." (Appellee's Br.36). This argument fails thrice: *First*, the CDA does not create immunity. *Barnes*, 570 F.3d at 1100; *StubHub!*, 624 F.3d at 366. *Second*, Congress

Google's only other response is denigrating this enacted *statutory* language as a mere "prefatory clause" or "preamble." (Appellee's Br.35). Plaintiffs explained in detail why it is not: Any language appearing after the enacting clause (such as the relevant language from JASTA) is binding law. (Appellants' Br.65). Google ignores this indisputable rule.

3.  Many court opinions discussing §230(c)(1) bear no relation to the statute's text or legislative history. When facing a conflict between those judicial pronouncements not rooted in §230's text or history and the ATA (or any other statute), this Court should default back to §230's statutory text. Common law expansions of §230(c)(1)'s reach, even if valid in other contexts, cannot trump the express statutory text of the ATA. (Appellants' Br.66) (citing cases).

---

unsurprisingly made no express reference to the CDA when it enacted JASTA. Congress was discussing the ATA, not the CDA. To the best of plaintiffs' knowledge, when JASTA was passed in 2016, no court had *ever* found that the ATA must yield to the CDA, so Congress had no reason to mention the CDA. Indeed, Congress deliberately used broad language to avoid Google's suggestion that omission of any particular statute (such as the CDA) is evidence of intent to exclude that statute from JASTA's reach. *Third*, JASTA §3 had to abrogate foreign sovereign immunity expressly. Foreign sovereigns have no rights under the Constitution and thus would not have benefited from the constitutional limitation in JASTA §2 (*see* Appellants' Br.64). Additionally, 28 U.S.C. 1604 provides a default rule that JASTA §3 needed to address: "[A] foreign state shall be immune from the jurisdiction of the courts...except as provided in sections 1605 to 1607 of this chapter." Thus, Congress had to enact language expressly overcoming that default rule of immunity. It faced no similar limitation in writing JASTA §2.

-45-

Google dismisses this common sense argument, rooted in Supreme Court precedent. (Appellee's Br.38). It suggests plaintiffs seek to have the Court disregard its prior opinions in *Barnes* and *Roommates.com*. *Id.* Not so. Those opinions are indeed rooted in "careful exegesis of the statutory language." *Id.* Neither places the CDA in conflict with the ATA.

The "common law expansions of §230" to which plaintiffs object are those finding in §230(c)(1)—a statute that merely defines the terms "publisher" and "speaker," *Barnes*, 570 F.3d at 1000—a general exemption from tort law. Those broad pronouncements have no basis in the CDA's text or history. They must not be followed, at least when doing so places the "CDA" in conflict with statutory language elsewhere, such as in the ATA.

4.      If the Court rejects those methods of resolving any conflict between the ATA and CDA, it should default to the later-enacted and more specific statute, the ATA. (Appellants' Br.66-68).

Again, Google pretends this argument asserts a limited *repeal* of the CDA. (Appellee's Br.36-38). Indeed, its only case on this point, *Hui v. Castaneda*, 559 U.S. 799, 810 (2010), is about the implied repeal by one statute of another. This too is a strawman.

-46-

Rather, this point is a rule of statutory construction by which conflicting statutes are reconciled. Under that rule of construction, specific statutes and later-enacted statutes are favored. (Appellants' Br.66-67).

Google first concedes that the CDA is the "more comprehensive" (that is, more *general*) statute. It later unpersuasively tries to backtrack, suggesting that it is "equally plausible to argue that [the ATA][16] is the more general statute" because it "generally authorizes secondary liability claims" while the CDA "covers only the specific category of claims against online services arising from third-party content." (Appellee's Br.37).

But the CDA covers most Internet postings. Today, over 70% of small businesses have a website and nearly every American spends many hours a day on the Internet. "Intermediary platforms" such as YouTube "are often the primary way...the majority of people engage...online." (EFF Br.14, 20-22). The CDA is pervasive. *Id.* The ATA, in contrast, covers claims by international terrorism victims who suffer personal injury or property damage and their "estates, survivors, or heirs." §2333(a). It permits claims only against terrorists and their supporters. *See id.* The ATA's reach is narrower and more focused than the CDA's.

---

[16] Google inexplicably references "JASTA," not the ATA (Appellee's Br.37), despite that the relevant section of the opening brief references the ATA. (Appellants' Br.66-68).

5.      Finally, if the Court rejects all these approaches to resolving any conflict between the ATA and CDA, deeming it impossible to honor both statutes, it will have no choice but to deem the later-enacted statute to have partially repealed the earlier-enacted one. (Appellants' Br.68-69). Google apparently agrees.

## CONCLUSION

For these reasons and those in the opening brief, the opinion of the court below should be reversed and this case remanded.

Dated: Baltimore, Maryland
     May 28, 2019

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
 *Attorneys for The Estate of Nohemi Gonzalez,*
 *Beatriz Gonzalez, Individually and as*
 *Administrator of the Estate of Nohemi Gonzalez,*
 *Jose Hernandez, Rey Gonzalez and Paul Gonzalez*

by:   /s/ Meir Katz
     Meir Katz
Robert J. Tolchin, Esq.
Meir Katz, Esq.
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
RTolchin@berkmanlaw.com
MKatz@berkmanlaw.com

EXCOLO LAW
 *Attorneys for Reynaldo Gonzalez*

by:   /s/ Keith L. Altman
     Keith L. Altman
Keith L. Altman, Esq.
Daniel W. Weininger, Esq.
26700 Lahser Road, Suite 401
Southfield, Michigan 48033
(516) 456-5885
KAltman@excololaw.com

-49-

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 18-16700

I am the attorney or self-represented party.

**This brief contains** | 10,865 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　○ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　　　　].

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Meir Katz | **Date** | 5/28/2019
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/2018*